UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEW YORK LEGAL ASSISTANCE
GROUP,

                    Plaintiff,

          v.

ELISABETH DeVOS, in her official capacity
as Secretary of Education, and UNITED
STATES DEPARTMENT OF EDUCATION,

                    Defendants.

No. 20 Civ.1414

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Over the past decade, information has come to light showing numerous instances in which for-profit colleges and universities misled and deceived vulnerable students, encouraging them to take out federal student loans to attend programs that provided minimal educational value. Many of these schools closed when the scope of their misdeeds was revealed, and students were left holding the bag—sometimes tens of thousands of dollars in federal student loan debt, borrowed in exchange for worthless educational experiences. Hundreds of thousands of borrowers have since sought relief from the United States Department of Education (ED) pursuant to the "borrower defense to repayment" and "closed school discharge" provisions of the Higher Education Act (HEA), under existing ED regulations and the loan contracts. According to one study, 99 percent of these requests for relief concerned for-profit schools.

2.      The large number of students asserting that their school defrauded them or closed without warning demonstrated that ED's regulations and methods of ensuring "institutional accountability" were insufficient to protect student borrowers and tax dollars. Accordingly, in

2016, ED amended its regulations, imposing new conditions on schools receiving federal student loan dollars and altering the processes for asserting borrower defenses and closed school discharges. The regulations aimed to forestall the impending student debt crises caused by predatory institutions, protect students who were harmed, and hold the institutions that profited off of vulnerable students responsible. *See* ED, Final Rule, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75,926 (Nov. 1, 2016) (2016 Rule). The 2016 Rule sought to protect student borrowers and federal taxpayers by strengthening mechanisms for borrowers who were misled, deceived, and defrauded by their schools to obtain relief from federal student loans and disincentivizing schools' financially risky and misleading practices.

3.      In 2017, in response to pressure from the for-profit college industry, ED unlawfully delayed implementation of the 2016 Rule—three times—in an attempt to keep the 2016 Rule from going into effect. Those efforts were eventually invalidated by a federal district court. *Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) (*Bauer I*).

4.      While the unlawful delay was in effect, ED commenced a negotiated rulemaking— as is required before ED can issue proposed regulations under the HEA. During that negotiated rulemaking, ED treated the 2016 Rule as if it had already been rescinded, and refused to allow discussion of some of the provisions included in that Rule as options for the new rulemaking. ED also declined to discuss its position on various aspects of its rulemaking proposals, citing "pending litigation." ED thus denied the negotiators a meaningful opportunity to participate in the rulemaking process.

5.      After the negotiation sessions, ED issued a notice of proposed rulemaking (NPRM), in which ED used the pre-2016 regulations as a starting point and failed to treat the 2016 Rule as the current law.

6.      After the close of comments on the NPRM, a federal court held that ED's delays of the 2016 Rule were unlawful because the delays were procedurally flawed and arbitrary and capricious. *See Bauer I*, 325 F. Supp. 3d 74. The court ordered the 2016 Rule to go into effect. *See Bauer v. DeVos*, 332 F. Supp. 3d 181 (D.D.C. 2018) (*Bauer II*).

7.      Nearly a year after the 2016 Rule went into effect, and more than a year after the comment period closed, ED issued a new final rule that rescinded many of the most borrower (and taxpayer) friendly provisions of the 2016 Rule. *See* ED, Final Rule, Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49,788 (Sept. 23, 2019) (2019 Rule).

8.      Even though the 2017–2018 negotiated rulemaking, proposed rule, and comments were all premised on the notion that the 2016 Rule had been rescinded and/or would never go into effect, ED issued the 2019 Rule without conducting a new negotiated rulemaking and without re-opening the comment period after the 2016 Rule went into effect. In the final Rule, ED asserted that it relied on its experience implementing the 2016 Rule, but the public had no ability to comment on the impacts of the 2016 Rule after it went into effect.

9.      In the 2019 Rule, ED greatly relaxed the safeguards put in place in 2016, despite mountains of evidence of the harm that unscrupulous schools had caused student borrowers and federal taxpayers. ED shifted the burden to students to become "informed consumers," essentially blaming the victims of fraud for being defrauded. At the same time, ED imposed herculean standards for obtaining borrower defense relief, adding both procedural and substantive hurdles

for students. It eliminated provisions of the 2016 Rule that conditioned participation in the federal student loan program on allowing students access to judicial remedies and the ability to proceed as a class. It imposed a short statute of limitations on the ability to assert borrower defenses, even when defending against collection proceedings, although this restriction was not suggested in the NPRM.

10.     The 2019 Rule creates a standard for borrower defense that will be nearly impossible for students to meet. The application process it creates is extremely burdensome and difficult for the average student borrower to navigate on his or her own; the Rule imposes a tougher standard for relief and requires borrowers to submit more evidence. Students will no longer be able to assert claims on a group basis, and they will be less likely to be able to proceed in class actions. Therefore, those who assist students, both in navigating the administrative process and in formal representation, will be required to spend more time and resources assisting each student, and more students will need their assistance.

11.     Throughout the 2019 Rule, ED embraced positions and reasoning that run contrary to both logic and the experience of student borrowers, as demonstrated by a wealth of data and comments submitted in opposition to its proposals. ED justified its action by repeatedly citing a supposed problem of thousands of frivolous claims that cost federal taxpayers money, yet nowhere in the Rule did ED cite evidence of a single frivolous claim that was approved under the existing, or any earlier, standard. ED simply stated that it had received a large number of unsubstantiated claims in the past, without providing any explanation, let alone a rational one, as to how the fact that many students did not qualify under a lower standard justified *raising* the standard so that more students' claims would be rejected.

12.     ED justified making it more difficult for students to obtain relief by citing the burden that large numbers of claims imposed on the agency. ED failed to account, though, for the fact that a good faith evaluation of applications under the new standard would be far more burdensome for ED staff on an application by application basis.

13.     Although ED repeatedly asserted that the need to invoke the borrower defense process would be eliminated if students simply became more informed, evidence in the record shows that this assertion is not true. At the same time, the assertion is inconsistent with ED's elimination of numerous provisions of the 2016 Rule that ensured students were provided with sufficient information to make informed decisions before incurring student loan debt.

14.     ED also made changes to the process by which student borrowers whose schools closed while they were enrolled, leaving them with worthless credits, could receive discharges of their federal student loan debt. ED eliminated the process by which discharges would be granted automatically, and it removed basic disclosure provisions that would make students aware of the availability of and process for obtaining closed school discharges. It did so without recognizing that the cumulative effect of these changes is to make it much more likely that students who are entitled to relief by statute are unaware of, and for that reason do not obtain, the relief to which they are entitled.

15.     Plaintiff New York Legal Assistance Group (NYLAG), a nonprofit organization that assists student borrowers, will be required to divert resources to assist student borrowers in navigating the increasingly complicated bureaucratic process created by ED. Plaintiff will also be required to divert resources to provide students with the information that the 2016 Rule either mandated schools provide themselves, or obviated the need for.  ED recognized this in the 2019 Rule: as ED eliminated requirements that would help make students "informed consumers," ED

explicitly foisted the responsibility on student advocacy groups to "help student [*sic*] become wise consumers on the front end." 2019 Rule, 84 Fed. Reg. at 49,818.

16.     Throughout the 2019 Rule, ED assumed, without citing evidence, that student borrowers act in bad faith, file frivolous claims, and otherwise seek to take advantage of the borrower defense and closed school discharge system. This position is unsupported by the record, which shows that it is institutions that have harmed students and federal taxpayers, and acted irresponsibly and caused the massive influx of borrower relief claims to ED. ED's abdication of its duty to students and taxpayers, favoring the interests of industry, is arbitrary and capricious.

17.     ED failed to comply with the procedures required by law (1) by failing to recognize the 2016 Rule's current status or allowing discussion of its elements in the negotiated rulemaking, (2) by failing to conduct new negotiated rulemaking and notice-and-comment procedures after the 2016 Rule went into effect, and (3) by unpredictably departing from the NPRM with respect to the statute of limitations for defensive claims. In addition, the 2019 Rule's inconsistencies, unsupported conclusions, and unexplained reversals reflect arbitrary and capricious decisionmaking. Accordingly, the Court should vacate the 2019 Rule in its entirety pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 706(2).

## JURISDICTION AND VENUE

18.     This Court has jurisdiction under 28 U.S.C. § 1331.

19.     Venue is proper in this district as Plaintiff resides here. 28 U.S.C. § 1391(c)(2), (e)(1).

## PARTIES

20.     Plaintiff New York Legal Assistance Group (NYLAG) is a nonprofit organization in New York City that provides a variety of free services to low-income New Yorkers in the areas

of immigration, government benefits, family law, disability rights, housing law, special education, and consumer debt, among others. These services include free legal services, financial counseling, and community education and partnerships.

21.     NYLAG provides a number of services to student loan borrowers who are seeking relief from their debt. NYLAG financial counselors, who are not lawyers, provide information and guidance about a variety of debt relief programs. They assist borrowers who are seeking closed school discharges pursuant to 20 U.S.C. § 1087(c), and asserting a defense to repayment ("borrower defense") pursuant to 20 U.S.C. § 1087e(h). Staff attorneys and paralegals in NYLAG's Consumer Protection Unit and Special Litigation Unit also provide advice and assistance to borrowers seeking closed school discharges and borrower defense relief, and provide legal representation to some borrowers in these processes. NYLAG attorneys have written a guide to assist borrowers who are navigating the Borrower Defense process pro se. NYLAG operates a hotline for students seeking information and assistance related to for-profit schools and has a dedicated email address for students who attend or attended such schools and believe they were misled or defrauded.

22.     The 2019 Rule will frustrate NYLAG's mission of ensuring fair and equal access to justice for those who need it most and assisting individuals and communities in eliminating threats to their economic stability and safety. In addition, because the 2019 Rule creates more complicated, burdensome application processes for both closed school discharges and borrower defense relief, more student borrowers in NYLAG's service area will seek NYLAG's assistance, requiring it to divert additional resources to assist student borrowers. Moreover, the 2019 Rule necessitates that each student will require more in-depth assistance from NYLAG staff, requiring more dedicated staff time. *See, e.g.*, 84 Fed. Reg. at 49,828 (explaining that students do not need

"paid legal counsel" to seek relief under new rule, because "students may seek help from legal aid clinics or take advantage of services from numerous student advocacy groups in submitting a borrower defense to repayment application"). Unlike current regulations, which allow NYLAG to file claims on behalf of a group of similarly situated student borrowers, the 2019 Rule does not allow group claims and will require NYLAG to duplicate its work for each student served.

23.     Defendant Elisabeth DeVos is the Secretary of Education and charged with the supervision and management of all decisions and actions within the U.S. Department of Education. Plaintiffs sue Secretary DeVos in her official capacity.

24.     Defendant U.S. Department of Education is an agency of the United States within the meaning of the APA. It is responsible for overseeing and adopting implementing regulations for Title IV of the Higher Education Act, 20 U.S.C. § 1070 *et seq.*, including the Federal Direct Loan Program.

## FACTS

### The Higher Education Act

25.     Title IV of the Higher Education Act (HEA), 20 U.S.C. § 1070 *et seq.*, as amended, establishes the largest stream of federal postsecondary student aid, accounting for more than $120 billion distributed in fiscal year 2019. *See* ED, Federal Student Aid, *FY 2019 Annual Report*, Nov. 15, 2019, https://studentaid.ed.gov/sa/sites/default/files/FY_2019_Federal_Student_Aid_Annual_ Report_Final_V2.pdf. The majority of funds available under Title IV are distributed through the Federal Direct Loan Program. Students use Direct Loans to attend colleges, career training programs, and graduate schools authorized to participate in the program. The Department requires that all schools that receive Title IV aid enter into a "Program Participation Agreement" with the Department. *See* 20 U.S.C. § 1094; 34 C.F.R. § 668.14(a). When the school enters such an

agreement, it agrees that it will "comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under the statutory authority," and applicable state laws in its administration of its program and in its dealings with students. *See* 34 C.F.R. § 668.14(b).

26.     If a school violates its contractual obligations, the Secretary has discretion to take corrective action. For instance, the Secretary may fine the school, suspend the program participation agreement, or terminate the school's participation agreement in Title IV.

27.     Both for-profit colleges and not-for-profit colleges can receive federal student aid. As the name implies, for-profit colleges are operated as businesses that seek to maximize revenue and minimize costs in order to profit or increase share prices for owners and investors. In contrast, non-profits are required to reinvest all net earnings in service of their educational mission.

28.     In enacting the HEA, Congress knew that there would be situations in which it would be unfair to expect student borrowers to be liable for student loan debt, including situations in which higher education institutions acted irresponsibly or unscrupulously, and when the institutions students attended suddenly closed.

29.     The statute includes a provision that requires the Secretary of Education to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of" Direct Loans. 20 U.S.C. § 1087e.

30.     The statute also includes a provision requiring the Secretary of Education to discharge a borrower's liability on loans when a student is "unable to complete the program in which such student is enrolled due to the closure of the institution," 20 U.S.C. § 1087(c)(1), or "if such student's eligibility to borrow under this part was falsely certified by the eligible institution or was falsely certified as a result of a crime of identity theft," *id*. Discharges in the first situation are

often referred to as "closed school discharges," and discharges in the second situation are often referred to as "false certification discharges."

31.     In granting ED authority to implement these, and other Title IV, provisions, Congress mandated an unusual amount of public involvement, requiring ED to engage in multiple steps above and beyond those required by the notice-and-comment provisions of the APA, 5 U.S.C. § 553. First, ED is required to "obtain public involvement in the development of proposed regulations," "provid[ing] for a comprehensive discussion and exchange of information concerning the implementation [of Title IV]." 20 U.S.C. § 1098a(1)–(2). The Secretary is required to "take into account the information received through such mechanisms in the development of proposed regulations." *Id.* §1098a(2).

32.     "After obtaining the advice and recommendations described [above] and before publishing proposed regulations in the Federal Register," the Secretary is required to "prepare draft regulations" and "submit such regulations to a negotiated rulemaking process." 20 U.S.C. § 1098a(1). After a negotiated rulemaking, ED must publish any proposed rule on which negotiators reach consensus, or a proposed rule of ED's choosing if negotiators do not reach consensus, in the Federal Register for public comment.

### *Predatory Colleges and Universities*

33.     Although ED wields significant regulatory power over the higher education industry, for decades ED allowed colleges that deceived students—predominantly for-profit colleges—to continue receiving federal student aid.

34.     For-profit college enrollment increased from approximately 766,000 students in 2001 to 2.4 million students in 2010. In 2012, the Senate Committee on Health, Education, Labor and Pensions (HELP) investigated the for-profit college industry and published a report of its

findings. U.S. Senate, Health, Education, Labor, and Pensions Committee, *For-Profit Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* (July 30, 2012) (HELP Report), https://www.help.senate.gov/imo/media/for_profit_report/PartI-PartIII-Selected Appendixes.pdf.

35.     The HELP Committee's report documented a significant rise in the for-profit college sector's reliance on federal student aid. For instance, in 2009–2010, the sector received $32 billion from the ED's student aid program funds, accounting for 25 percent of the total funds distributed. This amount was approximately five times the amount of federal student aid the sector had collected a decade earlier.

36.      In its report, the Committee noted that for-profit schools targeted low-income students "who are often not familiar with traditional higher education and may be facing difficult circumstances in their lives" so that they could "create a false sense of urgency to enroll and inflate the prestige of college." HELP Report at 4. The report cited numerous examples of for-profit schools where recruiters were trained to "search for and exploit potential students' emotional vulnerabilities by finding a 'pain point'—unhappiness with a dead-end job, inability to support one's children, fear of disappointing parents or relatives—and push[] on that point to convince prospects that easy, fast, affordable college is the way to finally address previous failings." *Id.* at 16.

37.     The Committee also found that for-profit colleges "used tactics that misled prospective students with regard to the cost of the program, the availability and obligations of Federal aid, the time to complete the program, the completion rates of other students, the job placement rate of other students, the transferability of [class] credit[s], or the reputation and accreditation of the school." *Id.* at 53. For example, one school told students that it placed 70

percent to 90 percent of students in jobs, when only 20 percent to 30 percent of students actually obtained employment. *Id.* at 55–56.

38.     Additionally, the HELP Committee noted that many for-profit colleges provided programs with "questionable academic rigor and educational value." For example, undercover investigators observed students who were awarded academic credit for obviously plagiarized work and for submitting photographs of celebrities in lieu of an essay. The report noted that students were "charged thousands of dollars to enroll in 3- to 6- week basic courses such as 'keyboarding[.]'" HELP Report at 90.

39.     A range of research has found that for-profit schools spend far less on instruction than they do on marketing, advertising, recruiting, and admissions. One report by the Century Foundation noted that several of the largest for-profit college chains—including University of Phoenix, DeVry, and Capella University—spent less than 25 percent of tuition on instruction. Stephanie Hall, *How Much Education Are Students Getting for Their Tuition Dollar?* (Feb. 28, 2019), https://tcf.org/content/report/much-education-students-getting-tuition-dollar/. At the same time, the cost of for-profit programs tends to be substantially higher than comparable programs at community colleges or flagship State public universities.

40.     The problems the HELP Committee found in 2012 have not abated. In 2014, ED conducted a study of for-profit college programs that found the average graduate in 72 percent of such programs earned less than high school dropouts. *See* ED, Proposed Rule, Program Integrity: Gainful Employment, 79 Fed. Reg. 16,426, 16,434 (March 25, 2014). A similar 2016 study found that for-profit college students earned less after leaving school than they did before they enrolled. Stephanie Riegg Cellini & Nicholas Turner, *Gainfully Employed? Assessing the Employment Earnings of For-Profit College Students Using Administrative Data*, NBER Working Paper No.

22287 (May 2016, Rev. Jan. 2018). Students who attend for-profit schools account for 13% of the student population, but 47% of all federal-student-loan defaults. HELP Report at 8.

41.     Students from several of the schools referenced in the HELP report—Corinthian Colleges Inc. (CCI), ITT, DeVry, University of Phoenix, EDMC (which later sold many of its campuses to Dream Center Education Holdings), CEC, Westwood, Kaplan, Bridgepoint, United Education Institute, Lincoln Technical Institute, and Anthem College—make up the largest numbers of pending borrower defense applications. *See* Yan Cao & Tariq Habash, *College Complaints Unmasked* (Nov. 8, 2017), https://tcf.org/content/report/college-complaints-unmasked/.

***The 2016 Rule***

42.     In 1994, ED promulgated generic regulations for the assertion of "borrower defenses," effective 1995 (the 1994 regulations). *See* ED, Proposed Rule, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 39,330, 39,333 (June 16, 2016) (2016 NPRM). Although initially intended to serve as a placeholder, these regulations remained in place for two decades. *See id.* The regulations required "a borrower to demonstrate that a school's acts or omissions would give rise to a cause of action under 'applicable State law,'" but were "silent on the process a borrower follows to assert a borrower defense claim." *Id.*

43.     The 1994 regulations were rarely used until 2015, when multiple state and federal investigations led to a finding that Corinthian Colleges had misrepresented its job placement rates to students, eventually leading to the schools' bankruptcy. *Id.* Corinthian's collapse alone led to thousands of borrower defense claims being filed with ED. *Id.*

44.     In August 2015, to address "difficulties in application and interpretation of the current State law standard, as well as the lack of clarity surrounding the procedures that apply for borrower defense," ED began the process of amending its regulations. *Id.* That month, ED published a notice in the Federal Register indicating that it intended to establish a negotiated rulemaking committee to develop proposed regulations setting out which of a school's acts or omissions could provide grounds for a borrower to seek cancellation of federal loans and to address the consequences of these borrower defenses for borrowers, schools, and the agency. ED, Negotiated Rulemaking Committee; Public Hearings, 80 Fed. Reg. 50,588, 50,588 (Aug. 20, 2015). Such a committee was established, but it was unable to reach consensus on a rule. *See* 2016 NPRM, 81 Fed. Reg. at 39,334.

45.     ED published a notice of proposed rulemaking (NPRM) on June 16, 2016. *Id.* at 39,330.

46.     ED received more than 10,000 comments in response to the NPRM. On November 1, 2016, ED published in the Federal Register its final Borrower Defense Regulations, with an effective date of July 1, 2017. 2016 Rule, 81 Fed. Reg. 75,926.

47.     The 2016 Rule included several provisions designed to increase institutional accountability and protect students and the public fisc. A number of these provisions directly regulated the relationship between schools and ED. For example, the 2016 Rule required schools to provide letters of credit upon "triggering" one of specified events that signified financial instability, and it regulated the process by which ED would attempt to recoup funds from schools where it had approved a borrower defense claim.

48.     The 2016 Rule also included four major parts relevant to this action that regulated the relationship between students and schools, and between students and ED.

49.     First, the Rule established procedures that made it easier for student loan borrowers to assert a borrower defense claim, whether or not they were already in default. *Id.* at 75,961–64; *see also* 34 C.F.R. § 685.22. In so doing, ED specified that a borrower could assert a borrower defense if the borrower was party to a judgment against a school based on violations of state or federal law, a school had breached its contractual obligations to the borrower, or, as judged under a federal standard, a school had "made a substantial misrepresentation … that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a direct loan." 34 C.F.R. § 685.222(b)–(d); *see also id.* § 668.71(c) (defining "misrepresentation"). The regulations provided that ED was to apply a "preponderance of the evidence" standard, based on all information in the agency's possession, even if not in the student's possession. 34 C.F.R. § 685.222(a)(2), (e)(3). ED established a six-year statute of limitations for students to seek to recoup amounts already paid on student loans, but provided that, as to amounts still owed, a borrower could assert a defense to repayment at any time. 34 C.F.R. § 685.222(d)

50.     In addition to creating a process by which individual applications would be adjudicated under this standard, the Rule allowed ED to adjudicate claims on a group-wide basis—even absent an application—when it concluded such consideration was appropriate, based on factors "including, but not limited to, common facts and claims, fiscal impact, and the promotion of compliance by the school or other title IV, HEA program participant." 34 C.F.R. § 685.222(f).

51.     In issuing the 2016 Rule, ED explained that these new provisions "give students access to consistent, clear, fair, and transparent processes to seek debt relief," and reduce obstacles to borrower defense claims. 81 Fed. Reg. at 76,047. It also explained that the streamlined borrower defense process aids schools: "[T]hrough clarification of circumstances that could lead to a valid

claim, institutions may better avoid behavior that could result in a valid claim and future borrowers may be less likely to face such behavior," which would also benefit both borrowers and the federal government. *Id.* at 76,049. ED also noted the extensive benefits to "borrowers who ultimately have their loans discharged," explaining that discharge would ameliorate the well-documented hardships associated with high student debt, while also providing "spillover economic benefits." *Id.* at 76051. By allowing more students to return to school, discharge would benefit both students and the public. *Id.*

52.     Second, the 2016 Rule updated the procedures for obtaining false certification and closed school discharges. Among these changes, ED added a requirement that closing schools affirmatively provide borrowers with information about closed school discharges, 34 C.F.R. § 668.14(b)(32). ED also provided that students who do not re-enroll in a Title IV-participating institution within three years of their school's closure would be granted a discharge without needing to file an application, whereas such "automatic" closed school discharges had previously been at ED's discretion. 34 C.F.R. § 685.214(c)(2)(ii).

53.     ED explained that the availability of these "automatic closed school discharges" was not new, as they were available under the prior regulations, and that they provided "an important benefit to borrowers." ED further explained that there was little risk of fraud and "that the likely minimal potential cost of granting discharges to a very small number of borrowers who do not qualify is counterbalanced by the benefit of granting closed school discharges to large numbers of borrowers who qualify for them, but do not receive them under our current procedures." 81 Fed. Reg. at 76,038–39.

54.     Third, ED added new provisions to the program participation agreements that institutions enter to receive Title IV funds related to the resolution of disputes between students

and schools. As a condition of participating in the Title IV program, schools were required to agree that they would not rely on predispute agreements that barred students from bringing class actions against their schools based on conduct that would also give rise to a borrower defense claim. 34 C.F.R. § 685.300(e). Schools were also required to agree not to enter into mandatory predispute arbitration agreements with students, or rely on such agreements, as to claims based on that conduct. *Id.* § 685.300(f).

55.    In explaining the necessity for conditions on the use of class action waivers, ED addressed criticisms that "class actions benefit lawyers more than consumers, and may result in modest returns for an individual member of the class," noting that there was no evidence of such a problem in the relevant market—post-secondary education—and that "recent history shows the significant consequences for students and taxpayers in an industry that has effectively barred consumers from using the class action tool." 81 Fed. Reg. at 76,026. The agency also noted that class actions have significant effects beyond financial recovery for the particular class members, including deterring misconduct by the institution, deterring misconduct by other industry members, and publicizing claims of misconduct that law enforcement authorities might otherwise have never been aware of, or may have discovered only much later." *Id.* ED explained that it "expect[ed] that the potential exposure to class actions will motivate institutions to provide value and treat their student consumers fairly in order to reduce the likelihood of suits in the first place." *Id*.

56.    In addressing comments on the arbitration provision, ED emphasized that "it is unrealistic to expect the students to understand what arbitration is and thus what they would be relinquishing by agreeing to arbitrate," and that there is "no realistic way to improve this awareness, and thus, we do not believe that the use of predispute agreements to arbitrate will result

in well-informed choices, particularly by students in the sector of the market in which such agreements are most commonly used." 81 Fed. Reg. at 76,028.

57.    ED also addressed at length arguments that it lacked authority to regulate schools' use of predispute arbitration agreements and class action bans, making clear that its regulations "do not invalidate any arbitration agreement, whether already in existence or obtained in the future," and that the regulations were well within the kind of regulation upheld by courts that address the authority of the government to impose conditions that limit the exercise of constitutional rights by beneficiaries. 81 Fed. Reg. at 76,021–24. These arguments were subsequently considered by a court, which upheld the arbitration provision of the 2016 Rule against an industry challenge. *See CAPPS v. DeVos*, No. 17-cv-00999-RDM, 2020 WL 516455 (D.D.C. Jan. 31, 2020).

58.    Finally, the 2016 Rule required for-profit institutions to make a variety of disclosures to students and potential students. One provision required for-profit institutions to provide a notice in their promotional materials if the median borrower had failed to pay off or reduce their loan balance by at least one dollar, as calculated by ED. 34 C.F.R. § 668.41(h). Another required that for-profit institutions provide disclosures to students and prospective students if the institution had encountered one of the "triggers" requiring it to provide financial protection to ED, as "these triggers identify events or conditions that signal impending financial problems." 81 Fed. Reg. at 75,934 (discussing 34 C.F.R. § 668.41(*i*)). At the time, ED explained that disclosure of "this additional information [would] help students, prospective students, and their families make informed decisions based on information about an institution's financial soundness and its borrowers' loan repayment outcomes." 81 Fed. Reg. at 75,927.

*ED's Unlawful Delays of the 2016 Rule*

59.     The 2016 Rule was scheduled to go into effect on July 1, 2017. Just two weeks before the 2016 Rule was scheduled to go into effect, ED issued a notice, purportedly pursuant to 5 U.S.C. § 705, delaying the effective date for many of the 2016 Rule's provisions "pending judicial review" in litigation brought by an association of for-profit colleges in the United States District Court for the District of Columbia. *See* ED, Notification of Partial Delay of Effective Dates, 82 Fed. Reg. 27,621, 27,621 (June 16, 2017) (the Section 705 Stay) (citing *Cal. Ass'n of Private Proprietary Schools v. DeVos*, No. 17-999 (D.D.C. filed May 24, 2017)). In that notice, ED also indicated that it intended to "review and revise" the 2016 Rule. *Id.* at 27,622.

60.     The Section 705 Stay was promptly challenged in court by student borrowers as an improper and arbitrary and capricious use of that statutory provision. *See Bauer v. DeVos*, No. 17-1330 (D.D.C. filed July 6, 2017).

61.     While the *Bauer* action was pending, ED issued two further delay rules. First, it issued an interim final rule, amending the effective date of the 2016 Rule to July 1, 2018, based on the agency's interpretation of the HEA's master calendar provision, 20 U.S.C. § 1089(c)(1). ED, Interim Final Rule; delay of effective date; request for comments, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 82 Fed. Reg. 49,114, 49,114 (Oct. 24, 2017) (2017 Delay Rule).

62.     ED then issued a third rule, further amending the effective date of the 2016 Rule to July 1, 2019. *See* ED, Final Regulations, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 83

Fed. Reg. 6458 (Feb. 14, 2018) (2018 Delay Rule). The 2018 Delay Rule was issued after a public notice and comment process, but ED did not engage in negotiated rulemaking on the rule.

63.      The *Bauer* plaintiffs amended their complaint to challenge both the 2017 and 2018 Delay Rules.

64.      On September 12, 2018, the court issued a ruling on the parties' cross-motions for summary judgment in *Bauer*, holding that ED's delays were unlawful. *Bauer I*, 325 F. Supp. 3d 74.

65.      First, the court rejected ED's interpretation of the master calendar provision, which ED had relied on in promulgating both the 2017 Delay Rule and 2018 Delay Rule. 325 F. Supp. 3d at 95–96.

66.      Second, the court found that ED's failure to conduct a negotiated rulemaking before issuing the 2018 Delay Rule was not justified by "good cause." In so doing, the court explicitly rejected many of ED's arguments about the costs to industry of complying with the 2016 Rule, and found that ED's rationale was "directly at odds with the determination that the Department made when it finalized the Borrower Defense Regulations that the arbitration and class action rules are lawful and that the 'case law gives strong support for the position that the Department has authority to impose limits of this kind ....'" 325 F. Supp. 3d at 100 (quoting 2016 Rule, 81 Fed. Reg. at 76,023).

67.      Finally, the court held that the Section 705 Stay was unlawful as ED had not provided a reasoned basis for the stay. The court noted that ED had failed to consider at all "how the public interest or the interest of student borrowers would be affected by its decision." 325 F. Supp. 3d at 108. The court further found that the agency's expressed concern with compliance costs and "serious questions" as to the lawfulness of the 2016 Rule represented "an

unacknowledged and unexplained inconsistency" with the 2016 Rule, and thus reflected arbitrary and capricious decisionmaking. *Id.* at 109. The court also rejected ED's argument that a stay was appropriate simply because ED wanted to conduct new rulemaking. *Id.* at 110. The court explained that the Section 705 Stay represented an improper attempt to use section 705 to implement policy, rather than maintain the status quo pending litigation. *Id.*

68.     The court vacated both the 2018 Delay Rule and the Section 705 Stay, but it stayed its order until October 12, 2018. *See Bauer v. DeVos*, 332 F. Supp. 3d 181 (D.D.C. 2018). The court subsequently extended that stay until October 16, 2018, after which the 2016 Rule went into effect.

69.     ED did not implement the 2016 Rules until well after the *Bauer* court ordered it to do so. ED has stated that it only began modifying the contracts necessary to ensure "completion of the changes necessitated by the implementation of the 2016 [R]ule" in June 2019. ED documents show that the target date for complete implementation of the 2016 Rules was December 31, 2019.

**The 2017–2018 Negotiated Rulemaking**

70.     On the same day ED issued the unlawful Section 705 Stay, it announced its intention to establish negotiated rulemaking committees, including one "to develop proposed regulations to revise the [2016] regulations on borrower defenses to repayment of Federal student loans and other matters." ED, Notice of intent to establish negotiated rulemaking committees; Negotiated Rulemaking Committee; Public Hearings, 82 Fed. Reg. 27,640, 27,640 (June 16, 2017). After two public hearings in July 2017, ED formed the committee, which met in November 2017, January 2018, and February 2018. *See* ED, Notice of Proposed Rulemaking, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan

Program, and William D. Ford Federal Direct Loan Program, 83 Fed. Reg. 37,242, 37,250 (July 31, 2018) (2018 NPRM).

71.     All of the negotiated rulemaking sessions proceeded under the assumption, explicitly stated by ED's designated "negotiator," that the 2016 Rule was a nullity. ED's negotiator stated: "As far as we're concerned, the starting point is the 1994 Regulations." Nov. 13, 2017 Unofficial Transcript.

72.     ED's negotiator also refused to engage in discussion on aspects of the 2016 Rule that members of the committee thought would be beneficial for students and the public fisc. At one point, ED's negotiator stated: "Okay, but what I'm hearing are items that were in the 2016 reg. And we have already considered those items at the Department, and for various reasons we have ruled them out." Feb. 14, 2018 Transcript, 34:4–8. ED's negotiator refused to explain those "various reasons."

73.     Throughout the negotiated rulemaking, ED's negotiator also refused to engage in meaningful discussion on topics that the negotiator believed were related to either the *Bauer* or *CAPPS* litigation, although ED was proposing regulatory changes on those very topics. In response to attempts to discuss ED's position that the 2016 Rule should be rescinded, for example, the negotiator stated, "I think because that is the main point of at least one lawsuit, we are unable to comment on that." Nov. 13, 2017 Unofficial Transcript. And when negotiators asked the basis for ED's position as to the 2016 Rule's provisions on pre-dispute arbitration agreements, the negotiator stated, "So, because the prior regulations are under litigation on this specific topic, we're not really able to comment on extensive information regarding where we are with arbitration right now." Nov. 15, 2017 Transcript, 70:4–8.

74.    ED's refusal to have an open discussion about its positions, as well as its insistence that provisions of the 2016 Rule had already been "eliminated from consideration," impeded meaningful collaborative negotiation.

75.    ED's positions led to confusion among other negotiators. One negotiator, for example, referred to the 2016 Rule as having been "rescinded," although it had not been.

76.    The negotiated rulemaking committee disbanded on February 15, 2018 without reaching consensus.

77.    ED did not reconvene the negotiated rulemaking committee or convene a new negotiated rulemaking committee after the *Bauer* court declared its actions with respect to delaying the 2016 Rule unlawful or after the 2016 Rule went into effect.

### The 2018 Proposed Rule

78.    On July 31, 2018, ED issued a notice of proposed rulemaking, with proposals that would both drastically curtail the amount of information available to student borrowers making decisions about enrollment and student loans, and significantly restrict the remedies available to students whose schools misled them and/or closed. 2018 NPRM, 83 Fed. Reg. 37,242.

79.    The NPRM in several places referred to "current regulations" as those issued in 1994, but also seemed to acknowledge that the regulations put into effect by the 2016 Rule were the current regulations, as it stated that ED was proposing to "rescind" the 2016 Rule.

80.    In the NPRM, ED requested comment "regarding what types of provisions or requirements could be used to reduce frivolous claims," though there was no evidence that the 2016 Rule would lead students to submit frivolous claims. 83 Fed. Reg. at 37,242.

81.    The NPRM stated that "through these proposed regulations," ED was considering whether to abandon a "new interpretation [of the HEA] to allow affirmative claims," which it

23

claimed ED had adopted in 2015, or instead whether to "reaffirm" a position that students could raise borrower defenses only in response to collection actions. *Id.* at 37,243, 37,251–52.

82.     ED had not adopted a new interpretation of the HEA in 2015. ED had long allowed affirmative borrower defense claims prior to that date.

83.     ED stated that its concern about "frivolous claims" was leading it to consider imposing a higher evidentiary standard for affirmative borrower defense claims as opposed to "defensive" ones. *Id.* at 37,254. ED said it was amenable to continuing to accept affirmative claims, suggesting that it might limit such affirmative claims "to the three-year period following the borrower's departure from the institution to ensure that the institution would have access to records that could be relevant to their defense." *Id.* at 37,252–53.

84.     ED did not mention the possibility of imposing a three-year limitation in connection with defenses raised in response to collection actions. To the contrary, it stated that, "[u]nder the proposed standard, a borrower may be able to assert a defense to repayment at any time during the repayment period, once the loan is in collections, regardless of whether the collection proceeding is one year or many years after a borrower's discovery of the misrepresentation." *Id.* at 37,257; *see also id.* at 37,260 ("The proposed regulations do not impose a statute of limitations on the filing of a borrower defense to repayment claim.").

85.     ED proposed a new three-part standard for borrower defenses that limited relief to scenarios in which a borrower could establish that an institution made a statement, act, or omission to the borrower that was "(i) false, misleading, or deceptive, (ii) made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth, and (iii) directly and clearly related to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was made." *Id.* at 37,244, 37,253. This "intent or reckless

disregard" standard was higher than the standard set forth in the 2016 Rule, which held institutions accountable for misrepresentations made with lower levels of *mens rea*. In addition to these three requirements, ED proposed adding an additional requirement, that a borrower produce "evidence of financial harm" beyond the taking out of a loan and the resulting debt burden. *Id.* at 37,259–60.

86.     ED also proposed a number of changes to the procedure by which borrower defense claims would be considered and processed, including the elimination of ED's ability to adjudicate borrower defense claims on a group-wide basis when it deemed it appropriate to do so. *Id*. at 37,262–63.

87.     ED stated that it did "not propose to adopt" the 2016 Rule's provisions addressing pre-dispute arbitration agreements and class action bans, citing a "re-weighing [of] all applicable factors, including the current legal landscape." *Id.* at 37,245, 37,264–66. These factors included purported benefits of arbitration, including its "eas[ing of] burdens on the overtaxed U.S. court system." *Id.* at 37,256. ED proposed to merely require disclosures related to such agreements. ED also falsely stated that the 2016 Rule "outright ban[ned]" the use of pre-dispute arbitration agreements and class action waivers, *id.* at 37,266, a position inconsistent with the argument it was making in the *CAPPS* litigation that was ongoing at the very same time.

88.     The proposal also included several changes to the closed school discharge process. *Id.* at 37,266–69. ED stated that "existing" regulations (by which it meant the 1994 regulations) allowed the Secretary to grant closed school discharges in its discretion, and that it saw no need to provide for automatic closed school discharges as the 2016 Rule had done. *Id.* at 37,267.

89.     ED also proposed to change the process by which it would seek to recoup money from schools when borrower defense claims were approved, reducing liability to schools and shifting the burden to taxpayers, *id.* at 37,263–64, and narrowing the circumstances in which

schools would have to provide guarantees to secure the federal government's investment, *id.* at 37,270–80.

90.     During the 30-day comment period, more than 30,000 comments were submitted in response to ED's NPRM, including significant numbers of comments in opposition on behalf of student and consumer advocates, civil rights organizations, veterans' groups, legal services providers, and several states.

91.     Plaintiff NYLAG submitted individual comments, and also joined two comments submitted on behalf of a group of organizations. *See* ED-2018-OPE-0027-25400 (NYLAG individual comments); ED-2018-OPE-0027-29073 (Legal Aid Community comments); ED-2018-OPE-0027-26150 (Coalition comments).

### The 2019 Final Rule

92.     In January 2019, ED officials stated that ED planned to issue a new notice of proposed rulemaking for borrower defense, reflecting changed circumstances in light of the decision in *Bauer* declaring ED's delay of the 2016 Rule unlawful and the fact that the 2016 Rule was now in effect. *See* Ben Unglesbee, As borrower defense gets another rewrite, for-profits wrestle with uncertainty, Education Dive, Feb. 7, 2019, https://www.educationdive.com/news/as-borrower-defense-gets-another-rewrite-for-profits-wrestle-with-uncertai/547903/ (noting statements of ED officials to this effect). ED did not issue a new notice, however.

93.     On September 23, 2019, ED issued the 2019 Rule, based on the 2018 NPRM and comments submitted by the August 30, 2018 closing date—months before the *Bauer* court invalidated ED's actions and the 2016 Rule went into effect. 2019 Rule, 84 Fed. Reg. 49,788. In brief, and without limitation, the 2019 Rule:

- Eliminated protections against forced arbitration and class action bans;

26

- Eliminated automatic closed school discharges;

- Curtailed and eliminated financial responsibility provisions;

- Inserted a time limit on borrowers' ability to raise claims, on both defaulted and non-defaulted loans;

- Eliminated group discharge provisions;

- Narrowed the bases and standards on which borrowers can assert defenses;

- Heightened the evidentiary standard to which borrowers' claims would be held; and

- Eliminated several mandatory disclosure requirements for schools that were in financially precarious situations, had poor records of student success, or were closing.

94. In the 2019 Rule, ED acknowledged that it had "initially considered publishing a second NPRM that used [the 2016] regulations as a starting point," as opposed to the 1994 regulations. It stated that it decided not to do so to avoid "further delay [of] the finality of the rulemaking process" and because, in its view, the "policies we proposed in the 2018 NPRM were not affected by the set of regulations that served as the underlying baseline, and … we provided a meaningful opportunity for the public to comment on each of the regulatory proposals in the NPRM and on the rescission of the 2016 final regulations." *Id.* at 49,789.

95. ED did not acknowledge that members of the public had no opportunity to comment on the impact of either the *Bauer* decision or experiences with the 2016 Rule, which had been in effect for nearly a year prior to ED's issuance of the 2019 Rule.

96. At the same time, throughout the Rule, ED relied upon its "experience" purportedly implementing the 2016 Rule. *Id.* at 49,792; *see also id.* at 49,821 (stating ED has "found it difficult" to apply the 2016 Rule without a financial harm requirement).

97.    ED did not explain why its desire to move quickly to rescind the 2016 Rule outweighed the HEA's strong policy of public participation in Title IV rulemaking or the APA's requirement that members of the public have a meaningful opportunity to comment.

98.    ED did not address its failure to conduct a new negotiated rulemaking, even though the 2017–2018 negotiated rulemaking had progressed on ED's assumption that the 2016 Rule was a nullity, and ED had refused to discuss various topics based on the existence of pending litigation. ED stated that the Rule "reflect[ed] the results of" the 2017–18 negotiated rulemaking. 84 Fed. Reg. at 49,789.

99.    In substance, the 2019 Rule largely adopted the proposals contained in the 2018 NPRM with some notable exceptions, discussed below.

100.   The entire rule, however, was infected by a refusal to consider relevant data and comments in the record, baseless speculation about the dangers of "frivolous" claims, and internally inconsistent explanations.

101.   First, the Rule presumed, without explanation, that any benefit to student borrowers came at a cost to taxpayers—an acknowledged but unexplained departure from ED's position in the 2016 Rule, which was supported by evidence in the 2019 Rule's record, that holding institutions accountable for their misrepresentations benefitted both student borrowers *and* taxpayers.

102.   In addition, although ED repeatedly cited a concern about "frivolous" claims, the "solutions" imposed by the Rule bear no relationship to that concern. For example, ED described as "frivolous claims" those that "seek discharge from private rather than Federal loans." *Id.* at 49,800. Such claims, however, were no more viable under the 2016 Rule than they would be under

the 2019 Rule. There is no reason why altering the evidentiary burden for students asserting claims on Federal loans would impact how many students *without* Federal loans would file claims.

103.    ED also cited the number of "unsubstantiated" claims as compelling changes adopted in the 2019 Rule. But the fact that 9,000 claims (over an unknown time period, out of an unknown total) were denied as "unsubstantiated" does not support *toughening* the standards for borrower defense claims; rather, it suggests that the standard is adequately operating to screen out claims that should be denied.

104.    Throughout  the 2019 Rule, ED offered a misleading discussion of its experience processing claims, suggesting that it had completed thorough, meaningful review of vast numbers of claims under the 2016 Rule. *See, e.g.*, 84 Fed. Reg. at 49,800–801, 49,884. But Defendant DeVos later informed Congress that ED had neither approved nor denied a single borrower defense claim between June 12, 2018 and March 28, 2019. *See* Testimony of Secretary DeVos in Response to Questions for the Record submitted by Senator Patty Murray at 20–21 (June 13, 2019), retrieved from  https://www.help.senate.gov/imo/media/doc/SenMurrayQFRresponses32819LHHShearing. pdf. And in ongoing litigation related to ED's processing of claims, ED admitted that it did not issue any borrower defense decisions through December 2019—months after the 2019 Rule was issued. ED has also conceded that, from 2017 through the present, it has not determined whether the misrepresentations alleged in *any* borrower defense claims pertaining to any schools other than Corinthian or ITT constituted new grounds for borrower defense eligibility. The minimal degree to which ED had implemented the 2016 Rule undercuts the value and credibility of the conclusions ED claimed to draw from its "experience" implementing the 2016 Rule. Plaintiff and other members of the public were unable to address this point due to ED's failure to re-start the rulemaking process after the 2016 Rule went into effect.

105.    ED also justified changes to both the process and standards for borrower defense claims based on the claimed burden that large numbers of claims would impose on ED. It failed to account, though, for the fact that a good faith evaluation of applications under the new, tougher standard would be more burdensome for ED staff on an application by application basis.

106.    The 2019 Rule also contains an unexplained internal inconsistency. ED repeatedly stated that borrower defense claims could be "prevent[ed]" if students simply became "wise consumers on the front end." 84 Fed. Reg. at 49,793, 49,818. ED opined that greater access to "information about various institutions … will help students make informed decisions based upon accurate data" and will "prevent borrower defense claims before they arise." *Id.* at 49,793; *see also id*. at 49,805 ("Prospective students benefit when schools share more information."); *id.* at 49,817 ("As more information becomes available to borrowers, they will be better able to make informed decisions"); *id.* at 49,823 ("Throughout these final regulations, the Department has emphasized the need for students to be engaged and informed consumers when making determinations about their education choices."); *id.* at 49,840 ("The Department agrees that it is very important that students are properly informed of their options and given the necessary information regarding how to proceed."); *id.* at 49,841 ("The Department values the ability of students to make informed, freely chosen decisions regarding how they spend their education dollars, time, and efforts.").

107.    At the same time that ED was "urg[ing] students to make informed consumer decisions," *id.* at 49,822, however, it made it harder for students to do so by eliminating multiple disclosure requirements and allowing recipients of federal taxpayer funds to force student borrowers into mandatory arbitration agreements and class action waivers, which the record evidence shows student borrowers are ill-equipped to understand.

108.     These analytical flaws, baseless assumptions, and unexplained reversals permeated the 2019 Rule in its entirety, as they demonstrate ED's entire approach to the rulemaking was based on inconsistent and illogical reasoning.

109.     In addition, there are aspects of specific provisions of the 2019 Rule that independently demonstrate arbitrary and capricious decisionmaking. The relevant provisions can be grouped into four categories: (1) changes to the claims process and the standard to be applied; (2) the elimination of conditions relating to class-action waivers and forced arbitration clauses; (3) the elimination of disclosure requirements; and (4) changes to the closed school discharge process.

**Changes to the Claims Process and Standard**

110.     As proposed in the NPRM, the 2019 Rule revamps the process by which students can invoke a borrower defense and the standards under which such claims will be measured. *See* new 34 C.F.R. §§ 685.206, 685.212.

111.     In the 2019 Rule, ED acknowledged that the factual premise for its proposal to eliminate the possibility of affirmative borrower defense claims—that such claims were only allowed from 2015 onward—was false, and that "throughout the history of the [1994] regulation," ED had approved affirmative borrower defense claims. *Id.* at 49,796. Accordingly, ED decided that it would continue to allow such affirmative defense claims. *Id.*

112.     As noted above, in the NPRM, ED suggested it might consider limiting a student to raising affirmative borrower defense claims within three years of leaving a school, while explicitly stating there would be *no* time limitation on raising borrower defenses in collections. In the 2019 Rule, however, ED included "a three-year limitations period for *both* affirmative and

31

defensive claims." 84 Fed. Reg. at 49,882 (emphasis added), 49,882–84 (discussing new § 685.206(e)(6)).

113.   ED did not acknowledge that the NPRM explicitly stated otherwise. ED also failed to acknowledge that a three-year statute of limitations is particularly nonsensical in the context of defensive claims because few students will enter the involuntary collections process so soon after leaving school.

114.   ED eliminated a group claims process. In so doing, it cited unspecified "evidence of outside actors attempting to personally gain from the bad acts of institutions." 84 Fed. Reg. at 49,798. ED did not identify any such actors or how the group submission of administrative claims somehow allowed these actors to "personally gain" in ways that individual claims would not.

115.   In rescinding provisions allowing group claims to proceed, and in imposing increased evidentiary requirements and heightened standards, ED failed to meaningfully consider the increased burden associated with completing individual applications. ED discounted the burden by stating that student borrowers must sign "a Master Promissory Note—a complicated legal documen—as well as other documents in order to sign a loan," and thus could be expected to have no more difficulty completing Borrower Defense applications. 84 Fed. Reg. at 49,799. This comparison is illogical. As established by undisputed research referenced by commenters, students largely do *not* understand the terms and conditions of their Master Promissory Notes, and are often pressured to sign such documents quickly and without understanding them. Moreover, the application process for borrower defense under the 2019 Rule is far more complicated, requiring the gathering of evidence to establish multiple elements. It is entirely dissimilar to signing a master promissory note. And ED's embrace of this comparison is inconsistent with its

refusal to give credence to social science research on consumer financial products on the grounds it was not "an apples-to-apples comparison." 84 Fed. Reg. at 49,801.

116.    ED's repeated assertions that students will be able to complete applications unaided are belied by common experience. They are also inconsistent with ED's position in other rules. For example, in ED's November 26, 2019 rule regarding the disability discharge process for veterans, ED acknowledged that a complicated application process "is an unnecessary administrative barrier, which the Department believes may have prevented more than 20,000 disabled veterans from obtaining the student loan discharge that they are by law entitled to receive." 84 Fed. Reg. at 65001–02.

117.    ED also adopted a "more stringent definition of misrepresentation," which requires evidence of an institution's intent to mislead or its reckless disregard for a borrower to obtain relief. 84 Fed. Reg. at 49,804–05 (discussing new § 685.206(e)(3)). ED's justification for doing so was irrational. It ignored the realities of student experiences, and failed to appropriately take into account the information imbalances between students and institutions. ED's assertion that students could avoid the challenge of satisfying the increased evidentiary burden by insisting that, during enrollment, institutions provide them with "written representations and documentation" reflects a willful blindness to the nature of interactions between students and predatory institutions. 84 Fed. Reg. at 49,805, 49,807. As reflected in the 2012 HELP Committee's report, predatory institutions often engage in high-pressure sales tactics where students lack the bargaining power to force such institutions to do anything, much less put all of their representations in writing.

118.    ED used nonexistent problems to justify its more stringent definition. For example, it stated such a standard was necessary to avoid a "chilling effect on academic freedom." But this assertion has no basis in fact or in the record.

119.    ED's explanation of the new more stringent ignored an important aspect of the problem; a lower misrepresentation standard, such as that contained in the 2016 Rule, provides an incentive to schools to provide accurate and honest information to students. Such an incentive both protects students and protects federal taxpayers from bankrolling schools' misleading and fraudulent conduct. ED ignore this, though, and instead assumed that the lower misrepresentation standard in the 2016 Rule harmed the public fisc.

120.    ED adopted its proposed new independent "financial harm" requirement, insisting that student borrowers demonstrate financial harm *other* than student debt. *See* 84 Fed. Reg. at 49,818–22 (discussing new § 685.206(e)(4), (8)). In so doing, ED ignored the crushing consequences that student debt itself has, as demonstrated in numerous comments to the agency.

121.    Additionally, ED imposed a "documentation" requirement that would make it practically impossible for the majority of students who had been harmed by their school to marshal sufficient evidence.

122.    ED claimed that the financial harm requirement was a "necessary deterrent to unsubstantiated claims" and was necessary to ensure that students would not file claims because they experienced "disappointments through their college experience and career, such as believing that they would have been better served by a different institution or major." *Id.* at 49,819. But the record does not support the proposition that either (1) students file borrower defense claims simply because they are "disappointed" by their "college experience" or (2) that a "financial harm" requirement would be the appropriate means for dealing with such a problem. *Id.* Under either the 2016 Rule or the 2019 Rule, students are not entitled to borrower defense relief because they are "disappointed"; they are entitled to such relief only if their school has made a misrepresentation or defrauded them.

123.    The 2019 Rule likewise jettisons the approach to relief that characterized both the 1994 and 2016 Rules. Under the 1994 Rule, as interpreted by ED, the amount of relief was connected to the amount of damages available under the state law that provided the cause of action for borrower defense. The 2016 Rule set out factors for ED to consider in determining the amount of relief to award. For a borrower defense predicated on the misrepresentation standard, the regulation required ED to consider the cost of and the value of the education received. *See* 2016 34 C.F.R. § 685.222(i)(2)(i). Although the new rule purports to base relief on "the amount of monetary loss that a borrower incurs as a result of a misrepresentation," new 34 C.F.R. § 685.206(e)(12), in fact the regulation only identifies the *type* of evidence that shows the existence of *any* monetary loss—*e.g.*, a period of unemployment—and does not provide any guidance as to how much relief should be awarded based on that evidence. No explanation was provided for this change.

### The Rescission of Conditions on the Use of Pre-Dispute Arbitration Agreements and Class Action Waivers

124.    ED replaced the conditions on the use of mandatory pre-dispute arbitration agreements and class action waivers (existing 34 C.F.R. § 685.300(e) and (f)) with a requirement that schools disclose their arbitration requirements to students (new 34 C.F.R. § 668.51(h), 685.304).

125.    In responding to comments urging ED to maintain conditions on the use of mandatory arbitration agreements and class action waivers, ED rejected the wealth of data about consumer arbitration submitted by commenters, and instead relied on a 2012 magazine article entitled the "Benefits of Arbitration for Commercial Disputes" for the proposition that arbitration would be beneficial to student borrowers. 84 Fed. Reg. at 49,841. ED's extrapolation of the experiences of businesses arbitrating with one another to the student borrower context, without

35

acknowledging this distinction, was irrational. None of ED's other claims about the benefits of arbitration were supported by the record. The record belies ED's conclusion that arbitration provides student borrowers with meaningful relief.

126.    ED's statements that the public airing of claims against institutions has "drawbacks," without acknowledging the benefits of public judicial proceedings and class actions, 84 Fed. Reg. at 49,843, was irrational and failed to address a major consideration expressed in the 2016 Rule.

127.    ED's assertion that "class action lawsuits benefit the wrong individuals, that is, lawyers and not wronged students," was based on a citation to a single article, issued by a conservative advocacy group and focusing on mass tort and securities class actions. *Id*. at 49,844–85. ED failed to explain how this advocacy piece, criticizing lawyers handling other kinds of cases, was relevant to the student borrower context, or why it was more probative than the academic and other studies submitted by commenters that showed the benefits of class actions for low-income consumers, like those most likely to be student borrower plaintiffs in cases alleging misrepresentation or fraud.

128.    ED's assertion that its disclosure requirements would ensure that students were able to make meaningful informed choices before signing away their rights to proceed in court or as part of a class action is contrary to evidence in the record and to ED's own prior conclusion that disclosures could not correct the innate informational imbalance facing students. ED also failed to explain how providing students with the right to choose whether or not to arbitrate after a dispute arose would be less respectful to "consumer autonomy" than allowing schools to essentially force students to forfeit their rights *ex ante*.

**Elimination of Disclosure Requirements**

129.    ED eliminated the loan repayment rate and financial protection disclosure requirements the 2016 Rule included at 34 C.F.R. § 668.41(h) and (i).

130.    ED's sole explanation was that, under the 2016 Rule, the agency determined whether an institution must make repayment rate disclosures based on data submitted pursuant to a different rule, known as the Gainful Employment rule, and that it had rescinded the relevant provisions of the Gainful Employment rule. 84 Fed. Reg. at 49,876. While this fact justified a change to the 2016 Rule, it did not compel ED to eliminate the disclosure requirement. ED did not address alternative methods of calculating loan repayment rates or disclosure requirements that would achieve the same purpose.

131.    ED's claim that the benefits of loan repayment rate disclosures by for-profit schools is "negated by not knowing the comparable loan repayment rate at a non-profit or public institution," *id*. at 49,876, ignores the differences between these different kinds of schools, and the fact that low loan repayment rates are far more prevalent in the for-profit industry than at non-profit or public institutions, as explained in the 2016 Rule. ED failed to acknowledge the agency's previous position and explanation of the unique aspects of the for-profit college industry that merited this aspect of the 2016 Rule.

132.    ED addressed the elimination of the financial protection disclosures in a single sentence, claiming that the benefit to students was outweighed by concerns for the "reputation" of schools in precarious financial scenarios. *See id*. at 49,876. ED did not address the contrary conclusion in the 2016 Rule, or the comments  explaining how such disclosures provide incentives for institutions to engage in sound practices, thus protecting both student borrowers and federal taxpayers. The elimination of the financial protection disclosures is also inconsistent with ED's

repeated emphasis on the need for students to become informed consumers. ED did not acknowledge the fact, supported by information in the record, that institutions hide their weaknesses in order to prop up failing institutions with federal loan dollars, and that such practices led to the very problem the 2016 Rule aimed to ameliorate.

**Closed School Discharge**

133.    ED went ahead with its plan to eliminate the process, codified at 34 C.F.R. § 685.214(c)(2)(ii), by which it would automatically discharge the loans of students who did not re-enroll in any Title IV-eligible institution within three years of closure of the school they had previously attended. ED explained that automatic discharges were contrary to the "goals" of encouraging students to complete their educational programs. 84 Fed. Reg. at 49,847. ED offered no evidence, however, that the availability of a discharge in three years encourages students to pass up the opportunity to pursue another educational program on that basis and accrue interest on their loans in the interim. To the contrary, the record shows a number of other factors that may cause students to neither participate in a teach-out or pursue other educational opportunities in the intervening three years after their school closes, including a lack of opportunity, good faith attempts to work to pay off their debts, or lost interest in continuing their education because of the negative experience associated with taking out loans for a worthless education. *See, e.g.,* NYLAG Comments at 1; ED-2018-OPE-0027-31868 (Comments from New America Foundation).

134.    ED's claim that the closed school discharge process is not burdensome for students is contrary to the record, as well as to ED's position in other rules. For example, in ED's November 26, 2019, veterans' disability discharge rule, ED explained that requiring applications for discharges based on veterans' total and permanent disabilities, when ED possesses sufficient information to grant them automatically, presented "an unnecessary administrative barrier, which

the Department believes may have prevented more than 20,000 disabled veterans from obtaining

the student loan discharge that they are by law entitled to receive." ED, Interim Final Regulations,

Total and Permanent Disability Discharge of Loans Under Title IV of the Higher Education Act,

84 Fed. Reg. 65,000, 65,001–02 (Nov. 26, 2019).

135.    ED also eliminated the requirement that closing schools provide information to

students about the availability of the closed school discharge process, currently at 35 C.F.R.

§ 668.14(b)(32). ED's explanation that it is "the Department's, not the school's burden to provide

this information to students," 84 Fed. Reg. at 49,847, is inconsistent with the purpose of

"Institutional Accountability" regulations, which is to seek to hold schools that have engaged in a

variety of practices that have led to massive debt for students at taxpayer expense accountable for

the results. It is also inconsistent with the view expressed throughout the 2019 Rule that providing

students with information is key to their ability to succeed, and fails to acknowledge the value of

these disclosures, which was discussed in the 2016 Rule.

136.    ED also failed to acknowledge the cumulative effect of eliminating the requirement

that schools disclose to students that they can file closed school discharge claims, while at the same

time eliminating automatic relief after three years. The harm to students who lack knowledge that

they are eligible for closed school discharges, as provided by statute, is made worse by requiring

them to affirmatively seek relief in all situations.

**FIRST CAUSE OF ACTION**
**Violation of the APA–Agency action without observance of procedure required by law –**
**Negotiated Rulemaking**

137.    The 2017–2018 negotiated rulemaking was premised on the notion that the 2016

Rule was a nullity. The 2016 Rule, however, went into effect and remains in effect.

138.    Throughout the negotiated rulemaking, ED refused to allow discussion of several

features of the 2016 Rule, to engage in discussion of the agency's own position on several aspects of its proposal, or consider the possibility that the 2016 Rule would go into effect before it issued a new rule. In so doing, ED failed to engage in meaningful public consultation and negotiated rulemaking, as required by 20 U.S.C. § 1098a, before promulgating draft regulations.

139.    Because ED failed to conduct a new negotiated rulemaking after its action delaying the 2016 Rule was held unlawful and the 2016 Rule went into effect, members of the public could not discuss the relevance of the *Bauer* court's decision or of the experience of students, schools, and ED with the 2016 Rule.

140.    ED relied on the flawed negotiated rulemaking in issuing the 2019 Rule, despite the intervening changed factual circumstances.

141.    By failing to engage in meaningful public consultation and negotiated rulemaking before issuing the 2018 NPRM, and failing to engage in public consultation and negotiated rulemaking after the 2016 Rule went into effect, ED failed to observe procedures required by law, in contravention of the APA, 5 U.S.C. § 706(2).

### SECOND CAUSE OF ACTION
**Violation of the APA –Agency action without observance of procedure required by law –
Notice-and-comment rulemaking**

142.    The 2018 NPRM was premised on the notion that the 2016 Rule was a nullity, but the 2016 Rule went into effect in October 2018 and will remain in effect until at least summer 2020.

143.    Although the comment period on ED's NPRM closed in August 2018, ED did not issue a new notice of proposed rulemaking reflecting the change in the status quo, and did not re-open public comment in light of the *Bauer* court's rejection of ED's positions in that case or the changed circumstances—that the 2016 Rule would be in effect for a minimum of nearly two years.

144.     In so doing, ED failed to provide Plaintiff and other interested members of the public a meaningful opportunity to comment on its proposed changes to the 2016 Rule, and thus failed to observe procedures required by law, in contravention of the APA, 5 U.S.C. § 706(2).

### THIRD CAUSE OF ACTION
### Violation of the APA –Agency action without observance of procedure required by law – Logical Outgrowth

145.     The 2019 Rule imposes a three-year statute of limitations on both "affirmative" and "defensive" borrower defense claims.

146.     The 2018 NPRM did not fairly apprise interested persons that ED was considering placing a three-year statute of limitations on "defensive" borrower defense claims. 84 Fed. Reg. at 49,928 (new § 685.206(e)(6)).

147.     Because the addition of a three-year statute of limitations on "defensive" borrower defense claims was not a logical outgrowth of the 2018 NPRM, Plaintiff and other interested members of the public were deprived of notice and a meaningful opportunity to comment, as required by the APA, 5 U.S.C. § 553(b)(3). ED thus failed to observe procedures required by law, in contravention of the APA, 5 U.S.C. § 706(2).

### FOURTH CAUSE OF ACTION
### Violation of the APA –Agency action arbitrary, capricious, and contrary to law

148.     ED's radical overhaul of the borrower defense claims process, including heightened evidentiary requirements with respect to both scienter and harm, a short limitations time period, an increased standard of proof, and the elimination of the possibility to pursue claims as a group, is arbitrary and capricious, because, among other things, it is contrary to the evidence of the record, unjustifiably imposes burdens on students and those who assist them, including Plaintiff, and fails to acknowledge the role the prior regime had in incentivizing institutions not to make misrepresentations.

149.    ED's elimination of  the 2016 Rule's use of class action waivers and mandatory pre-dispute arbitration agreements is arbitrary and capricious, as it is based on unsupported assertions about the benefits of arbitration and the harms of class actions and access to judicial relief, and failed to take into account the contrary record evidence.

150.    ED's elimination of requirements for institutions to make disclosures about their financial conditions and about students' loan repayment rates was arbitrary and capricious, because it failed to acknowledge the harm that the change will cause to students and federal taxpayers, did not recognize its inconsistency from prior agency position, and was internally inconsistent with ED's repeated assertions as to the value of information.

151.    ED's alterations to the closed school discharge process—eliminating automatic closed school discharges and the requirement that closing schools provide students with information about the availability of such discharges—is arbitrary and capricious, because it increases the likelihood that students will be unaware of, and not obtain, relief to which they are statutorily entitled, and reflects internally inconsistent reasoning.

152.    Because ED failed to engage in reasoned decisionmaking based on the record before it, the 2019 Rule is arbitrary, capricious, and contrary to law, in contravention of the APA, 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

(A)    Declare the 2019 Rule unlawful because it was promulgated without observance of procedure required by law;

(B)    Declare the 2019 Rule arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(C)     Vacate the 2019 Rule in its entirety;

(D)     Award Plaintiff its costs and expenses, including reasonable attorney's fees; and

(E)     Grant such other relief as this Court deems just and proper.

Dated: February 19, 2020

Respectfully submitted,

/s/ *Adam R. Pulver*
Adam R. Pulver
Adina H. Rosenbaum (application for admission forthcoming)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

Eileen M. Connor
Toby R. Merrill
Michael N. Turi
PROJECT ON PREDATORY STUDENT LENDING,
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003
tomerrill@law.harvard.edu

*Counsel for Plaintiff*