UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK LEGAL ASSISTANCE GROUP,<br><br>                    Plaintiff,<br><br>          v.<br><br>ELISABETH DeVOS, in her official capacity as Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,<br><br>                    Defendants. | No. 20 Civ. 1414 (LGS) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Eileen M. Connor
Toby R. Merrill
Michael N. Turi
PROJECT ON PREDATORY STUDENT LENDING,
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003
tomerrill@law.harvard.edu

Adam R. Pulver
Adina H. Rosenbaum
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-7790
apulver@citizen.org

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 3

    I.    Statutory and Regulatory Background ........................................................ 3

    II.    The 2016 Rule .......................................................................................... 5

    III.    The Rulemaking at Issue ......................................................................... 7

        A.  The 2017–18 Negotiated Rulemaking ............................................... 7

        B.  The Proposed Rule ............................................................................. 8

        C.  The Final Rule .................................................................................... 9

    IV.    Plaintiff NYLAG .................................................................................... 9

LEGAL STANDARD ......................................................................................... 10

ARGUMENT ....................................................................................................... 10

    I.    Plaintiff Has Standing to Challenge the 2019 Rule. ............................... 10

    II.    ED Failed to Comply with Required Procedure. ..................................... 12

        A.  ED failed to engage in meaningful public consultation and negotiated rulemaking before issuing the 2018 NPRM. ...................................... 13

        B.  ED was required to reinitiate, or at least reopen, the rulemaking after the 2016 Rule went into effect. ........................................................ 14

        C.  The three-year limitations period for "defensive" claims was not a logical out-growth of the proposed rule. ................................................. 16

    III.    The 2019 Rule is Arbitrary and Capricious. ........................................... 17

        A.  Changes to the claims process and standard for relief were arbitrary and capri-cious. ..................................................................................... 19

            1.    Three-year limitations period on "defensive" claims ................... 20

            2.    The new standard for relief .......................................................... 22

            3.    Elimination of the group claims process ...................................... 25

            4.    Amount of relief ........................................................................... 27

B.   The rescission of conditions on the use of pre-dispute arbitration agreements and class action waivers was arbitrary and capricious. ...............................................27

C.   ED's elimination of disclosure requirements was arbitrary and capricious. .........30

D.   ED's elimination of automatic closed school discharges was arbitrary and capricious. ............................................................................................................................32

CONCLUSION ....................................................................................................................34

# TABLE OF AUTHORITIES[1]

**CASES**                                                 **PAGE(S)**

*Allina Health Services v. Sebelius,*
   746 F.3d 1102 (D.C. Cir. 2014) ................................................................... 17

*American Iron & Steel Institute v. EPA,*
   115 F.3d 979 (D.C. Cir. 1997) ..................................................................... 14

*American Water Works Ass'n v. EPA,*
   40 F.3d 1266 (D.C. Cir. 1994) ..................................................................... 14

*American Wild Horse Preservation Campaign v. Perdue,*
   873 F.3d 914 (D.C. Cir. 2017) ..................................................................... 21

*Animal Legal Defense Fund v. Perdue,*
   872 F.3d 602 (D.C. Cir. 2017) ..................................................................... 20

*Batalla Vidal v. Duke,*
   No. 16-CV-47561(NGG), 2017 WL 4480198 (E.D.N.Y. Oct. 3, 2017) .......... 8

*Bauer v. DeVos,*
   325 F. Supp. 3d 74 (D.D.C. 2018) ......................................................... 2, 7, 15

*Bull v. United States,*
   295 U.S. 247 (1935) ..................................................................................... 21

*Catawba County v. EPA,*
   571 F.3d 20 (D.C. Cir. 2009) ....................................................................... 14

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
   868 F.3d 104 (2d Cir. 2017) ........................................................................ 11

*County of Westchester v. U.S. Department of Housing & Urban Development,*
   116 F. Supp. 3d 251 (S.D.N.Y. 2015) ......................................................... 10

*Community Nutrition Institute v. Block,*
   749 F.2d 50 (D.C. Cir. 1984) ....................................................................... 15

*Consumer Energy Council of America v. Federal Energy Regulatory Commission,*
   673 F.3d 425 (D.C. Cir. 1982) ..................................................................... 13

---

[1] Comments cited are not included herein, but will be provided to the Court in a Joint Appendix, along with an index, per the Court's June 23, 2020 Order (ECF 33).

*Department of Homeland Security v. Regents of the University of California*,
   No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020) .......................................................31

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2008) ...........................................................................................................18

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ...............................................................................................18, 20

*Hadwan v. U.S. Department of State*,
   340 F. Supp. 3d 351 (S.D.N.Y. 2018) ..................................................................................3

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ...........................................................................................................11

*Hill Dermaceuticals, Inc. v. FDA*,
   709 F.3d 44 (D.C. Cir. 2013) ...............................................................................................8

*Idaho Farm Bureau Federation v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995) .............................................................................................15

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007) ...........................................................................................................16

*Make the Road New York v. Cuccinelli*,
   419 F. Supp. 3d 661 (S.D.N.Y. 2019) ..........................................................................12, 18

*Motor Vehicle Manufacturers Association of the U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*,
   463 U.S. 29 (1983) ........................................................................................................18, 22

*National Ass'n of Psychiatric Health Systems v. Shalala*,
   120 F. Supp. 2d 33 (D.D.C. 2000) .....................................................................................17

*National Black Media Coalition v. FCC*,
   791 F.2d 1016 (2d Cir. 1986) ............................................................................................16

*National Education Ass'n v. DeVos*,
   379 F. Supp. 3d 1001 (N.D. Cal. 2019). ...........................................................................13

*New Jersey v. EPA*,
   626 F.2d 1038 (D.C. Cir. 1980) ........................................................................................13

*New York v. U.S. Department of Health & Human Services*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) ....................................................................17, 20, 31

*New York Civil Liberties Union v. New York City Transit Authority*,
  684 F.3d 286 (2d Cir. 2012).........................................................................................10, 11

*NRDC v. U.S. Department of Energy*,
  362 F. Supp. 3d 126 (S.D.N.Y. 2019)...............................................................................18

*NRDC v. U.S. EPA*,
  279 F.3d 1180 (9th Cir. 2002) .........................................................................................14

*NRDC v. U.S. EPA*,
  676 F. Supp. 2d 307 (S.D.N.Y. 2009) ...............................................................................13

*Nnebe v. Daus*,
  644 F.3d 147 (2d Cir. 2011)..............................................................................................12

*Olsen v. Stark Homes, Inc.*,
  759 F.3d 140 (2d Cir. 2014)..............................................................................................12

*Pen American Center, Inc. v. Trump*,
  No. 18 Civ. 9433 (LGS), 2020 WL 1434573 (S.D.N.Y. Mar. 24, 2020) .........................10

*Pharmaceutical Research & Manufacturers of America v. FTC*,
  44 F. Supp. 3d 95 (D.D.C. 2014) ......................................................................................15

*Portland Cement Ass'n v. EPA*,
  665 F.3d 177 (D.C. Cir. 2011) ..........................................................................................14

*Rural Cellular Ass'n v. FCC*,
  588 F.3d 1095 (D.C. Cir. 2009) ........................................................................................13

*Solite Corp. v. U.S. EPA*,
  952 F.2d 473 (D.C. Cir. 1991) ..........................................................................................15

*Time Warner Cable Inc. v. FCC*,
  729 F.3d 137 (2d Cir. 2013)..............................................................................................16

*USA Group Loan Service, Inc. v. Riley*,
  82 F.3d 708 (7th Cir. 1996) ..............................................................................................13

*Vara v. DeVos*,
  No. 19-cv-12175-LTS, 2020 WL 3489679 (D. Mass. June 25, 2020) ..............................11

*Williams v. Pierce*,
  708 F.2d 57 (2d Cir. 1983)................................................................................................16

*Yale New Haven Hospital v. Azar,*
   No. 3:18-CV-1230 (JCH), 2020 WL 2204197 (D. Conn. May 6, 2020)..........................17

*Yale-New Haven Hospital v. Leavitt,*
   470 F.3d 71 (2d Cir. 2006)................................................................................18

## STATUTES

5 U.S.C. § 553...........................................................................................2, 12

5 U.S.C. §706(2)(A)..........................................................................................10

5 U.S.C. §706(2)(D)..........................................................................................10

20 U.S.C. § 1070..............................................................................................3

20 U.S.C. § 1087..............................................................................................3

20 U.S.C. § 1087(c)(1)....................................................................................1, 4

20 U.S.C. § 1087(c)(2).......................................................................................1

20 U.S.C. § 1087e(h)..........................................................................................3

20 U.S.C. § 1087e(m).........................................................................................3

20 U.S.C. § 1087j..............................................................................................3

20 U.S.C. § 1094..............................................................................................3

20 U.S.C. § 1098a.........................................................................................4, 12

20 U.S.C. § 1098a(a)(1).......................................................................................4

20 U.S.C. § 1098a(a)(2).......................................................................................4

20 U.S.C. § 1098a(b).......................................................................................2, 4

CARES Act, H.R. 78, 116th Cong. § 3513 ...........................................................22

## REGULATIONS

34 C.F.R. § 668.14(a)..........................................................................................3

34 C.F.R. § 668.14(b)..........................................................................................3

34 C.F.R. § 668.14(b)(32) ................................................................................6, 33

34 C.F.R. § 668.171 ................................................................................................5

34 C.F.R. § 668.41(h) ......................................................................................6, 31

34 C.F.R. § 668.41(i) ........................................................................................6, 31

34 C.F.R. § 668.51(i) ............................................................................................27

34 C.F.R. § 668.71(c) ......................................................................................5, 22

34 C.F.R. § 682.200(b) .........................................................................................22

34 C.F.R. § 685.206(e) .......................................................................9, 17, 20, 23, 27

34 C.F.R. § 685.207(b) .........................................................................................22

34 C.F.R. § 685.207(b)(2)(ii) ...............................................................................22

34 C.F.R. § 685.207(c) .........................................................................................21

34 C.F.R. § 685.214(c)(2)(ii) ...........................................................................6, 32

34 C.F.R. § 685.222 ................................................................................................5

34 C.F.R. § 685.222(b) ...........................................................................................5

34 C.F.R. § 685.222(c) ......................................................................................5, 16

34 C.F.R. § 685.222(d) ......................................................................................5, 16

34 C.F.R. § 685.222(d)(7) .......................................................................................5

34 C.F.R. § 685.222(f) ......................................................................................5, 25

34 C.F.R. § 685.222(g) .........................................................................................25

34 C.F.R. § 685.222(h) .........................................................................................25

34 C.F.R. § 685.222(i)(2) .....................................................................................27

34 C.F.R. § 685.300(e) ......................................................................................6, 27

34 C.F.R. § 685.300(f) ......................................................................................6, 27

34 C.F.R. § 685.304 ....................................................................................................27

## OTHER AGENCY MATERIALS

ED, Final regulations; Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75,926, AR-K-1 (Nov. 1, 2016) ......................... *passim*

ED, Final regulations; Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 83 Fed. Reg. 6458, AR-K-175 (Feb. 14, 2018) .................................7

ED, Final rule, notification of partial delay of effective dates; Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 82 Fed. Reg. 27,621, AR-K-165 (Jun. 16, 2017) ....................................................................................6

ED, Interim final rule; delay of effective date; request for comments; Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 82 Fed. Reg. 49,114, AR-K-167 (Oct. 24, 2017) ....................................................................7

ED, Notice of intent to establish negotiated rulemaking committees; Negotiated Rulemaking Committee; Public Hearings, 82 Fed. Reg. 27,640, AR-C-1 (June 16, 2017) .........................................................................................................................7

ED, Notice of proposed rulemaking; Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 83 Fed. Reg. 37,242, AR-B-1 (July 31, 2018) . *passim*

## MISCELLANEOUS

American Bar Ass'n, Section of Dispute Resolution, "Section Membership" ..............................28

American Bar Ass'n, Section of Dispute Resolution, "Benefits of Arbitration for Commercial Disputes," AR-G-3358 ...............................................................................28

James R. Copland, et al., *Class Actions and Mass Torts*, Trial Lawyers, Inc. 2016, Manhattan Institute (2016), AR-G-730 .............................................................................29

## INTRODUCTION

In 2016, defendant U.S. Department of Education (ED) issued a final rule that aimed "to protect student loan borrowers from misleading, deceitful, and predatory practices of, and failures to fulfill contractual promises by, institutions participating in [ED's] student aid programs." AR-K-1 (2016 Rule).[2] Two of the ways the 2016 Rule did so were: (1) by altering the processes by which students could obtain relief from federal student loan debt pursuant to the Higher Education Act's (HEA) "borrower defense" and "closed school discharge" provisions, 20 U.S.C. § 1087(c)(1), and (2) via new regulatory requirements for participating institutions including mandatory disclosure requirements and conditions on the use of forced arbitration clauses and class action waivers. *See* Joint Statement of Facts (JSOF) ¶¶ 23–26.[3]

The 2016 Rule was explicitly premised on the notion that the pre-existing regime did not work, given widespread revelations of fraudulent conduct by schools, particularly in the for-profit sector. Once the scope of this conduct was revealed, many schools suddenly closed. Even where they did not, students were saddled with tens of thousands of dollars in student loan debt incurred in exchange for coursework of little or no value. The 2016 Rule recognized that ED's existing loan discharge process was insufficiently "accessible" to students and did not sufficiently allow ED "to hold schools accountable for actions and omissions that result in loan discharges." AR-K-1. It also recognized that the problems in the industry, and the resulting harm to student borrowers and taxpayers, could not be solved by shifting the onus to students to become wiser consumers, and that

---

[2] All citations to AR-X-### are to the Certified Administrative Record, to be filed with the court at the completion of briefing, per the Court's June 11, 2020 Order. ECF 29.

[3] In accordance with the Court's June 17, 2020 Order, ECF 31, Plaintiff incorporates the concurrently filed Joint Statement of Facts by reference.

holding students to higher burdens in navigating the borrower defense process, given "information asymmetry between borrowers and institutions," would be inappropriate. AR-K-12.

Nonetheless, in 2017, before the 2016 Rule went into effect, ED set out to repeal it. First, ED made three unlawful attempts to delay the rule, all of which were invalidated by a district court. *See Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) (*Bauer I*). Then, while the lawfulness of those delays was being litigated, ED convened a negotiated rulemaking committee, as was required by the HEA. 20 U.S.C. §1098a(b). In the resulting negotiated rulemaking sessions, ED improperly treated the repeal of the 2016 Rule as a *fait accompli*—not even allowing discussion as to the reasoning behind ED's change in position. In 2018, after the negotiated rulemaking failed to reach consensus, ED issued a notice of proposed rulemaking (NPRM) that presumed the 2016 Rule would never go into effect. *See* AR-B-67. Later that year, following the *Bauer* decision, the 2016 Rule went into effect. Nonetheless, in 2019, ED relied on its earlier, stale rulemaking record, which had incorrectly assumed the 2016 Rule would never go into effect, to issue a new rule that essentially eliminates all "institutional accountability," shifts blame to defrauded students, and creates Herculean standards for borrower defense relief.

The 2019 Rule is procedurally flawed because ED failed to engage in meaningful negotiated rulemaking as required by the HEA, and failed to provide a meaningful opportunity to comment as required by the Administrative Procedure Act (APA), 5 U.S.C. § 553. It is also substantively flawed because ED failed to engage in the reasoned analysis required to support rescission of the 2016 Rule. Throughout the Rule, ED repeatedly failed to acknowledge contrary facts and conclusions it relied upon in the 2016 Rule, much less explain its divergence from its 2016 position. ED also repeatedly ignored the benefits associated with the 2016 Rule, and the harms its proposal would cause to student borrowers and taxpayers; this failure to consider important relevant factors

was arbitrary and capricious. The explanations that ED *did* give for rescinding the 2016 Rule were not supported by the record; ED relied on invented problems, including "frivolous" claims and mischievous unidentified third-parties, despite no evidence that these problems existed or that ED's policy changes would do anything to combat these issues even if they did exist.

Because the 2019 Rule is procedurally flawed and arbitrary and capricious, the Court should set aside the 2019 Rule in its entirety.

## BACKGROUND

## I.  Statutory and Regulatory Background[4]

ED distributes more than $120 billion a year in postsecondary student aid via Title IV of the HEA, 20 U.S.C. § 1070 *et seq*—the majority through the Federal Direct Loan Program. AR-G-1693 at 1704, 1722. To receive these funds, schools sign "Program Participation Agreements" (PPAs), via which they agree to comply with the HEA, its implementing regulations, and applicable state laws. 20 U.S.C. § 1094; 34 C.F.R. § 668.14(a)-(b).

Title IV identifies situations in which Congress determined borrowers should not be liable for student loan debt. *See, e.g.*, 20 U.S.C. § 1087, 1087e(h), 1087e(m), 1087j. The statute requires ED to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of" Direct Loans (the "borrower defense" provision). 20 U.S.C. § 1087e(h). It also requires ED to discharge a borrower's liability on loans when a student is "unable to complete the program in which such student is enrolled due to the closure of the institution" ("closed school" discharges) and when a student's eligibility for Title IV loans "was falsely certified by the eligible institution or was falsely certified as a result of a crime of identity

---

[4] Cited materials not in the administrative record may be considered as relevant background information. *See Hadwan v. U.S. Dep't of State*, 340 F. Supp. 3d 351, 355 (S.D.N.Y. 2018).

theft" ("false certification" discharges). 20 U.S.C. § 1087(c)(1).

Congress mandated an unusual amount of public involvement in ED's implementation of these and other Title IV provisions, beyond that required by the APA. First, ED is required to "obtain public involvement in the development of proposed regulations," "provid[ing] for a comprehensive discussion and exchange of information concerning the implementation [of Title IV]." 20 U.S.C. § 1098a(a)(1)–(2). ED is required to "take into account the information received through such mechanisms in the development of proposed regulations." *Id.* §1098a(a)(2). ED is then required to "prepare draft regulations" and "submit such regulations to a negotiated rulemaking process." *Id.* § 1098a(b)(1). After a negotiated rulemaking, ED must publish any proposed rule on which negotiators reach consensus, or a proposed rule of ED's choosing if negotiators do not reach consensus, in the Federal Register for public comment. *See* AR-G-1974.

In 1994, ED promulgated regulations for the assertion of "borrower defenses," which provided that borrowers had a defense to repayment where they demonstrated that a school's acts or omissions "would give rise to a cause of action under applicable State law," but were silent on the process a borrower follows to assert a borrower defense claim. JSOF ¶ 4. Although initially intended to serve as a placeholder, these regulations remained in place for two decades. JSOF ¶ 18. The 1994 regulations were rarely used until 2015, when state and federal investigations revealed that Corinthian Colleges, a group of for-profit schools, had misrepresented their job placement rates to students, eventually leading to the schools' bankruptcy. JSOF ¶ 19. Corinthian's collapse alone led to thousands of borrower defense claims being filed with ED. JSOF ¶ 20. The Corinthian claims, and "the growth of the proprietary higher education sector" more generally, highlighted "difficulties in application and interpretation of the current State law standard, as well as the lack

of clarity surrounding the procedures that apply for borrower defense," leading ED to begin the process of amending its regulations in 2015.  JSOF ¶ 6.

## II.  The 2016 Rule

The resulting rule was published on November 1, 2016, effective July 1, 2017. 2016 Rule, AR-K-1. The 2016 Rule included several provisions designed to increase institutional accountability and protect students and the public fisc, some of which directly regulated the relationship between schools and ED. *See, e.g.*, *id.* at AR-K-53–89. For example, the rule required schools to provide letters of credit upon "triggering" one of specified events that signified financial instability, 34 C.F.R. § 668.171 (2016), and regulated the process by which ED would attempt to recoup funds from schools where it had approved a borrower defense claim, 34 C.F.R. § 685.222(d)(7) (2016).

The rule also included provisions regulating the relationship between students and schools, and between students and ED. *See, e.g.*, AR-K-89–116. Among these provisions, the rule made it easier for borrowers to assert a borrower defense, both substantively and procedurally. *See generally* 34 C.F.R. § 685.222 (2016).The rule provided that borrowers had a defense to repayment if they were party to a judgment against a school based on violations of state or federal law, a school had breached its contractual obligations, or a school had "made a substantial misrepresentation … that the borrower reasonably relied on to the borrower's detriment when the borrower decided to attend, or to continue attending, the school or decided to take out a direct loan." 34 C.F.R. § 685.222(b)–(d) (2016); *see also id.* § 668.71(c) (2016) (defining "misrepresentation"). ED established a six-year statute of limitations for students seeking to recoup amounts already paid on student loans, but provided that, as to amounts still owed, a borrower could assert a defense to repayment at any time. *Id.* § 685.222(d) (2016). The rule also provided ED could adjudicate claims on a group-wide basis when it deemed it appropriate, even absent an application. *Id.* § 685.222(f) (2016).

Second, the 2016 Rule updated the procedures for obtaining false certification and closed school discharges. Closing schools were required to provide borrowers with information about closed school discharges. 34 C.F.R. § 668.14(b)(32) (2016). Students who did not re-enroll in a Title IV-participating institution within three years of their school's closure would be granted "automatic" discharges, without needing to file an application. 34 C.F.R. § 685.214(c)(2)(ii) (2016).

Third, ED added new provisions to PPAs related to the resolution of disputes between students and schools. As a condition of receiving Title IV funds, schools were required to agree not to rely on predispute agreements that barred students from bringing class actions based on conduct that would also give rise to a borrower defense claim. 34 C.F.R. § 685.300(e) (2016). Schools were also required to agree not to enter into mandatory predispute arbitration agreements with students, or rely on such agreements, as to claims based on that conduct. *Id.* § 685.300(f) (2016).

Finally, the 2016 Rule required for-profit institutions to make a variety of disclosures to students and potential students. One provision required for-profit institutions to provide a notice in their promotional materials if the median borrower had failed to pay off or reduce their loan balance by at least one dollar, as calculated by ED. 34 C.F.R. § 668.41(h) (2016). Another required for-profit institutions provide disclosures if the institution experienced one of the events that "triggered" the financial protection requirement. 34 C.F.R. § 668.41(i) (2016).

Two weeks before the 2016 Rule was scheduled to go into effect, ED issued a notice staying the effective date for many of the 2016 Rule's provisions "pending judicial review," citing litigation brought by an association of for-profit colleges, purportedly pursuant to 5 U.S.C. § 705. *See* AR-K-165 (the Section 705 Stay). In that notice, ED also indicated that it intended to "review and revise" the 2016 Rule. *Id.* at AR-K-166.

Student borrowers challenged the Section 705 stay under the APA. *See Bauer v. DeVos*, No. 17-1330, AR-G-22 (D.D.C. filed July 6, 2017). While the *Bauer* action was pending, ED issued two further delay rules. *See* AR-K-167, AR-K-175. These new delays were challenged in *Bauer*. On September 12, 2018, the court held all of ED's delays were unlawful. *Bauer I*, 325 F. Supp. 3d 74. In so doing, it found ED failed to consider at all "how the public interest or the interest of student borrowers would be affected by its decision," *id.* at 108, and that ED's stated concern with compliance costs and "serious questions" as to the lawfulness of the 2016 Rule, particularly the arbitration and class action waiver provisions, represented "an unacknowledged and unexplained inconsistency" with the 2016 Rule, *id.* at 109. The court vacated the rules effective October 16, 2018, after which the 2016 Rule went into effect. JSOF ¶ 15.

## III. The Rulemaking at Issue

### A. The 2017-18 Negotiated Rulemaking

The same day ED issued its stay, it announced its intention to establish a negotiated rulemaking committee "to develop proposed regulations to revise the [2016] regulations on borrower defenses to repayment of Federal student loans and other matters." AR-C-1. That committee met in November 2017, January 2018, and February 2018. *See* 2018 NPRM, AR-B-1, 9.

In those sessions, ED's designated "negotiator" repeatedly treated the repeal of the 2016 Rule as a *fait accompli*, and refused to allow any discussion of the 2016 Rule or whether it was wise to repeal it. *See, e.g.*, Connor Decl., Ex. B (Nov. 13, 2017 Trans.) at 16 (51:43) ("As far as we're concerned, the starting point is the 1994 Regulations.");[5] AR-F-663:4–8 (Feb. 14, 2018 Trans.)

---

[5] Although the Certified Administrative Record contains transcripts of later negotiated rulemaking sessions, it appears ED did not prepare such a transcript for November 13, 2017. The court may consider the authenticated transcript submitted concurrently with this motion, nonetheless, in light of the well-established principle that extra-record evidence is properly considered when "the ad-

("Okay, but what I'm hearing are items that were in the 2016 reg. And we have already considered those items at the Department, and for various reasons we have ruled them out."). ED's negotiator also refused to allow discussion of topics she believed were related to either the *Bauer* or *CAPPS* litigation, including ED's position on the arbitration and class action provisions. Connor Decl., Ex. B at 16 (51:43) ("I think because that is the main point of at least one lawsuit, we are unable to comment on that."); AR-D-475:4–8 (Nov. 15, 2017 Trans.) ("[W]e're not really able to comment on extensive information regarding where we are with arbitration right now."). The negotiated rulemaking committee disbanded on February 15, 2018 without reaching consensus.

### B.  The Proposed Rule

While the unlawful delay rules were in effect, on July 31, 2018, ED issued a notice of proposed rulemaking, in which it "propose[d] rescission of the 2016 final regulations that [ED] delayed through previous notification," 2018 NPRM, AR-B-9. In that proposal, which included more burdensome procedures and a higher standard for obtaining relief, the elimination of nearly all disclosure requirements, and a variety of other changes designed to limit institutional accountability, ED acted "as if the delayed amendments from the 2016 final regulations were never published." *Id.* AR-B-67. During the thirty-day comment period that ended on August 30, 2018, more than 30,000 comments were submitted, including significant numbers of comments in opposition on behalf of student and consumer advocates, civil rights organizations, veterans' groups, legal services providers, and several states. JSOF ¶ 42.

---

ministrative record itself is so deficient as to preclude effective review" of compliance with a procedural requirement. *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013), *cited in Batalla Vidal v. Duke*, No. 16-CV-4756(NGG), 2017 WL 4480198, at *1 (E.D.N.Y. Oct. 3, 2017).

### C. The Final Rule

After the decisions in *Bauer*, ED officials publicly stated the agency would issue a new notice of proposed rulemaking reflecting the *Bauer* decisions and that the 2016 Rule had gone into effect. JSOF ¶ 43. ED did not do so, though. Instead, nearly a year after the 2016 Rule went into effect, ED issued the 2019 Rule, based on the 2018 NPRM and comments submitted in summer 2018, explaining that "an additional NPRM would further delay the finality of the rulemaking process." 2019 Rule, AR-A-2.  As discussed in greater detail below, without limitation, the 2019 Rule:

- Imposed a three-year limitations period on borrowers' ability to raise claims, on both defaulted and non-defaulted loans (AR-A-9–10, 35–37 (discussing § 685.206(e) (2019));

- Eliminated provisions allowing ED to adjudicate claims on a group-wide basis (AR-A-12–13);

- Imposed a new stricter standard for asserting defenses to repayment based on misrepresentations, heightened borrowers' evidentiary burden, and required borrowers to show "financial harm" other than that associated with student loan debt (AR-A-14–35 (discussing § 685.206 (2019) generally);

- Eliminated conditions on the use of forced arbitration clauses and class action bans (AR-A-52–58);

- Eliminated several mandatory disclosure requirements for schools that were in financially precarious situations, had poor records of student success, or were closing (AR-A-89);

- Eliminated automatic closed school discharges (AR-A-60–61); and

- Curtailed and eliminated financial responsibility provisions (AR-A-73–89).

### IV. Plaintiff NYLAG

Plaintiff New York Legal Assistance Group (NYLAG) is a nonprofit organization in New York City that provides a variety of free services to low-income New Yorkers in the areas of immigration, government benefits, family law, disability rights, housing law, special education, and consumer debt, among others. JSOF ¶ 54. NYLAG provides a number of services to student loan

borrowers who are seeking relief from their debt. NYLAG financial counselors, who are not law-yers, provide information and guidance about a variety of debt relief programs. *Id.* ¶ 59. They assist borrowers who are seeking closed school discharges and asserting borrower defenses. *Id*. Staff attorneys and paralegals in NYLAG's Consumer Protection Unit and Special Litigation Unit also provide advice and assistance to borrowers seeking closed school discharges and borrower defense relief, and provide legal representation to some borrowers in these processes. *Id.* ¶ 57.

## LEGAL STANDARD

Under the APA, a reviewing court "shall hold unlawful and set aside agency action" that is "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The question of whether a rule is unlawful under the APA is "a legal one which the district court can resolve on the agency record on a motion for summary judgment." *Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 116 F. Supp. 3d 251, 275–76 (S.D.N.Y. 2015).

## ARGUMENT

## I. Plaintiff Has Standing to Challenge the 2019 Rule.

Plaintiff New York Legal Assistance Group (NYLAG) is a non-profit organization that will be directly impacted by the 2019 Rule. NYLAG has standing to seek relief here because "the organ-ization has an injury-in-fact fairly traceable to a defendant's conduct and likely redressable by a favorable court decision." *Pen Am. Ctr., Inc. v. Trump*, No. 18 CIV. 9433 (LGS), 2020 WL 1434573, at *7 (S.D.N.Y. Mar. 24, 2020) (citing *N.Y. Civil Liberties Union v. N.Y. City Transit Auth*., 684 F.3d 286, 294 (2d Cir. 2012)).

"[A]n organization shows injury-in-fact where, as here, a policy has impeded, and will continue to impede, the organization's ability to carry out its responsibilities." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (quoting *N.Y. Civ. Liberties Union*, 684 F.3d at 295) (cleaned up). A diversion of resources to respond to harm caused by a challenged action constitutes an Article III injury. *Id.* at 111 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

The 2019 Rule will cause NYLAG to divert its resources in a number of ways. First, in eliminating disclosure requirements, ED explicitly foisted the responsibility on student advocacy groups to "help student [*sic*] become wise consumers on the front end." 2019 Rule, AR-A-31. As ED anticipated, NYLAG will be required to provide students with the information that the 2016 Rule either mandated that schools provide themselves or obviated the need for. *See, e.g.*, JSOF ¶ 63. Second, the Rule will both increase the demand for assistance and increase the amount of resources needed to assist students. The new claims standard and process are extremely burdensome and difficult for the average student borrower to navigate on his or her own. *See id.* ¶ 64. The elimination of conditions on the use of class action waivers, AR-A-52–58, means students will be less likely to be able to obtain relief through class actions. ED expressly recognized that such changes would increase demand for entities like NYLAG. *See, e.g.*, AR-A-41 (explaining that students do not need "paid legal counsel" to seek relief under new rule, because "students may seek help from legal aid clinics or take advantage of services from numerous student advocacy groups in submitting a borrower defense to repayment application"). At the same time, given the additional complexities of the application process, and the elimination of the option to submit group applications, AR-A-12–13, NYLAG will be required to spend more time and resources helping each student. *See* JSOF ¶ 65. *Cf. Vara v. Devos*, No. 19-cv-12175-LTS, 2020 WL 3489679 (D. Mass. June 25,

2020) (holding that, under pre-2019 rules, ED was required to adjudicate borrower defense applications submitted on behalf of a group).

The injuries NYLAG will suffer are analogous to those repeatedly acknowledged by courts in this Circuit as sufficient to provide organizational standing. *See, e.g.*, *Make the Road N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 657 (S.D.N.Y. 2019) (finding standing where plaintiffs would "have to expend additional resources helping clients prepare applications for adjustments, representing clients in removal proceedings, and conducting additional trainings" and "develop new materials for legal information sessions that previously could be held on a groupwide basis but now require individualized consultation due to the Rule's complexity"); *see also Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (standing based on organization's need to divert resources "from its other advocacy and counseling activities"); *Nnebe v. Daus*, 644 F.3d 147, 157–58 (2d Cir. 2011) (standing for organization that provided counseling and assistance in obtaining counsel).

## II. ED Failed to Comply with Required Procedure.

To enact a rule under Title IV of the HEA, ED must undertake public consultation and negotiated rulemaking, and then proceed through notice-and-comment rulemaking required by the APA. 20 U.S.C. § 1098a; 5 U.S.C. § 553. In promulgating the 2019 Rule, ED failed to comply with these procedural requirements in three ways: (1) It failed to provide a meaningful opportunity to discuss the need for, and content of, a new rule during the negotiated rulemaking proceedings. (2) It relied on a negotiated rulemaking and notice-and-comment process that were premised on the mistaken assumption that the 2016 Rule never went into effect. (3) It included in the 2019 Rule a provision that was not a logical outgrowth of the 2018 NPRM.

### A. ED failed to engage in meaningful public consultation and negotiated rulemaking before issuing the 2018 NPRM.

"Congress's decision to enact a statutory negotiated-rulemaking requirement in Title IV reflects a congressional determination that the process itself is important." *Nat'l Educ. Ass'n v. DeVos*, 379 F. Supp. 3d 1001, 1028 (N.D. Cal. 2019). Requirements for public participation in the rulemaking process are not mere formalities. Such requirements "ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas." *New Jersey v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980), *quoted in NRDC v. U.S. EPA*, 676 F. Supp. 2d 307, 313 (S.D.N.Y. 2009); *see also Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009) ("The opportunity for comment must be a meaningful opportunity."). For a negotiated rulemaking as to whether to repeal a rule to be meaningful, there must, at the very least, be a willingness to discuss whether to repeal that rule. *Cf. Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n*, 673 F.3d 425, 446 (D.C. Cir. 1982) ("the value of notice and comment prior to repeal of a final rule is that it ensures that an agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal.").

Throughout the negotiated rulemaking, however, ED refused to allow discussion of several relevant points—including the issue of whether or not to repeal the 2016 Rule at all, and ED's position on the arbitration and class action provisions. *See, e.g.*, Connor Decl., Ex. B at 16; AR-F-663:4–8; AR-D-475:4–8. Such a refusal to discuss relevant issues "because the agency was determined to stonewall" is grounds to "invalidate the rule eventually adopted by the agency." *USA Group Loan Service, Inc. v. Riley*, 82 F.3d 708, 714 (7th Cir. 1996) (interpreting HEA negotiated rulemaking requirement).

### B. ED was required to reinitiate, or at least reopen, the rulemaking after the 2016 Rule went into effect.

When relevant information comes to light after the close of the administrative record, "an agency has an obligation to deal with newly acquired evidence in some reasonable fashion." *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1007 (D.C. Cir. 1997); *see also Catawba Cnty v. EPA*, 571 F.3d 20, 45 (D.C. Cir. 2009). An agency must also "'reexamine [its] approach[] if a significant factual predicate changes" while rulemaking is ongoing. *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (quotation omitted). That reexamination requires a new round of public participation where it "would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." *NRDC v. U.S. EPA*, 279 F.3d 1180 (9th Cir. 2002) (quoting *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994)).

Here, significant relevant changes occurred after the end of public participation. Both the 2017–18 negotiated rulemaking and the 2018 NPRM were based on the presumption that the 2016 Rule would not go into effect. *See, e.g.*, Connor Decl., Ex. B at 16 (51:43); 2018 NPRM, AR-B-9 ("we describe the proposed changes to the regulations based on the currently effective regulations and not the delayed provisions of the 2016 final regulations"). In 2018, after the court in *Bauer* vacated the agency's delays as unlawful and the 2016 Rule went into effect, that presumption was no longer valid.

In addition, ED had refused during the negotiated rulemaking to discuss topics that were at issue in *Bauer*. *See* Connor Decl., Ex. B at 16 (51:43) (negotiator refusing to discuss agency's position that 2016 Rule should be rescinded because it was "the main point" of the *Bauer* litigation). To the extent the litigation was ever a valid reason to preclude discussion of an issue central to the need for a new rule, once *Bauer* was decided, it was not even arguably valid to refuse consider comments on the issue.

"[T]he necessity for notice and opportunity to comment on [the 2016 Rule going into effect] was greatly heightened because [ED] relied largely on" its experience implementing the 2016 Rule to support the final rule. *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1403 (9th Cir. 1995). *See, e.g.*, AR-K-1, 5, 78. "[A]gencies may rely on their experience in administering statutes and promulgating regulations so long as the agency identifies this and there is 'an adequate opportunity to respond.'" *Pharmaceutical Research & Mfrs. of Am. v. FTC*, 44 F. Supp. 3d 95, 128 (D.D.C. 2014). And while "an agency may use 'supplementary' data, unavailable during the notice and comment period, that 'expands on and confirms' information contained in the proposed rulemaking" without reopening the comment period, it may only do so if there is "no prejudice" in doing so. *Solite Corp. v. U.S. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991) (quoting *Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 57–58 (D.C. Cir. 1984)). Here, the changed circumstances, and ED's reliance on them, did more than "expand on and confirm" the agency's position in the 2018 NPRM. Members of the public had no ability to comment on ED's implementation of the 2016 Rule or to share the experience of student borrowers under the Rule. Moreover, because ED's negotiator refused to entertain discussion about the wisdom of repealing the 2016 Rule based on the pending litigation in *Bauer*, the committee should have been reconvened as well. *Cf. Bauer I*, 325 F. Supp. 3d at 97 (holding that the same legal standard governs whether negotiated rulemaking is required under the HEA and whether notice-and-comment is required under the APA).

In the 2019 Rule, ED acknowledged that it had "initially considered publishing a second NPRM that used [the 2016] regulations as a starting point," rather than using the 1994 regulations as the starting point. It stated that it decided not to do so to avoid "further delay [of] the finality of the rulemaking process." AR-A-2. The agency's desire to move more quickly, however, did not justify evasion of its statutory obligation with respect to public participation; such "an exception

to the public comment rule … would swallow the rule." *Williams v. Pierce*, 708 F.2d 57, 64 (2d Cir. 1983). Put simply, if an agency seeks to rely on new evidence or changed facts in adopting a final rule, it must allow members of the public to weigh in on the impact of those changes.

### C. The three-year limitations period for "defensive" claims was not a logical outgrowth of the proposed rule.

Where an agency conducts notice-and-comment rulemaking, "the final rule the agency adopts must be 'a logical outgrowth of the rule proposed.'" *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (quoting *Nat'l Black Media Coalition v. FCC*, 791 F.2d 1016, 1022 (2d Cir. 1986)). To provide members of the public with a meaningful opportunity to comment, an agency "must describe the range of alternatives being considered with reasonable specificity." *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 170 (2d Cir. 2013) (cleaned up). In adopting a three-year limitations period for "defensive" claims, ED failed to comply with these principles as nothing in the proposed rule suggested ED was considering *any* limitations period for defensive claims.

An "affirmative" claim is one filed when a borrower's loan is "not in collection proceedings." 2018 NPRM, AR-B-11. A "defensive" claim is one raised "as part of a proceeding related to certain actions by the Department to collect on a Direct Loan." *Id.* The 2016 Rule provided a six-year limitations period for borrowers to file affirmative claims. 34 C.F.R. § 685.222(c), (d) (2016). That limit was "only applicable to students' claims for amounts already paid on student loans," and ED noted that "[a] borrower may assert a defense to repayment at any time." 2016 Rule, AR-K-4.

In its NPRM, ED maintained a distinction between affirmative and defensive claims. Based on its concern about "frivolous claims," *see infra* at 19, the agency proposed either eliminating the ability to file "affirmative" claims in their entirety, or limiting affirmative claims "to the three-year period following the borrower's departure from the institution to ensure that the institution would have access to records that could be relevant to their defense." 2018 NPRM, AR-B-11–12; *see*

*also id.* at AR-B-3. ED did not mention the possibility of imposing a three-year limitation in connection with defensive claims. To the contrary, it stated that, "[u]nder the proposed standard, a borrower may be able to assert a defense to repayment at any time during the repayment period, once the loan is in collections, regardless of whether the collection proceeding is one year or many years after a borrower's discovery of the misrepresentation." *Id.* at AR-B-16; *see also id.* at AR-B-19 ("The proposed regulations do not impose a statute of limitations on the filing of a borrower defense to repayment claim.").

In its final rule, however, ED included "a three-year limitations period for *both* affirmative and defensive claims." 2019 Rule, AR-A-95–97 (discussing new § 685.206(e)(6)). ED's discussion of limitations periods in the NPRM "did not come close to foreshadowing" this change. *New York v. U.S. Dep't of Health & Human Servs.* (*N.Y. v. HHS*), 414 F. Supp. 3d 475, 560 (S.D.N.Y. 2019) (citing *Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 33, 39 (D.D.C. 2000)). That members of the public had notice of potential changes to the limitations period for affirmative claims is irrelevant, given that affirmative and defensive claims pose different policy considerations. Because affected parties could not have anticipated a three-year limitations period for defensive claims based on the 2018 NPRM, the rule is "procedurally defective." *Yale New Haven Hosp. v. Azar*, No. 3:18-CV-1230 (JCH), 2020 WL 2204197, at *9, *10 (D. Conn. May 6, 2020) (citing *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107 (D.C. Cir. 2014)).

## III. The 2019 Rule is Arbitrary and Capricious.

In addition to ED's procedural violations, the arbitrary and capricious reasoning provided in the 2019 Rule independently warrants setting the Rule aside. "An agency action is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *NRDC v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 144 (S.D.N.Y. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). When reversing a prior position, an agency must acknowledge that it is changing positions, and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2008); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."). This requirement is "heightened where the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' as 'a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" *Make the Road N.Y*, 419 F. Supp. 3d at 661 (quoting *Fox*); *see also Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 79 (2d Cir. 2006) (a court's "review is particularly searching" where the agency is reversing course).

The 2019 Rule fails to meet these standards. ED's reasoning is inconsistent with the record, replete with illogical, unsupported, and conclusory statements, and fails to include meaningful justification for its departures from both the policy and factual determinations contained in the 2016 Rule. Two overarching false premises infect the 2019 Rule: (1) that the availability of borrower defense discharges impacts student behavior at and before enrollment, and (2) that, at the claims stage, borrowers and unidentified third-party actors somehow game the system and act in bad-faith. Relying on these unsupported false premises and ignoring the mountains of evidence that bad-faith actions by *schools* led to the need for the 2016 Rule, ED adopted a scheme that blames victims for being defrauded. And at the same time that ED was "urg[ing] students to make informed consumer decisions," 2019 Rule, AR-A-35, it made it harder for students to do so by

eliminating multiple disclosure requirements and allowing recipients of federal taxpayer funds to force student borrowers into mandatory arbitration agreements and class action waivers, which the record evidence shows student borrowers are ill-equipped to understand. As highlighted by the examples discussed below, these deficiencies were pervasive and warrant vacatur of the 2019 Rule.

### A. Changes to the claims process and standard for relief were arbitrary and capricious.

In overhauling the claims process and the standard to be applied in adjudicating applications, ED relied on the supposed problem of "frivolous" claims, defined as those "that allege misrepresentations that actually did not occur, that seek discharge from private rather than Federal loans, or that seek relief from a school not associated with any of the borrower's current underlying loans." 2019 Rule, AR-A-13. ED claimed that its denial of 9,000 applications on these grounds showed that tougher standards than those in the 2016 Rule were necessary to protect taxpayers. *Id.* at AR-A-13–14. First, no information about these applications is contained in the certified Administrative Record. Second, even if ED had evidence that 9,000 claims (over an unknown time period, out of an unknown total) were denied as "unsubstantiated," that evidence would not support *toughening* the standards for borrower defense claims; rather, it would suggest that the standard was adequately screening out claims that should be denied. There is no reason to believe that borrowers who did not qualify under the 2016 Rule but nonetheless submitted claims would not have submitted those same claims under the 2019 Rule, requiring the same expenditure of agency resources to process them. *See* Legal Aid Cmty. Comments (29073) at 13–14 (explaining flaws in agency's justification).[6] Because these 9,000 claims "do not substantiate [ED]'s claim of a problem meriting" making it even more difficult to obtain relief, "[ED]'s reliance even '*in part* on the basis of'"

---

[6] ED has not included the comments submitted to the agency as part of the Certified Administrative Record, but rather "incorporated [them] by [] reference," referring to https://www.regulations.gov/docket?D=ED-2018-OPE-0027. AR-J-1. Plaintiff thus refers to comments by the name

these claims "is enough to render the Rule arbitrary and capricious." *New York v. HHS*, 414 F. Supp. 3d at 546 (quoting *Animal Legal Def. Fund v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017)).

While purporting to be concerned about taxpayer harms, ED failed to consider taxpayer benefits of the process and standard contained in the 2016 Rule; nowhere did ED address the "spillover economic benefits" it had previously acknowledged. *See* 2016 Rule, AR-K-126. For example, in 2016, ED noted that increasing the availability of discharges would allow borrowers "to become bigger participants in the economy, possibly buying a home, saving for retirement, or paying for other expenses," benefitting not just the individual borrowers, but the larger economy. *Id.* Numerous commenters raised this issue. *See, e.g.*, Ctr. for Responsible Lending (CRL) Comments (28126) at 3; Nat'l Student Legal Def. Network (NSLDN) Borrower Defense Comments (31574) at 9; Lawyers' Cmte. for Civ. Rts. Under Law Comments (26266) at 3; N.Y. State Higher Ed. Servs. Corp. Comments (28506); Nat'l Ass'n of State Student Grant & Aid Programs Comments (1419) at 2. Because ED failed to acknowledge its reversal on this point and failed to provide a meaningful explanation as to why it no longer considered these spillover economic benefits germane, its decisionmaking was arbitrary and capricious. *See Encino Motorcars*, 136 S. Ct. at 2127.

In addition to these pervasive flaws, ED's adoption of specific changes to the claims process was inadequately reasoned.

### 1.    Three-year limitations period on "defensive" claims

ED's imposition of a three-year limitations period for defensive claims, § 685.206(e)(6), was invalid not only because it was not a logical outgrowth of the proposed rule, *see supra* at 16–17

---

of their author and unique identification number. Each comment is available at https://www.regulations.gov/document?D=ED-2018-OPE-0027-[Identification Number]. Per the parties' agreement, they will submit a joint appendix containing each comment cited by the parties in summary judgment briefing at the time ED files its reply memorandum.

but because ED's justification was arbitrary and capricious. ED's sole reason for this change was an assumption that institutions would not have "the records needed to defend against" a borrower defense claim more than three years after the end of a borrower's enrollment. 2019 Rule, AR-A-36. ED did not, however, consider any of the other factors that had previously led the agency to treat affirmative and defensive claims differently for limitations purposes.

In the 2016 Rule, ED explained why defensive claims are treated differently from affirmative ones for limitations purposes, relying on the FTC's "Holder Rule," 16 C.F.R. part 433, "general State law principles," and "general principles relating to the defense of recoupment." *See* AR-K-31–32, 34. ED quoted the Supreme Court's decision in *Bull v. United States*, 295 U.S. 247, 262 (1935), for the statement that "[r]ecoupment is in the nature of a defense arising out of some feature of a transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations…." *Id.* at AR-K-34. ED's historical reliance on the Holder Rule in determining statutes of limitations was explicitly raised in comments. *See* Legal Aid Cmty. Comments (29073) at 15, Attachment 2. ED's failure "even to acknowledge its past practice and formal policies regarding [defensive claims], let alone to explain its reversal of course…, was arbitrary and capricious." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017).

In any event, a three-year limitations period for defensive claims is illogical. Inherently, borrowers cannot make a defensive claim until they are in default *and* in collection proceedings. And as a matter of law, borrowers are not required to *begin* making payments until six months after they leave school—not the school that they took out the loan to attend, but *any* Title IV-eligible school. 34 C.F.R. § 685.207(b)-(c). Thus, if a student leaves a school that defrauded them, and enrolls in another school, their obligation to repay will not even begin until six months after they leave the second school. For members of the active duty military, the grace period can be even

longer. 34 C.F.R. § 685.207(b)(2)(ii), (c)(2)(ii). Moreover, borrowers do not enter into default on

the first day their loan payments are due. Currently, all direct loans are in administrative forbear-

ance until September 30, 2020. CARES Act, H.R. 78, 116th Cong. § 3513(a) (2020). Even after

that period, ED will not consider a loan to be in default until a borrower fails to make scheduled

payments for at least 270 days. 34 C.F.R. § 682.200(b). If collections proceedings were to begin

on the very first day of default, an unlikely scenario, the *earliest* opportunity to raise a defensive

claim would be fifteen months after a student leaves school—nearly halfway through the three-

year period allowed under ED's rule. If a student makes even a single monthly payment on their

loan, it would be even later. The three-year statute of limitations thus effectively eliminates the

possibility of defensive claims for a large number of student borrowers. Furthermore, as a result,

it *encourages* the filing of preemptive affirmative claims, contrary to ED's stated goal of *reducing*

the number of affirmative claims, *see, e.g.*, AR-A-9, and discourages students from making partial

or sporadic payments on their loans, as that would simply run out the clock on their ability to file

a defensive claim. ED's failure to acknowledge and consider this obvious, important defect was

arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

### 2.     The new standard for relief

Under the 2016 Rule, a borrower is entitled to relief upon a showing of a "substantial misrep-

resentation" by their school, which includes not only intentional falsehoods, but "any statement

that has the likelihood or tendency to mislead under the circumstances," including statements that

"omit[] information in such a way as to make the statement false, erroneous, or misleading."

§ 668.71(c) (2016). The 2019 Rule adopted a "more stringent definition of misrepresentation" that

requires evidence of an institution's intent to mislead or its reckless disregard for the truth to obtain

relief. 2019 Rule, AR-A-17–18 (discussing § 685.206(e)(3) (2019)). ED also imposed a "documentation" requirement, explaining that "a borrower's affidavit or sworn testimony" as to misrepresentations made by a school will not constitute sufficient evidence of a misrepresentation; rather, borrowers must produce evidence showing the misrepresentation *in writing*. *Id.* at AR-A-30–31. Finally, ED imposed a new independent "financial harm" requirement, insisting that, even if they are able to produce written evidence of an intentional misrepresentation that induced them to take out a loan, a borrower can only obtain relief if they show financial harm *other* than the student debt they took out. *Id.* at AR-A-31–34 (discussing § 685.206(e)(4), (8) (2019)). These three components together make it nearly impossible to obtain borrower defense relief.

In support of these changes, ED maintained that a less strict standard would cause students to act recklessly, or even maliciously, in enrolling in schools and taking out loans. For example, ED stated a higher standard was needed to address a concern that "students either alone, or with the help of unscrupulous third parties, attempt to induce statements that could then be misconstrued or used out of context to relieve borrowers who otherwise received an education from their repayment obligations." *Id.* at AR-A-29–30. This contention is absurd: ED is suggesting that "third parties" are in cahoots with students, getting the students to trick schools into making misrepresentations, enroll in courses, and take out thousands of dollars in loans, just so that years down the line, the students can apply for borrower defense relief. Not surprisingly, no evidence in the record supports the notion that this problem actually exists.

This lack of evidence also highlights the arbitrariness of ED's repeated suggestion that a more stringent standard, and a written evidentiary requirement, would encourage students to become "wise consumers on the front end." *Id.* at AR-A-31; *see also id.* at 30 (standard would encourage "personal responsibility"); *id.* at 7 ("Students are not passive victims; they take an active role in

making informed decisions."). As ED noted in the 2016 Rule, "[g]athering evidence of intent would likely be nearly impossible for borrowers. Information asymmetry between borrowers and institutions, which are likely in control of the best evidence of intentionality of misrepresentations, would render borrower defense claims implausible for most borrowers." 2016 Rule, AR-K-12. ED's assertion that the increased evidentiary burden would not be problematic because students could insist that, during enrollment, institutions provide them with "written representations and documentation," 2019 Rule, AR-A-20, is untethered to the reality of interactions between students and predatory institutions. Such actors often engage in high-pressure sales tactics where students lack bargaining power to force such institutions to do anything, much less put all of their representations in writing. *See, e.g.*, Legal Aid Cmty. Comments (29073) at 32, 41–42; Public Citizen Comments (27568) at 23–24. ED's suggestion that students are in control, while at the same time eliminating disclosure requirements and financial responsibility triggers in other parts of the Rule, ignores the well-documented problems which led to the crisis that gave rise to the 2016 Rule. *See* 2016 Rule, AR-K-37 (rule sought to "even[] the playing field for students"); *see also* Attys. General Comments (26408) at 4–5; Advocates for Basic Legal Equality (ABLE) Comments (27322) at 1–2; The Institute for College Access & Success (TICAS) Comments (28060) at 1.

Even where students can obtain accurate written statements in such settings, such documents cannot be presumed to cancel out the impact of misleading "oral statements (or omissions) made by school representatives, for which no documentary evidence exists." NSLDN Comments (31574) at 7. For example, students have widely reported "that recruiters from various career programs made unsupported job placement claims or guarantees to them verbally in one-on-one recruiting calls or in-person meetings that went further than the more general assertions of job readiness made in school advertisements. These borrowers were not provided written documentation

of these promises, but remember what they were told and how it convinced them to enroll." Legal Aid Cmty. Comments (29073) at 41.

With respect to the financial harm requirement, ED claimed that such a requirement was a "necessary deterrent to unsubstantiated claims," such as anticipated claims predicated upon "disappointments through their college experience and career, such as believing that they would have been better served by a different institution or major." 2019 Rule, AR-A-32. But the record does not support the proposition that (1) students file borrower defense claims simply because they are "disappointed" by their "college experience" or (2) a "financial harm" requirement would be the appropriate means for dealing with such a problem. *Id.* Under either the 2016 Rule or the 2019 Rule, students are not entitled to borrower defense relief because they are "disappointed"; they are entitled to such relief only if their school has made a misrepresentation or defrauded them. ED's strawman argument is evidence of arbitrary and capricious decisionmaking.

### 3.   Elimination of the group claims process

The 2016 Rule contained a process by which ED could decide borrower defense claims raising common issues on a groupwide basis. 34 C.F.R. § 685.222(f)–(h) (2016). ED repealed this provision in its entirety. 2019 Rule, AR-A-11–13. In doing so, ED cited unspecified "evidence of outside actors attempting to personally gain from the bad acts of institutions." *Id.* at AR-A-11. ED did not identify these actors or explain how the group resolution of administrative claims (which contained no attorney fee-shifting or analogous provision) allowed them to "personally gain" in ways that individual claims would not. No evidence in the record shows that anyone manipulated the group claims process created by the 2016 Rule, or even that ED employed the process at all.

In contrast, the record includes detailed comments from legal services providers and state governments—who lack any "personal" incentive—explaining the value of the group claims process

to students and taxpayers. *See, e.g.*, Legal Aid Cmty. Comments (29073) at 44–48; Attys. General Comments (24608) at 11-12; N.Y.C. Dep't of Consumer Affs. Comments (26489) at 3. The comments explain how "group relief promotes equity and efficiency" and why "group relief is essential to ensuring that cheated borrowers get relief." Legal Aid Cmty. Comments (29073) at 44, 45.

ED barely acknowledged these concerns, discounting the increased burden associated with the individual application requirement by stating that student borrowers must sign "a Master Promissory Note—a complicated legal document—as well as other documents in order to sign a loan," and thus could be expected to have no more difficulty completing Borrower Defense applications. 2019 Rule, AR-A-12. This comparison is truly one of apples and oranges—signing a loan document requires far less affirmative effort by a student than the highly complicated application process for borrower defense under the 2019 Rule, which requires the gathering of evidence to establish multiple elements. *Cf. id.* at AR-A-14 (ED's refusal to give credence to social science research on consumer financial products on the grounds it was not "an apples-to-apples comparison."). But even if the applications were similar, students largely do *not* understand the terms and conditions of their Master Promissory Notes and are often pressured to sign such documents quickly and without understanding them. *See, e.g.*, Legal Aid Cmty. Comments (29073) at 32; CRL Comments (28126) at 17 (citing CFPB complaint alleging such conduct by one school); Public Citizen Comments (27568) at 23 (collecting citations to student experiences). As one comment explains, "clients targeted by fraudulent, for-profit schools are the least prepared to navigate the Department's forms and systems, even when those forms and systems are significantly simpler than those likely to be involved in borrower defense." Legal Aid Cmty. Comments (29073) at 11. ED's repeated assertions that students will be able to complete applications unaided are belied by comments in the record as to borrower experiences, *see, e.g.*, *id.* at 23–24, 80; Coalition of 80 Organizations

Comments (26150) at 2, as well as ED's own recognition that students will benefit from assistance from legal aid and other organizations, *see, e.g.*, 2019 Rule, AR-A-41.

### 4.    Amount of relief

The 2016 Rule set out factors for ED to consider in determining the amount of relief to award a borrower that had successfully established a defense to repayment. For a borrower defense predicated on a misrepresentation, the regulation required ED to consider the cost of and the value of the education received. *See* 34 C.F.R. § 685.222(i)(2)(i) (2016). Although the new rule purports to base relief on "the amount of monetary loss that a borrower incurs as a result of a misrepresentation," 34 C.F.R. § 685.206(e)(12) (2019), in fact the regulation only identifies *types* of evidence that shows the existence of *any* monetary loss—*e.g.*, a period of unemployment—and does not provide any guidance as to how much relief should be awarded based on that evidence. ED provided no explanation for this change, and the change was therefore arbitrary and capricious.

### B.  The rescission of conditions on the use of pre-dispute arbitration agreements and class action waivers was arbitrary and capricious.

The 2016 Rule conditioned participation in ED's Title IV programs on schools' agreement not to impose or invoke mandatory pre-dispute arbitration agreements and class action waivers on or against students. 34 C.F.R. § 685.300(e)–(f) (2016). The 2019 Rule replaced those conditions with a requirement that schools could use, but must disclose, such provisions. 34 C.F.R. § 668.51(h) (2019); *id.* § 685.304 (2019). ED's reasoning ignored the evidence in the record and failed to adequately acknowledge its departure from its conclusions in the 2016 Rule.

Many commenters explained how mandatory arbitration agreements make it unlikely that student borrowers will obtain any meaningful relief when they are defrauded by their schools. *See, e.g.*, Public Citizen Comments (27568) at 4–13; New Am. Comments (31868) at 42; Legal Aid Cmty. Comments (29073) at 53–54, 56–59. ED rejected this extensive evidence, and instead relied

on a 2012 pamphlet published by the American Bar Association's Section of Dispute Resolution entitled the "Benefits of Arbitration for Commercial Disputes" for the proposition that arbitration would be beneficial to student borrowers. 2019 Rule, AR-A-54 (citing AR-G-3358). ED's characterization of this pamphlet as "findings" by "the ABA," *id.*, represents either a misunderstanding or a misrepresentation of the document. The ABA Section of Dispute Resolution is a group of alternative dispute resolution professionals. *See* Am. Bar Ass'n, Section of Dispute Resolution, "Section Membership," https://www.americanbar.org/groups/dispute_resolution/membership/. A pamphlet written by a group of professional arbitrators and mediators extoling the benefits of arbitration is not an objective "finding" of the ABA, as ED made it out to be. Particularly given ED's purported "concern" that the availability of class action lawsuits would "benefit the wrong individuals, that is … lawyers and not wronged students," AR-A-57, ED's failure to acknowledge the financial incentive of arbitrators to say good things about arbitration seems particularly disingenuous. Moreover, the discussion in the pamphlet was limited to the experiences of business-to-business arbitration. ED's extrapolation of its conclusions to the student borrower context, without acknowledging this distinction, was irrational—particularly given that, in the very same section, ED rejected a Department of Defense report on predatory lending as irrelevant because it focused on different types of consumer loans. *Id.* at AR-A-55 (declining to consider conclusions of report that examined "payday loans, car title loans, tax refund anticipations loans, and unsecured loans").

ED's rejection of limitations on the use of class action waivers also improperly relied on an article concerning a completely different context—an advocacy piece about mass tort and securities class actions that ED cited for the proposition that class actions benefit "lawyers and not wronged students." *Id*. at AR-A-57 (citing James R. Copland, et al., *Class Actions and Mass Torts*,

Trial Lawyers, Inc. 2016, Manhattan Institute (2016), AR-G-730). ED did not explain how criticism of lawyers handling other kinds of cases was relevant to the student borrower context. It also failed to acknowledge that the article's conclusion was directly contrary to conclusions in the 2016 Rule. There, ED addressed criticisms that "class actions benefit lawyers more than consumers, and may result in modest returns for an individual member of the class," noting that there was no evidence of such a problem in the relevant market—post-secondary education—and that "recent history shows the significant consequences for students and taxpayers in an industry that has effectively barred consumers from using the class action tool." 2016 Rule, AR-K-101. ED was required to acknowledge and explain the inconsistency of its conflicting positions.

ED also reversed its 2016 position that "class actions have significant effects beyond financial recovery for the particular class members, including deterring misconduct by the institution, deterring misconduct by other industry members, and publicizing claims of misconduct that law enforcement authorities might otherwise have never been aware of, or may have discovered only much later." 2016 Rule, AR-K-101. In the 2016 Rule, ED explained that it "expect[ed] that the potential exposure to class actions will motivate institutions to provide value and treat their student consumers fairly in order to reduce the likelihood of suits in the first place," citing specific examples. *Id*. In 2019, ED's only explanation for abandoning this position was that it was "possible" that institutions that changed their practices after class actions were brought against them did so for other reasons, "regardless of whether students had been able to bring class actions." 2019 Rule, AR-A-55. Such cursory speculation is insufficient to justify ED's reversal, particularly in light of the extensive record evidence in support of the 2016 position. *See, e.g.*, Legal Aid Cmty. Comments (29073) at 53–54; Ams. for Fin. Reform Ed. Fund Comments (13941) at 8–9; New Am. Comments (31868) at 43–44; Am. Ass'n of Justice Comments (24647) at 5.

Throughout its discussion of arbitration and class actions, ED repeatedly referred to the concept of choice, explaining that the "government does not know what is best for a particular student." 2019 Rule, AR-A-58. But while increasing consumer choice may be a valid policy goal, both the record and ED's 2016 findings make clear that allowing Title IV recipients to use mandatory pre-dispute arbitration agreements and class-action waivers *reduces* consumer choice. Notably, the 2016 Rule allowed students and schools to enter into *post*-dispute arbitration agreements, explaining that such agreements allow an "informed choice by the student," AR-K-105, a fact that ED ignored in 2019. *See also* New Am. Comments (31868) at 42–43 If arbitration really would produce better, more efficient outcomes for students as ED claims, one would expect students to make that choice, and the problem would be solved. As ED explained in 2016, though, there is no such thing as "informed choice" in the context of pre-dispute agreements; it is "unrealistic to expect the students to understand what arbitration is and thus what they would be relinquishing by agreeing to arbitrate," and there is "no realistic way to improve this awareness." 2016 Rule, AR-K-103. Thus, ED concluded there was no reason to believe that "predispute agreements to arbitrate will result in well-informed choices, particularly by students in the sector of the market in which such agreements are most commonly used." *Id.*; *see also* Public Citizen Comments (27568) at 23–24 (noting pressure to sign without reading); Am. Ass'n of Justice Comments (24647) at 5–6 (noting lack of bargaining power). ED did not acknowledge or explain its changed conclusion that disclosure requirements would allow for well-informed choices. *See* 2019 Rule, AR-A-58.

**C. ED's elimination of disclosure requirements was arbitrary and capricious.**

The 2016 Rule required for-profit institutions to make a variety of disclosures to students and potential students. One provision required for-profit institutions to provide a notice in their promotional materials if the median borrower had failed to pay off or reduce their loan balance by at

least one dollar, as calculated by ED. 34 C.F.R. § 668.41(h) (2016). Another required for-profit institutions to inform students and prospective students if the institution had experienced an event or condition that "triggered" requiring it to provide financial protection to ED, as "these triggers identify events or conditions that signal impending financial problems." AR-K-9 (discussing 34 C.F.R. § 668.41(i) (2016)). At the time, ED explained that such disclosures would "help students, prospective students, and their families make informed decisions based on information about an institution's financial soundness and its borrowers' loan repayment outcomes." *Id.* at AR-K-2.

In 2019, ED eliminated both of these disclosure requirements. As to the loan repayment disclosures, ED's sole explanation was that, under the 2016 Rule, the agency determined whether an institution must make repayment rate disclosures based on data submitted pursuant to a different rule, known as the Gainful Employment rule, and it had rescinded the relevant provisions of the Gainful Employment rule. 2019 Rule, AR-A-89. Although this fact justified a change to the 2016 disclosure requirement, it did not compel ED to eliminate it, and ED did not address alternative methods of calculating loan repayment rates or disclosure requirements that would achieve the same purpose. The failure to consider such alternatives was arbitrary and capricious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, No. 18-587, 2020 WL 3271746, at *14 (U.S. June 18, 2020) ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." (citation omitted)); *see also New York v. HHS*, 414 F. Supp. 3d at 557 (finding rule invalid where agency failed to consider alternatives).

ED also stated that the value of the disclosure requirement was "negated by not knowing the comparable loan repayment rate at a non-profit or public institution." 2019 Rule, AR-A-89. That statement ignores the differences between these different kinds of schools, as well as the fact that low loan repayment rates are far more prevalent in the for-profit industry than at non-profit or

31

public institutions, as explained in the 2016 Rule and in comments. *See, e.g.*, 2016 Rule, AR-K-9 ("We apply the loan repayment rate disclosure only to the for-profit sector primarily because the frequency of poor repayment outcomes is greatest in this sector."); Attys. General Comments (24608) at 2–3. The failure to address these differences was arbitrary and capricious.

ED addressed the elimination of the financial protection disclosures in a single sentence, claiming that the benefit to students was outweighed by concerns for the "reputation" of schools in precarious financial scenarios. *See* 2019 Rule, AR-K-89. ED did not address the contrary conclusion in the 2016 Rule, AR-K-86, or the comments explaining how such disclosures provide incentives for institutions to engage in sound practices, thus protecting both student borrowers and federal taxpayers. *See* NSLDN Fin. Responsibility Comments (24732) at 2–5; Attys. Gen. Comments (26408) at 21–22; New Am. Comments (31868) at 29–32. The elimination of the financial protection disclosures is also inconsistent with ED's repeated emphasis on the need for students to become informed consumers. *See supra* at 30. ED did not acknowledge the fact, supported by the record, that institutions hide their weaknesses in order to prop up failing institutions with federal loan dollars, and that such practices led to the very problem the 2016 Rule aimed to ameliorate. *See id.*; *see also* House Cmte. on Educ. & Workforce Comments (26856) at 5–6.

### D. ED's elimination of automatic closed school discharges was arbitrary and capricious.

The 2016 Rule required ED to discharge the loans of students who did not re-enroll in any Title IV-eligible institution within three years of closure of the school they had previously attended, without requiring them to submit an application. 34 C.F.R. § 685.214(c)(2)(ii) (2016).  At the time, ED noted that such automatic discharges had been available under the 1994 regulations and provided "an important benefit to borrowers." 2016 Rule, AR-K-113.

In eliminating the automatic discharges in 2019, ED stated that such discharges were contrary to the "goals" of encouraging students to complete their educational programs. 2019 Rule, AR-A-60. ED offered no evidence, however, that the availability of a discharge in three years encourages students to pass up the opportunity to pursue another educational program and accrue interest on their loans in the interim. To the contrary, the record shows a number of other factors that may cause students to neither participate in a "teach-out" or pursue other educational opportunities in the intervening three years after their school closes—including lack of opportunity, good faith attempts to work to pay off debts, or lost interest in education because of the negative experience associated with taking out loans for a worthless educational program. *See, e.g.,* NYLAG Comments (25400) at 1; Legal Aid Cmty. Comments (29073) at 84-86; New Am. Comments (31868) at 34. ED also failed to address the extensive comments explaining how burdensome the closed school discharge application process was, and that requiring students to undertake that process, rather than provide them automatic relief, would lead students to be denied the relief they were entitled to by statute. *See, e.g.*, Legal Aid Cmty. Comments (29073) at 80.

At the same time ED eliminated automatic closed school discharges, ED *also* eliminated the requirement that closing schools provide information to students about the (not-automatic) closed school discharge process. *See* 34 C.F.R. § 668.14(b)(32) (2016). ED's explanation that it is "the Department's, not the school's burden to provide this information to students," 2019 Rule, AR-A-60, is inconsistent with the purpose of "Institutional Accountability" regulations, which is to seek to hold accountable schools that have engaged in practices that have led to massive debt for students at taxpayer expense. It is also inconsistent with the view expressed throughout the 2019 Rule, discussed above, that providing students with information is key to their ability to succeed. As ED

33

stated in the 2016 Rule, closed school disclosures would help "the borrower to make an informed decision based on full knowledge of the borrower's options." 2016 Rule, AR-K-109.

ED did not acknowledge, much less address, the obvious cumulative effect of eliminating the requirement that schools disclose to students that they can file closed school discharge claims, while at the same time eliminating the availability of automatic relief after three years. The harm to students who lack knowledge that they are eligible for closed school discharges, as provided by statute, is made worse by requiring them to affirmatively seek relief in all situations. ED's elimination of each of these provisions was arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment should be granted and the 2019 Rule should be vacated.

Dated: June 29, 2020                                      Respectfully submitted,

                                                         /s/ Adam R. Pulver
                                                          Adam R. Pulver
Eileen M. Connor                                          Adina H. Rosenbaum (*pro hac vice*)
Toby R. Merrill                                          PUBLIC CITIZEN LITIGATION GROUP
Michael N. Turi                                          1600 20th Street NW
PROJECT ON PREDATORY STUDENT LENDING,                    Washington, DC 20009
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL              (202) 588-7790
122 Boylston Street                                       apulver@citizen.org
Jamaica Plain, MA 02130
(617) 522-3003
tomerrill@law.harvard.edu

*Counsel for Plaintiff*