UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK LEGAL ASSISTANCE GROUP,<br><br>       Plaintiff,<br><br>v.<br><br>ELISABETH DeVOS, in her official capacity as Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION,<br><br>       Defendants. | No. 20-cv-01414 (LGS) |

## DECLARATION OF JANE GREENGOLD STEVENS

I, Jane Greengold Stevens, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Co-Director of the Special Litigation Unit (SLU) at New York Legal Assistance Group (NYLAG), a non-profit organization based in New York, New York.  I have worked at NYLAG for almost 19 years and during the majority of that time have been the Director or Co-Director of SLU.

2. NYLAG is a nonprofit that provides free civil legal services and financial counseling to, and engages in policy advocacy efforts to help New Yorkers experiencing poverty. NYLAG provides a variety of free services to low-income New Yorkers in the areas of immigration, government benefits, family law, disability rights, housing law, special education, and consumer debt, among others. These services include free legal services, financial counseling, and community education and partnerships.

3. For more than 18 years, several units at NYLAG have devoted significant attention and resources to providing services to student borrowers seeking relief from student loan debt. This work has included class actions challenging actions and failures to act by the U.S. Department of Education (ED) and its servicers, representing individual borrowers in both judicial and administrative proceedings, and educating and advising borrowers about, and assisting them with, asserting borrower defenses to repayment.

**NYLAG's Multifaceted Structure for Meeting the Needs of Student Borrowers**

4. Many units of NYLAG provide services to student loan borrowers who are seeking relief from their debt. These services are provided without cost to student loan borrowers.

5. SLU collaborates with NYLAG attorneys and financial counselors across practice areas to identify broad institutional failures and initiate class actions and other impact lawsuits to bring about systemic change for thousands of people in need.

6. SLU brings impact litigation seeking to protect student loan borrowers from bad-acting proprietary trade schools, law-breaking debt collectors, and ED itself, and has represented individual borrowers in court cases, particularly concerning defense to repayment.

7. In addition to its class actions, SLU has counseled 66 students who attended a now-closed for-profit school, Technical Careers Institute, about their rights to discharge of their loans because of the closing of their school while they were enrolled.

8. Since January 2019, SLU has counseled approximately 175 students who attended one of the many Wilfred Academy of Hair and Beauty Culture schools, in addition to many hundreds of Wilfred students counseled two years before that. about their rights to discharge of their loans because their schools had falsely certified their ability to benefit from the program.

9. Beyond SLU's work, NYLAG operates a hotline for students seeking information and assistance related to for-profit schools and has a dedicated email address for students who attend or attended such schools and believe they were misled or defrauded.

10. Since September 2018 approximately 70 borrowers have called the hotline for advice concerning their student loan debts. NYLAG attorneys or paralegals respond to these calls, provide information and brief advice, and, in some cases, representation.

11. Staff attorneys and paralegals in NYLAG's Consumer Protection Unit (CPU) provide advice and assistance to borrowers seeking closed school discharges and borrower defense relief, and provide legal representation to some borrowers in these processes.

12. CPU, with nine staff attorneys and six paralegals, is dedicated to eradicating abusive debt collection practices, lending violations, and fraud that create barriers to education, job mobility, stable housing, and, in some cases, safety for our clients. CPU's work promotes the long-term financial security of families with low incomes and aims to stop the cycle of debt and poverty. CPU focuses on individual representation in cases that include debt collection defense, foreclosure defense, and bankruptcy.

13. The Consumer Protection Project (CPP) is a division of CPU that handles all forms of unsecured debt, including student loans. CPP consists of a director, four staff attorneys, and a paralegal. Three of CPP's staff attorneys and its paralegal work on student loans as part of their regular caseloads.

14. Many borrowers come to CPP as a result of a partnership with New York City's Office of Financial Empowerment, which aims to help New Yorkers become financially secure and contracted with NYLAG to provide legal support to New Yorkers struggling with student

loan debt. CPP also serves clients with student loan issues who are referred from other units within NYLAG and from NYLAG's general intake line

15. Since 2018, CPP has counseled hundreds of clients struggling with student loan debt. In 2018 and 2019, CPP served 135 unique clients whose primary issue was student loan debt.

16. CPP's work involving student loans ranges from brief advice and counsel to full representation cases that can take years of litigation.

17. CPP counsels clients with student loan debt about their options for making their loan payments more affordable.

18. CPP also assists borrowers whose federal loans are in default, counseling them on the consequences of default and assisting them in bringing their loans back into good standing through rehabilitation or consolidation.

19. As a standard practice, during these consultations, CPP staff screen clients for potential eligibility for loan discharges based on disability, false certification of the students' eligibility for the loan, closing of the school during the client's attendance, unpaid refund discharges, and defense to repayment discharges.

20. If CPP determines that a client is potentially eligible for a discharge based on the misconduct of the school, whether that is a defense to repayment discharge or a false certification discharge, CPP works to gather information about both the school itself and the student's experience at that school, in order to determine the viability of a borrower defense to repayment claim, and then to prepare such a claim.

21. In addition to extensively interviewing the client, CPP takes steps to obtain that student's records as well as gather information as described below.

22. If the school the client attended is still open, CPP contacts the school to request a student's entire file, including academic records as well as financial aid records. If the school is closed CPP seeks student records from the Bureau of Proprietary School Supervision, which oversees and monitors non-degree granting proprietary schools in New York State and maintains student records from closed schools.

23. In many cases, CPP submits freedom of information law (both federal FOIA and New York state FOIL) requests to government agencies. These requests seek both information unique to that student such as academic records, financial aid records, and records of enrollment, and information about the school itself. Requests for information about the school include reports of investigations of that school, information regarding the number of loan discharges granted to students that have attended that school, and complaints made against the school.

24. To date, in assisting individual borrowers, CPP has compiled extensive records of close to a dozen for-profit schools that have engaged in documented misconduct.

25. These investigations take months to complete. CPP expends time composing and submitting the requests, determining what information CPP already has about that school, what additional information is needed, and drafting comprehensive requests that comply with the restricts of freedom of information laws. It usually takes agencies several months to respond to the requests, requiring that CPP continuously track the requests and send follow up requests to ensure the requests are completed. Once a response is provided, CPP must review the response to ensure that all information requested was received, and submits a supplemental request, if necessary.

26. Once CPP receives complete responses to the requests, CPP reviews the information to determine what is relevant to the client's claim, and then compiles that information, together with the client's narrative, to draft the relevant discharge application.

27. NYLAG's Financial Counseling Division (FCD) was launched in 2009 as a pilot project to provide financial guidance in the aftermath of the Great Recession. The division now consists of 13 financial counselors who provide financial education, counseling and coaching, reaching roughly 5,000 clients a year. Financial counselors have advised clients as to the availability of student loan debt relief programs since the beginning of FDC.

28. NYLAG financial counselors, who are not lawyers, provide information and guidance about a variety of debt relief programs. They assist borrowers who are seeking closed school discharges pursuant to 20 U.S.C. § 1087(c), and asserting a defense to repayment ("borrower defense") pursuant to 20 U.S.C. § 1087e(h).

**The Effect of the 2019 Borrower Defense Regulation on NYLAG's work on Behalf of Student Borrowers**

29. When ED issued its notice of proposed rulemaking, NYLAG and other legal services providers recognized that if the 2019 Rule was enacted, it would have a profound negative impact on not only borrowers, but those that serve them.

30. NYLAG submitted comments on ED's proposed rule, and also joined two comments submitted on behalf of a group of organizations. *See* ED-2018-OPE-0027-25400 (NYLAG individual comments); ED-2018-OPE-0027-29073 (Legal Aid Community comments); ED-2018-OPE-0027-26150 (Coalition comments).

31. The 2019 Rule being challenged in this case would require NYLAG to divert substantial additional resources to student loan issues, as explained in more detail below.

32. After ED amended its regulations to improve students' ability to assert borrower defenses and obtain closed school discharges in 2016, NYLAG attorneys, in May 2018, wrote a guide for student borrowers to explain the new rules and provide assistance for borrowers to seek the benefits of the Rule without the assistance of counsel. *See* Borrower Defense to Repayment Guide, https://nylag.sharepoint.com/:b:/g/SpecialLitigationUnit/ESDYuBTja91EvKfTPGEArHwBj7CKbzYdvAmj87fXFEDeIQ?e=3aohWs.

33. If the 2019 Rule remains in place, NYLAG would need to divert resources to revising and/or replacing this guide to reflect the new, more complicated procedures in place for asserting borrower defenses to repayment and closed school discharges.

34. The 2019 Rule would require students asserting borrower defenses to repayment to prove substantial misrepresentations by their schools under a higher standard than they would have under the 2016 Rule. Students would also need to produce additional evidence beyond their own affidavits. This higher standard and evidentiary requirement would make it much harder for students to obtain discharges. Based on our experience, we believe fewer students will be able to take advantage of the borrower defense process themselves, leading more student borrowers to contact NYLAG for assistance – via its for-profit schools hotline, the NYLAG general intake line, or the other means through which NYLAG obtains referrals.

35. The changes to the borrower defense process will also require NYLAG staff attorneys to devote a significantly greater amount of time helping each client.

36. The 2019 rule would require students to prove that their school "acted with an intent to deceive, knowledge of the falsity of a misrepresentation or a reckless disregard for the truth."  This requirement would require a level of investigation by NYLAG staff attorneys

7

that would require substantially more time and resources than currently spent on each application.

37. Because the 2019 Rule would make it more complicated and time consuming for borrowers to seek defense to repayment, SLU and CPP staff would have to spend more time investigating and presenting discharge claims for each borrower. This would require them to divert time and energy from other aspects of their work fulfilling NYLAG's mission

38. Similarly, FCD staff would have to spend more time investigating relevant facts and counseling each borrower.

39. This extra time inevitably means that each unit would need to commit more resources to represent and advise the same number of students.

40. The 2019 Rule's elimination of conditions on the use of class action waivers will mean more schools will seek and more students will sign such waivers, thus further limiting NYLAG's ability to seek group relief for students.

41. If students are precluded from joining class actions or pursuing remedies in judicial fora, they will be more likely to turn to the administrative borrower defense process, leading more student borrowers to seek NYLAG's assistance.

42. Restrictions on class actions and the elimination of group discharges mean that every student who might be eligible for a closed school discharge will have to submit an individual discharge application.

43. As a result of these changes, NYLAG staff will have to assist every student individually, thus significantly increasing the burden on NYLAG's time and resources.

44. The 2019 Rule would punish students who have been misled by unscrupulous colleges by making it more difficult for them to obtain discharges of their loans.

45. NYLAG will be directly affected by that change, because more student loan borrowers will need legal assistance in seeking relief to which they are statutorily entitled and the road to that relief will be more complicated and time consuming.

46. Promulgation of the 2019 Rule would therefore impair NYLAG's mission to represent as many low-income clients as possible while keeping to the high standards it has been able to maintain.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 23, 2020 in Brooklyn, New York.

*Jane Greengold Stevens (Jun 23, 2020 11:18 EDT)*

Jane Greengold Stevens
Co-Director, Special Litigation Unit