**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

NEW YORK LEGAL ASSISTANCE GROUP,

       *Plaintiff*,

   v.

ELISABETH DeVOS, in her official capacity as
Secretary of Education, and UNITED STATES
DEPARTMENT OF EDUCATION,

       *Defendants*.

No. 1:20-cv-01414 (LGS)

**BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK
UNIVERSITY SCHOOL OF LAW AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Richard L. Revesz
Max Sarinsky
Jack Lienke (*pro hac vice* pending)
139 MacDougal Street, 3rd Floor
New York, New York 10012
(212) 992-8932
*Counsel for Amicus Curiae*
*Institute for Policy Integrity*

July 3, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTEREST OF AMICUS CURIAE ..................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................ 2

ARGUMENT ....................................................................................................................... 5

I.   THE DEPARTMENT DISREGARDS MANY OF THE 2019 RULE'S SUBSTANTIAL
     SOCIAL COSTS ........................................................................................................... 5

     A.  The Department Ignores the Costs of Forgone Loan Discharges for Defrauded
         Borrowers and Their Communities .......................................................................... 7

     B.  The Department Assumes Away Costs that the 2019 Rule Will Impose on Future
         Borrowers by Increasing Institutional Misconduct ................................................. 9

     C.  The Department Obscures the Costs of Repealing the 2016 Rule's Regulations on
         Class-Action Waivers, Mandatory Arbitration Clauses, and Financial Disclosure ........ 12

II.  IN STARK CONTRAST TO ITS TREATMENT OF COSTS, THE DEPARTMENT
     TOUTS INFLATED AND ILLUSORY REGULATORY BENEFITS ............................ 16

     A.  The Department Applies the Wrong Baseline to Mask Certain Costs to Borrowers as
         Benefits ................................................................................................................... 17

     B.  By Touting a Reduction in Federal Student-Loan Discharges, the Department
         Improperly Treats a Transfer as a Regulatory Benefit ........................................... 20

CONCLUSION ................................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Air All. Hous. v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018)............................................................. 19, 20

*Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) ......................................................... 2

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011)............................................. 20

*California v. Dep't of the Interior*, 381 F. Supp. 3d 1153 (N.D. Cal. 2019) ................................. 2

*Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49 (2d Cir. 2018) ................................ 14

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008) ........................................................................................................ 4, 21

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ........................................................ 14

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).................................................... passim

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) ................................................................... 6, 9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................... 5, 9

*Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797 (9th Cir. 2005) ................................ 19

*New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019).......... 2

*Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39 (2d Cir. 2003)..................................................... 3

*Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir. 1983) ..................................................... 12

*Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014) ................................................ 12

*United Techs. Corp. v. Dep't of Def.*, 601 F.3d 557 (D.C. Cir. 2010).......................................... 12

**Statutes and Regulations**

5 U.S.C. § 706(2) .................................................................................................... 5

**Statutes and Regulations (cont.)**                                   **Page(s)**

Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49,788 (Sept. 23, 2019)................. passim

Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75,926 (Nov. 1, 2016)....................................................................................................... passim

**Other Authorities**

Adam Looney & Constantine Yannelis, Brookings Papers, *A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions They Attended Contributes to Rising Loan Defaults* (2015)................................................................................ 16

Brief for Institute for Policy Integrity as Amicus Curiae, *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) ................................................. 2

Brief for Institute for Policy Integrity as Amicus Curiae, *New York v. U.S. Dep't of Homeland Security*, No. 19-3591 (2d Cir. filed Jan. 31, 2020).................................................... 2

Briefs for Institute for Policy Integrity as Amicus Curiae, Docket Nos. 26, 48, 79, *Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) ............................................................... 2

Ctr. for Law & Soc. Policy, Comment Letter (Aug. 30, 2018) ...................................... 9

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) ......................... 6, 20, 21

Legal Aid Community, Comment Letter (Aug. 30, 2018) ................................. 9, 13, 15

Office of Info. & Regulatory Affairs, Regulatory Impact Analysis: A Primer (2011)................ 20

Office of Mgmt. & Budget, Circular A-4, Regulatory Analysis (2003)................................ 19, 21

The Institute for Policy Integrity at New York University School of Law ("Policy Integrity")[1] submits this brief as *amicus curiae* in support of Plaintiff's Motion for Summary Judgment, seeking vacatur of Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49,788 (Sept. 23, 2019) ("2019 Rule"), which was promulgated by the Department of Education ("Department"). The 2019 Rule rescinds or revises many provisions of a prior rule, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed. Reg. 75,926 (Nov. 1, 2016) ("2016 Rule").

## INTEREST OF AMICUS CURIAE

Policy Integrity is a nonpartisan, not-for-profit think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in the fields of administrative law, economics, and public policy, with a particular focus on economic issues. Policy Integrity's staff of economists and lawyers has produced extensive scholarship on the use of cost-benefit analysis in regulatory decisionmaking. Its director, Richard L. Revesz, has published more than eighty articles and books on environmental and administrative law, including works that address the legal and economic principles that inform rational agency decisions.[2]

In furtherance of its mission to promote rational decisionmaking, Policy Integrity has filed *amicus* briefs in numerous recent cases addressing economic analyses performed by administrative

---

[1] This brief does not purport to represent the views, if any, of New York University School of Law. Policy Integrity states that no party's counsel authored this brief in whole or in part, and no person contributed money intended to fund the preparation or submission of this brief.

[2] A full list of publications can be found on Prof. Revesz's online faculty profile, https://its.law.nyu.edu/facultyprofiles/index.cfm?fuseaction=profile.overview&personid=20228.

agencies.[3] In many such cases, courts have agreed that the agency's analysis—and, in turn, the rule issued in reliance on that analysis—was arbitrary and capricious for mischaracterizing or ignoring the costs of a regulatory rollback.[4] Of particular relevance here, Policy Integrity filed *amicus* briefs supporting challenges to the Department's three attempts in 2017–18 to suspend the 2016 Rule, arguing that the Department unlawfully disregarded widespread harms that the delays would cause. *See* Briefs for Institute for Policy Integrity as Amicus Curiae, Docket Nos. 26, 48, 79, *Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018). The court vacated all three suspensions. *Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018).

In this case, Plaintiff similarly contends that the 2019 Rule is arbitrary and capricious under the Administrative Procedure Act because the Department fails to properly "acknowledge the harm that the [rule] will cause to students" and the educational system, makes "unsupported assertions about the benefits" of the rule, and "fail[s] to take into account the contrary record evidence" on these costs and benefits, among other reasons. Complaint ¶¶ 149–50; *see also* Plaintiff Br. 17–34. Policy Integrity's expertise in cost-benefit analysis and experience with the Department's related rulemakings give it a unique perspective from which to evaluate this claim.

## SUMMARY OF ARGUMENT

When an agency relies on a cost-benefit analysis as part of its rulemaking, a "fundamental

---

[3] *See, e.g.*, Brief for Institute for Policy Integrity as Amicus Curiae, *New York v. U.S. Dep't of Homeland Security*, No. 19-3591 (2d Cir. filed Jan. 31, 2020) (critiquing cost-benefit analysis underlying Department of Homeland Security's public charge rule for disregarding key health and welfare harms); Brief for Institute for Policy Integrity as Amicus Curiae, *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) (arguing that agency's incomplete assessment of costs and reliance on speculative benefits rendered conscience-protections rule unlawful).

[4] *See, e.g.*, *California v. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1170 (N.D. Cal. 2019) (finding repeal arbitrary due to agency's flawed regulatory impact assessment and lack of "a reasoned explanation" for contradicting prior findings); *New York*, 414 F. Supp. 3d at 546–56.

flaw" undermining that analysis renders the rule unreasonable. *Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 57 (2d Cir. 2003). Here, the Department promulgates the 2019 Rule "only on a . . . determination that [its] benefits justify [its] costs," 84 Fed. Reg. at 49,878, but this determination—and thus the rule itself—is fatally undermined by fundamental errors in the Department's cost-benefit assessment.

Although the Department projects that the Rule's main effect will be a substantial reduction in student-loan discharges, the Department disregards nearly all of the real-world costs that such a reduction will entail—overlooking key social benefits of student-loan discharges that the Department recognized in the 2016 Rule. Specifically, a critical basis for the 2016 Rule was the Department's finding that borrowers whose loans are discharged can "become bigger participants in the economy" by, for example, "buying a home, saving for retirement, or paying for other expenses"—a finding supported by considerable economic research. 81 Fed. Reg. at 76,051. Yet the Department now entirely ignores these impacts in rolling back many of the key provisions of the 2016 Rule, failing to account for the economic and social harm to borrowers and society of these forgone loan discharges.

The Department also disregards costs that the 2019 Rule will impose by increasing institutional misconduct—that is, causing more frequent and widespread defrauding of student borrowers by institutions of higher education. In promulgating the 2016 Rule, the Department found that discharging loans of defrauded borrowers and recouping the value of those discharges from culpable institutions would "deter[] misconduct," such that fewer borrowers would be defrauded in the future. *Id.* at 75,927. But while the 2019 Rule will dramatically reduce financial responsibility for culpable institutions by restricting both student-loan discharges and recoupment mechanisms, the Department implausibly assumes that these rollbacks will in no way undermine

the deterrent effects of the 2016 Rule, effectively papering over the costs on future borrowers who will be defrauded as a result of the 2019 Rule.

The Department similarly obscures the costs of eliminating the 2016 Rule's regulations of class-action waivers and mandatory arbitration clauses in student enrollment agreements, as well as its requirement that loan-repayment rates be disclosed to prospective borrowers. The Department's flimsy excuses for disregarding its past findings on the benefits of these provisions—benefits which the 2019 Rule will forgo—fall far short of the "reasoned explanation" required under the Administrative Procedure Act. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

While neglecting some of the 2019 Rule's largest costs, the Department extols supposed regulatory benefits that are implausible or non-existent. For instance, the Department touts benefits for borrowers whose loans will be forgiven under the new rule, failing to appreciate that such forgiveness would also have occurred under the 2016 Rule and that, in total, the 2019 Rule *reduces* the total volume of loan discharges. The Department also characterizes a reduction in federal outlays as a "benefit" to the federal government, 84 Fed. Reg. at 49,893, violating longstanding executive guidance and agency precedent—as well as basic economic principles—directing agencies to treat a change in federal outlays as a monetary transfer rather than a cost or benefit.

By emphasizing illusory regulatory benefits while ignoring substantial social costs, the Department impermissibly puts a "thumb on the scale" in favor of the 2019 Rule and fails to rationally support its conclusion that benefits justify costs. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198 (9th Cir. 2008). And because the Department relies on this lopsided analysis to justify the 2019 Rule, the rule is arbitrary and capricious.

## ARGUMENT

Final agency actions are arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2), if the agency fails to "examine the relevant data," "consider an important aspect of the problem," or "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). When, as here, an agency amends an existing rule, this standard requires the agency to provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay . . . the prior policy." *Fox*, 556 U.S. at 516. "And when an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable," *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012), even if that analysis was not statutorily required, *id.* at 1039–40.

Here, as previewed above, the Department predicates the 2019 Rule on its "determination that [the rule's] benefits justify [its] costs," 84 Fed. Reg. at 49,878, yet disregards substantial social costs of forgone student-loan forgiveness that it recognized in the 2016 Rule while identifying benefits that are illusory or ill-considered. Each of these two fundamental errors—detailed in turn below—provides an independent basis to vacate the 2019 Rule as arbitrary and capricious.

## I.      The Department Disregards Many of the 2019 Rule's Substantial Social Costs

The Department improperly and impermissibly disregards the 2019 Rule's most significant social costs, failing to acknowledge that, by dramatically scaling back the volume of student-loan discharges for defrauded borrowers that were provided under the 2016 Rule, the current regulations forgo many of the key benefits of that prior rule.

"[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages" of rulemaking. *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015). Accordingly, agencies typically treat costs as a "centrally relevant factor when deciding whether to regulate." *Id*. The Supreme Court has recognized that the concept of regulatory "cost" encompasses "any disadvantage" resulting from a rule, including not just compliance-related financial expenditures but also broader economic and social harms. *Id.* Similarly, the primary executive order governing regulatory cost-benefit analysis instructs agencies that their cost assessments should include "adverse effects on the efficient functioning of the economy, private markets (including productivity, employment, and competitiveness), [and] health, safety, and the natural environment." Exec. Order No. 12,866 § 6(a)(3)(C)(ii), 58 Fed. Reg. 51,735 (Sept. 30, 1993).

Here, as the Department acknowledges, the 2019 Rule will substantially reduce—by roughly $500 million annually—student-loan discharges that would have been provided under the 2016 Rule to borrowers who were defrauded by their financial institutions. 84 Fed. Reg. at 49,888. The Department further recognizes that the 2019 Rule will drastically reduce the percentage of discharged loans recouped from culpable institutions. *Id.* at 49,894 (reporting decline in "Recovery Percent"). Yet whereas the Department recognized in 2016 that student-loan discharges produce widespread economic benefits for defrauded borrowers and deter misconduct when coupled with recovery from culpable institutions, the Department now ignores these factual determinations and fails to acknowledge that the 2019 Rule will cause severe harm to defrauded borrowers while also increasing the number of borrowers who are defrauded. Moreover, the Department compounds this error by failing to recognize additional costs of individual provisions of the 2019 Rule.

### A. The Department Ignores the Costs of Forgone Loan Discharges for Defrauded Borrowers and Their Communities

Because student-loan discharges present widespread economic and social benefits to defrauded borrowers and their communities, which the Department acknowledged in the 2016 Rule, the 2019 Rule—which is expected to result in considerable reductions in student-loan discharges—forgoes those benefits and imposes substantial social costs. Yet now, in promulgating the 2019 Rule, the Department impermissibly disregards these harms.

These social costs of substantial debt for borrowers are manifold, severe, and well-documented. Specifically, as the Department explained in the 2016 Rule, "[r]esearch has shown that large sums of student debt can reduce levels of participation in the economy, especially if borrowers are unable to obtain adequate income to repay their debts." 81 Fed. Reg. at 76,047. Moreover, the Department further recognized, "[r]ecent literature related to student loans suggests that high levels of student debt may decrease the long-term probability of marriage, increase the probability of bankruptcy, reduce home ownership rates, and increase credit constraints." *Id*. at 76,051 (footnotes omitted). Borrower default can also make "everyday activities like signing up for utilities, obtaining insurance, or renting an apartment . . . a challenge," the Department continued, as defaulted borrowers "might also be denied a job due to poor credit, struggle to pay fees necessary to maintain professional licenses, or be unable open a new checking account." *Id*.

Accordingly, by allowing more defrauded borrowers to have their loans discharged, the 2016 Rule was expected to allow many borrowers "to become bigger participants in the economy, possibly buying a home, saving for retirement, or paying for other expenses." *Id.* And while the Department was unable to quantify the precise magnitude of these effects, it recognized that the 2016 Rule would likely "have significant positive consequences for affected borrowers and associated spillover economic benefits," highlighting these myriad effects among the rule's

principal regulatory benefits. *Id.* Needless to say, given that the loan discharges of the 2016 Rule were expected to have widespread benefits for defrauded borrowers and their communities, it stands to reason that the 2019 Rule—by drastically reducing the volume of student-loan discharges, *see* 84 Fed. Reg. at 49,894 tbl.3 (finding that rate of borrower claim success, or "Borrower Percent," will decrease nearly 90 percent under the 2019 Rule)—will have the opposite effect, producing substantial social costs in the form of forgone benefits.

Yet in analyzing the regulatory impacts of the 2019 Rule—under which, by the Department's own projections, less than 8 percent of loan-forgiveness claims against for-profit educational institutions will be granted, versus 65 percent under the 2016 Rule, *id.*—the Department entirely ignores these considerable costs. In stark contrast to its reasoned analysis in the 2016 Rule, the Department now fails to assess the 2019 Rule's impacts on borrowers' "participa[tion] in the economy" or any of the resulting "associated spillover economic" impacts, 81 Fed. Reg. at 76,051—not once mentioning these effects, or the considerable economic research documenting them, at any point in the Department's assessment of the rule's costs and benefits, *see* 84 Fed. Reg. at 49,888–93. The Department's attempts to "disregard contrary or inconvenient factual determinations that it made in the past" regarding the widespread social benefits of student-loan discharge—causing it to overlook some of the key costs of the 2019 Rule—renders its analysis incomplete and unreasonable. *Fox*, 556 U.S. at 537 (Kennedy, J., concurring).

Indeed, the Department disregards not only its prior analysis from the 2016 Rule, but also numerous comments filed in this rulemaking that further underscored the significance of these costs. One comment, for instance, cited "a growing body of research demonstrating . . . negative impacts on individual decision-making about careers, marriage, family formation, and wealth accumulation" as a result of long-term student debt, highlighting research finding "that households

with an average student debt burden experienced a lifetime wealth loss of nearly $208,000 compared to households without student debt, attributable to a decreased ability to put money into retirement savings or invest in a home during the life of the loan." Legal Aid Community, Comment Letter 27 (Aug. 30, 2018) ("Legal Aid Coalition Comments").[5] The Department was further advised that student-loan debt can "limit [borrowers'] ability to continue their postsecondary education elsewhere, and negatively impact their credit score, which can, in turn, limit their ability to rent or purchase a home, buy a car, or find and maintain employment." Ctr. for Law & Soc. Policy, Comment Letter 4 (Aug. 30, 2018).[6]

The Department's total lack of evaluation of these substantial social costs in the 2019 Rule is a far cry from the "central[] relevan[ce]" of costs typical in agency decisionmaking, *Michigan*, 135 S. Ct. at 2707, and represents a complete failure to "examine the relevant data" and "consider [all] important aspect[s]" of the rule's impacts, *State Farm*, 463 U.S. at 43. Because the Department bases the 2019 Rule on its "determination that [the rule's] benefits justify [its] costs," 84 Fed. Reg. at 49,878, yet entirely ignores this key cost, the 2019 Rule is arbitrary and capricious.

### B. The Department Assumes Away Costs that the 2019 Rule Will Impose on Future Borrowers by Increasing Institutional Misconduct

In addition to disregarding costs that the 2019 Rule will impose on borrowers who would have had their loans discharged under the 2016 Rule and now will not, the Department also ignores costs that the new rule will impose on borrowers who would not have been defrauded in the first place under the 2016 Rule and now will. Specifically, while decreasing student-loan discharges and institutional accountability will dilute the deterrent effects of the 2016 Rule—thereby encouraging institutional misconduct relative to the pre-2019 Rule baseline and creating more

---

[5] *Available at* https://www.regulations.gov/document?D=ED-2018-OPE-0027-29073.
[6] *Available at* https://www.regulations.gov/document?D=ED-2018-OPE-0027-24317.

borrowers who will suffer the severe adverse consequences of fraud in the future—the Department implausibly assumes away this cost.

The deterrent impacts of holding institutions financially accountable for misconduct is well established through economic theory, and was recognized by the Department as one of the main benefits of the 2016 Rule. Specifically, the Department found that the 2016 Rule would lead to "improved conduct of schools by holding individual institutions accountable and thereby deterring misconduct," highlighting this impact as one of the rule's "primary . . . benefits." 81 Fed. Reg. at 75,927. This conclusion makes sense: If institutions are financially liable for misconduct, then they have a direct monetary incentive to improve their behavior. And the 2016 Rule held institutions accountable through multiple avenues—such as instituting distress-signaling triggers that required schools to "provide financial protection . . . to insure against future borrower defense claims," along with imposing restrictions on the use of pre-dispute arbitration agreements and class-action waivers. *Id.* Regarding the latter, for instance, the Department explained that limiting class-action waivers would lead to greater "financial recovery" for borrowers and thereby "deter[] misconduct by the institution . . . [and] other industry members." *Id.* at 76,026. Accordingly, because the 2016 Rule held institutions more accountable for fraud, the Department concluded that institutional misconduct would decline under that rule by more than 60 percent within ten years, *id.* at 76,057 tbl.3-A (projecting declining "Conduct Percent" from 2017–2026), as "the worst performers are removed from the system" and "other institutions adapt to the new requirements," *id.* at 76,056. In other words, thousands of future borrowers would be spared the harmful impacts of fraud.

Because the 2019 Rule drastically limits the scope of institutional accountability—saving the industry roughly $150 million annually in discharge reimbursements alone, 84 Fed. Reg. at 49,899 tbl.5—it can naturally be expected to have a lesser deterrent effect than the 2016 Rule, and

thus, relative to that baseline, increase institutional misconduct and the harm to future borrowers. *See id.* at 49,894 (reporting drastic decline in percentage of recovered student-loan discharges). Yet the Department once again entirely disregards this critical cost, explaining that the 2019 Rule continues to "deter unlawful conduct" and so "the Department will not assess the reduction in deterrence [flagged by numerous commenters] as a cost." *Id.* at 49,886. On this basis, the Department assumes virtually the same year-by-year rates of institutional misconduct as it did in the 2016 Rule, *compare id.* at 49,894 tbl.3 *with* 81 Fed. Reg. at 76,057 tbl.3-A (both projecting substantial annual declines)—explaining that the 2019 Rule "is not expected to significantly change the percent of loan volume subject to conduct that might give rise to a borrower defense claim," 84 Fed. Reg. at 49,896.[7] Essentially, the Department concludes that future borrowers will be no more likely to experience fraud—and suffer its many harmful effects—under the 2019 Rule.

This is illogical. Whereas the 2016 Rule anticipated significant liability for institutions that engaged in misconduct through a suite of provisions meant to assist defrauded borrowers and protect taxpayers, the 2019 Rule rolls backs many of those provisions—restricting protections for borrowers (such as the group-claims process and limitations on class-action waivers and pre-dispute arbitration agreements) and taxpayers (including many of the triggering provisions in the 2016 Rule), *see generally id.* at 49,790–91—and, accordingly, results in significantly reduced institutional liability, *id.* at 49,899 tbl.5. In light of these vastly different approaches and impacts, there is no basis to conclude that the 2019 Rule will have the same deterrent effect as the 2016 Rule. Rather, one should expect that more borrowers will be subject to consumer fraud, and suffer

---

[7] The Department's analysis of the 2019 Rule in fact assumes a 5 percent decrease in the rate of institutional misconduct compared to its analysis of the 2016 Rule. This is due to the 2019 Rule's "changes in the misrepresentation definition and removal of the breach of contract claims." 84 Fed. Reg. at 49,896. In other words, the Department assumes that institutional conduct will not change, but narrows what it considers to be misconduct.

the hazardous consequences, as a result of the 2019 Rule. The Department's "conclusory [and] unsupported supposition[]" to the contrary is irrational and does not merit deference. *United Techs. Corp. v. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (internal quotations marks omitted).

Indeed, the Department's cursory rationale for its conclusion—that misconduct will not increase because institutions still face "potential liability, political risk, and some reputational risk [that] will continue to have some deterrent effect," 84 Fed. Reg. at 49,896—does not pass muster. While these factors may indeed have "*some* deterrent effect," *id.* (emphasis added), there is no reason to believe, as the Department reasons, that they will have the same deterrent effect as the 2016 Rule. In fact, because these three factors all pre-date the 2016 Rule, the Department's suggestion that they alone account for all of the deterrence expected under the 2016 Rule contravenes the Department's findings that the 2016 Rule would itself "deter[] misconduct," 81 Fed. Reg. at 75,927. In essence, the Department now assumes that the 2016 Rule had no deterrent effect, contradicting its own prior findings without any "reasoned explanation," *Fox*, 556 U.S. at 516.

In short, the Department's conclusion that the 2019 Rule will not produce costs in the form of increased fraud against student borrowers relies on "sheer speculation" rather than "logic and evidence." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (internal quotation marks omitted). And through this assumption, the Department further "tip[s] the scale" by "ignoring [the] costs" of the 2019 Rule, once again rendering the rule arbitrary and capricious. *Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983).

**C. The Department Obscures the Costs of Repealing the 2016 Rule's Regulations on Class-Action Waivers, Mandatory Arbitration Clauses, and Financial Disclosure**

Separate from its implausible quantitative estimates of the 2019 Rule's overall effect on the volume of loan discharges and the proportion of those discharges that will be recovered from

12

institutions, the Department qualitatively assesses the impacts of particular provisions on borrowers and institutions. But here, too, its assessments omit important regulatory costs and present a one-sided analysis. Most notably, the Department entirely disregards prominent costs of the following regulatory rollbacks:

**Class-Action Waivers and Arbitration Agreements:** The Department fails to recognize the significant costs of eliminating the 2016 Rule's regulations on mandatory arbitration clauses and class-action waivers in student enrollment agreements. When promulgating the 2016 Rule, the Department detailed the "aggressive[]" use of class-action waivers by Corinthian Colleges "to thwart actions by students for . . . abusive conduct," 81 Fed. Reg. at 76,022, and cited a study from the Consumer Financial Protection Bureau ("CFPB") showing that judicial class-action proceedings were highly effective at yielding "net cash or in kind relief to consumers," *id.* at 76,026. Indeed, this government study found that class actions netted consumers $2.2 billion over a five-year period, *id.*, whereas arbitration was far less effective at providing consumer relief, Legal Aid Coalition Comments at 56 (discussing same study). Accordingly, the Department concluded in the 2016 Rule that restricting institutions from entering class-action waivers and mandatory arbitration clauses with their students would help ensure "direct and effective accountability for their misconduct," 81 Fed Reg. at 76,022, and thus would ultimately "deter[] misconduct" by the industry, *id.* at 76,026.

Yet the Department reverses this position in the 2019 Rule, now finding that "mandatory arbitration clauses and class action waivers do not help institutions avoid liability, but instead provide more speedy recovery and potentially greater relief to students impacted by the institutions' alleged conduct." 84 Fed. Reg. at 49,841–42 (internal quotation marks omitted); *see also id.* at 49,842 (claiming that arbitration "provides a more cost-effective and accessible conflict

resolution path than traditional court proceedings"). In other words, the Department not only refuses to admit that restricting borrowers' litigation rights is harmful to borrowers, but even suggests that denying access to a traditional judicial proceeding will benefit borrowers by allowing them to "receive quicker and more generous financial remedies." *Id.* at 49,888.

This claim is illogical for multiple reasons. For one, as noted above, the Department has previously recognized that litigation often allows for more effective relief than arbitration, *see* 81 Fed. Reg. at 76,026, and now "offer[s] barely any explanation" for its sudden reversal, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). Instead, the Department merely notes that Congress passed a resolution disapproving a CFPB rule regarding arbitration agreements in financial contracts that relied on the aforementioned study, which, it claims "reaffirm[s] the strong Federal policy in support of arbitration." 84 Fed. Reg. at 49,844. Yet the fact that Congress disapproved of a CFPB rule hardly negates the evidence that the Department relied upon in the 2016 Rule on the substantial costs of restricting defrauded borrowers from the courthouse, nor does it absolve the Department of its obligation to "consider the . . . costs" of rolling back key provisions of that rule "as part of reasoned decisionmaking," *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 67 (2d Cir. 2018).

Indeed, even assuming that arbitration may be preferable for *some* borrowers, the Department still fails to explain how allowing institutions to require *all* borrowers to pursue this remedy—eliminating the option to engage in litigation or arbitration, which the 2016 Rule secured—will result in no harm to borrowers. Nor does the Department justify its disregard for broader social costs of mandatory arbitration provisions that it previously acknowledged, such as the fact that arbitration "deter[s] publicity that would prompt government oversight agencies to react," 81 Fed. Reg. at 76,022. Indeed, as commenters to this regulation explained, "bans on

classwide arbitration of claims means that evidence of a widespread pattern and practice of unlawful conduct on the part of a school is unlikely to arise in arbitration." Legal Aid Coalition Comments at 58–59.

In short, the Department's failure to recognize any social costs from its reversal of the 2016 Rule's restrictions on mandatory arbitration clauses and class-action waivers is unreasonable.

**Financial Disclosures:** The Department also fails to recognize the cost to borrowers of the elimination of important financial disclosures from for-profit academic institutions. Specifically, in the 2016 Rule, the Department required for-profit institutions to provide borrowers with important disclosures regarding the repayment rate among borrowers who attend the institution. *See, e.g.*, 81 Fed. Reg. at 76,016. As the Department then explained, such disclosure would "help students, prospective students, and their families make informed decisions based on information about . . . its borrowers' loan repayment outcomes," identifying this as one of the rule's "primary . . . benefits." *Id.* at 75,927.

Yet the Department provides virtually no analysis of its elimination of this disclosure in the 2019 Rule, and pays scant attention to the fact that this rollback will weaken the ability of prospective students to make informed financial choices. Instead, the Department simply asserts that information about a for-profit college's loan-repayment rate is useless without knowledge of a "comparable loan repayment rate at a non-profit or public institution." 84 Fed. Reg. at 49,876. But as the Department has previous recognized, "the frequency of poor repayment outcomes is greatest in [the for-profit] sector." 81 Fed. Reg. at 75,934. Indeed, as a recent Brookings study found, "nearly half of for-profit students default on their student loans within five years of entering repayment." Legal Aid Coalition Comments at 7 (citing Adam Looney & Constantine Yannelis, Brookings Papers, *A Crisis in Student Loans? How Changes in the Characteristics of Borrowers*

15

*and in the Institutions They Attended Contributes to Rising Loan Defaults* 50 (2015) ("Brookings Study")). This is almost twice the default rate for "non-selective" four-year nonprofit colleges and five times the default rate for "selective" four-year nonprofit colleges. Brookings Study at 49.

Given the substantially lower repayment rates among borrowers at for-profit institutions, the Department's claim that the value of information about repayment rates at for-profit colleges is "negated" by the lack of comparable information for other institutions, 84 Fed. Reg. at 49,876, rings hollow. As the Department previously acknowledged, eliminating such disclosure will hinder the ability of prospective borrowers to "make informed decisions," 81 Fed. Reg. at 75,927, and the Department fails to provide a "reasoned explanation" for now disregarding that prior finding, *Fox*, 556 U.S. at 516.

## II.    In Stark Contrast to Its Treatment of Costs, the Department Touts Inflated and Illusory Regulatory Benefits

While the Department's insufficient assessment of costs alone renders the 2019 Rule arbitrary and capricious, its analysis of the 2019 Rule's supposed benefits supplies an additional, independent ground to vacate the rule.

Although the Department does not present any clear tally of the 2019 Rule's purported benefits, it generally touts three broad categories of supposedly beneficial impacts: administrative cost savings, benefits for borrowers, and federal cost savings in the form of forgone student-loan discharges. In touting alleged benefits for borrowers, however, the Department repeatedly uses the wrong baseline to assess the 2019 Rule's impacts, failing to appreciate the impacts of this rule on borrowers relative to the baseline of the 2016 Rule. And insofar as the Department points to reduced federal discharges as a regulatory benefit, this violates longstanding principles of cost-benefit analysis counseling the Department to treat the loss of government relief as a transfer of money from defrauded borrowers to the federal government—meaning, in other words, that every

16

dollar "saved" by the federal government is matched by a dollar lost by defrauded borrowers—not a regulatory "benefit" that can justify the 2019 Rule's costs. Accordingly, the only legitimate benefits identified by the Department are administrative cost savings that almost certainly pale in comparison to the rule's substantial, unquantified costs to defrauded borrowers.

We detail these two errors—the Department's flawed analysis of purported benefits for borrowers and treatment of forgone federal student-loan disbursements—in turn below.

### A. The Department Applies the Wrong Baseline to Mask Certain Costs to Borrowers as Benefits

While the Department entirely disregards key harms to defrauded borrowers, as detailed in Section I, *supra*, it compounds this error by falsely claiming that borrowers will actually benefit from the 2019 Rule. The Department's myriad claims of borrower benefits are based on cursory and unsound analyses that suffer from an obvious flaw: namely, the Department's comparison of this rule to a strawman regulatory regime with no protections in place for defrauded borrowers, rather than the proper baseline of the 2016 Rule, which provided considerable protections.

For instance, the Department claims as a benefit of the 2019 Rule that "[s]ome borrowers may be eligible for additional subsidized loans and no longer be responsible for accrued interest on their subsidized loans as a result of their subsidized usage period being eliminated or recalculated" following a successful student-loan discharge. 84 Fed. Reg. at 49,899. Similarly, the Department alleges that borrowers "may benefit from an ability to appeal to the Secretary if a guaranty agency denies their closed school discharge application." *Id.* at 49,888. Plainly stated, however, these are not benefits of the 2019 Rule: While the ability to qualify for additional subsidized loans is a benefit of loan forgiveness generally, the 2019 Rule substantially reduces—not increases—loan forgiveness for defrauded borrowers, *see id.* at 49,894 (projecting impacts on

student-loan forgiveness). Thus, what the Department characterizes as a regulatory benefit is, when properly analyzed with the appropriate baseline, really a substantial cost.

The Department's analysis of its removal of restrictions on class-action waivers and mandatory arbitrary clauses—which the Department claims will benefit borrowers, despite considerable evidence to the contrary, *see supra* Section I.C—suffers from a similar analytical flaw. Specifically, the Department claims that borrowers "would benefit from increased transparency from institutions' disclosures of mandatory arbitration clauses and class action lawsuit waivers in their enrollment agreements," 84 Fed. Reg. at 49,889, as these disclosures would "allow the student to decide whether to enroll at that institution or another," *id.* at 49,841. But claiming "increased transparency" as a regulatory benefit is absurd, since the 2016 Rule imposed conditions on the use of arbitration clauses and class-action waivers and thus, relative to that baseline, the 2019 Rule will leave borrowers more, not less, vulnerable to harm from such clauses and waivers. In other words, it is illogical for the Department to claim that borrowers benefit from heightened disclosure when the underlying items to disclose were heavily regulated under the baseline scenario.

Similarly, the Department applies the wrong baseline in claiming that institutions "may be more motivated to make students whole through the arbitration process in order to avoid defense to repayment claims," *id.* at 49,888. This is because the 2016 Rule also permitted students to pursue their claims through arbitration, yet in that rule, the defense-to-repayment relief that students could pursue in lieu of arbitration was more expansive than under the 2019 Rule, and it was more likely that a discharged loan would ultimately be recovered from the culpable institution rather than borne by the taxpayers. Thus, even if it is true that the possibility of students filing a defense-to-

repayment claim under the 2019 Rule will motivate institutions to settle arbitration claims, such motivation will undoubtedly be weaker than under the 2016 Rule.

The Department's contortion of regulatory costs to report illusory benefits is not only illogical, but also illegal. As courts have explained, "the baseline for measuring the impact of a change or rescission of a final rule is the requirements of the rule itself, not the world as it would have been had the rule never been promulgated." *Air All. Hous. v. EPA*, 906 F.3d 1049, 1068 (D.C. Cir. 2018). Echoing this requirement, longstanding White House guidance on cost-benefit analysis advises agencies to compare the rule's impacts to a baseline representing "what the world will be like if the . . . rule is not adopted," which in the case of a deregulatory rule like this one, "reflect[s] the future effect of current government programs and policies" prior to the deregulatory action. Office of Mgmt. & Budget, Circular A-4, Regulatory Analysis 2, 15 (2003) ("Circular A-4"). By violating this requirement—sometimes comparing the 2019 Rule to a regime with no borrower protection rather than the considerable protections provided under the 2016 Rule—the Department relies on an "[i]naccurate" baseline that effectively "defeat[s] the purpose" of its analysis and impermissibly "skew[s] [the] evaluation" of the 2019 Rule's costs and benefits. *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 811–12 (9th Cir. 2005).

The Department's reliance on an inconsistent baseline is symptomatic of a more fundamental problem with its cost-benefit analysis: an unequal treatment of costs and benefits. That is, the Department "compare[s] the final regulations to" the baseline established under "the 2016 final regulations" when assessing certain beneficial effects of the 2019 Rule, 84 Fed. Reg. at 49,879—such as a reduction in administrative and paperwork costs—yet applies the wrong baseline to hide virtually all of the 2019 Rule's regulatory costs and present them as benefits. "Inconsistently and opportunistically fram[ing] the costs and benefits of [the] rule" in this manner

is flatly impermissible under the Administrative Procedure Act. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148–49 (D.C. Cir. 2011). The Department, in short, "cannot have it both ways." *Air All.*, 906 F.3d at 1068.

### B. By Touting a Reduction in Federal Student-Loan Discharges, the Department Improperly Treats a Transfer as a Regulatory Benefit

While the Department also touts the 2019 Rule's reductions in student-loan discharges as a key motivation behind the rule, *see, e.g.*, 84 Fed. Reg. at 49,791 ("The Department generally seeks to decrease costs to Federal taxpayers and decrease Federal spending through these final regulations."), longstanding principles of regulatory cost-benefit analysis clearly provide that such reductions should be treated as a monetary transfer, not a benefit. The Department errs insofar as it does otherwise.

On this point, some economic background is instructive. The purpose of regulatory cost-benefit analysis is to determine whether a regulation will increase societal welfare. *See* Exec. Order No. 12,866 § 1(a) (instructing agencies to regulate in manner "that maximize[s] net benefits . . . unless a statute requires another regulatory approach"). And from the perspective of society, reductions in federal discharges are neither a cost nor a benefit, but rather a transfer from defrauded borrowers to the federal government. Office of Info. & Regulatory Affairs, Regulatory Impact Analysis: A Primer 8 (2011)[8] ("Transfer payments are monetary payments from one group to another that do not affect total resources available to society," such as "[p]ayment by the Federal government for goods or services provided by the private sector[.]"). In other words, any savings to the federal government from reductions in student-loan discharges are fully offset by the loss of student-loan relief for defrauded borrowers.

---

[8] *Available at* https://www.reginfo.gov/public/jsp/Utilities/circular-a-4_regulatory-impact-analysis-a-primer.pdf.

Although the Department sometimes recognizes that the cost savings to the federal government from decreases in student-loan discharges represent "transfers," 84 Fed. Reg. at 49,879, it nevertheless effectively—and improperly—treats this transfer as a regulatory benefit at numerous points. For instance, as noted above, the Department explains that a "decrease [in] Federal spending" is a principal motivation underlying the rule, *id*. at 49,791, and on numerous occasions identifies potential discharges as "costs," *see, e.g.*, *id.* at 49,898. This violates regulatory guidance and precedent, as noted above, since agencies are directed "not [to] include transfers in the[ir] estimates of the benefits and costs of a regulation." Circular A-4 at 38.

Insofar as the Department effectively treats transfers from defrauded borrowers to the federal government as a regulatory benefit, the agency improperly puts its "thumb on the scale" in favor of the 2019 Rule by "overvaluing" the rule's alleged benefits. *See Ctr. for Biological Diversity*, 538 F.3d at 1198. And while agencies should "adopt a regulation only upon a reasoned determination that the *benefits* of the intended regulation justify its costs," Exec. Order No. 12,866 § 1(b)(6) (emphasis added), the Department circumvents the required analysis by effectively and improperly treating federal cost savings as a regulatory benefit. Because the Department fails to rationally weigh the 2019 Rule's costs against its benefits, its "determination that [the 2019 Rule's] benefits justify [its] costs," 84 Fed. Reg. at 49,878—and thus the 2019 Rule itself—is arbitrary and capricious.

## CONCLUSION

This Court should grant Plaintiff's motion for summary judgment and permanently enjoin the 2019 Rule.

DATED:      July 3, 2020            Respectfully submitted,

/s/ Richard L. Revesz
Richard L. Revesz
Max Sarinsky
Jack Lienke (*pro hac vice* pending)
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, Third Floor
New York, NY 10012
(212) 992-8932
richard.revesz@nyu.edu
*Counsel for Amicus Curiae*
*Institute for Policy Integrity*[9]

---

[9] Policy Integrity gratefully acknowledges John Corgan, Lisa Femia, Youlia Racheva, and Jonathan Silverstone, students in New York University School of Law's Regulatory Policy Clinic, for assisting in the preparation of this brief.