UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEW YORK LEGAL ASSISTANCE GROUP,

                         Plaintiff,

              -v-

ELISABETH DeVOS, in her official capacity as
Secretary of Education, and UNITED STATES
DEPARTMENT OF EDUCATION,

                         Defendants.

20 Civ. 1414

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

JENNIFER C. SIMON
Assistant United States Attorney
        *Of Counsel*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ........................................................................................................................4

   A.   HEA and the Direct Loan Program ...............................................................4

   B.   Development of Borrower Defense Regulations.........................................5

         1.  1994 Regulations .................................................................5

         2.  2016 Regulations .................................................................6

         3.  2019 Regulations .................................................................9

   C.   Plaintiff's Claims.......................................................................................12

ARGUMENT .........................................................................................................................13

   A.   Standard of Review ...................................................................................13

         1.  APA ...................................................................................13

         2. Negotiated Rulemaking Requirement Under HEA....................................15

   B.   ED's Promulgation of the 2019 Regulations Was Neither Arbitrary Nor Capricious ................................................................................................16

   C.   Plaintiff's Challenges to Specific Provisions of the 2019 Regulations Are Also Without Merit...................................................................................20

         1.  Definition of Misrepresentation .................................................20

         2.  Financial Harm .................................................................22

         3.  Group Claims ...................................................................24

         4.  Amount of Relief Afforded to Borrowers ...............................................27

         5. Arbitration and Class Action Waivers .......................................29

         6.  Elimination of Disclosure Requirements ................................................31

         7.  Closed School Discharges .......................................................32

D.      The Statute of Limitations on Defensive Claims Is a Logical Outgrowth of the Proposals Contained in the 2018 NPRM and Is Not Arbitrary or Capricious ...........34

E.      ED Complied with the Relevant Procedural Requirements ......................................38

F.      Even if the Court Determines Some Aspect of the 2019 Regulations Fails to Comply with the APA, the Court Should Not Vacate the 2019 Regulations............40

CONCLUSION .........................................................................................................................41

TABLE OF AUTHORITIES

## Cases

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm.*,
  988 F.2d 146 (D.C. Cir. 1993) ........................................................................ 40, 41

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ........................................................................ 15

*Bauer v. DeVos*,
  325 F. Supp. 3d 74 (D.D.C. 2018) ........................................................................ 10

*Bauer v. DeVos*,
  332 F. Supp. 3d 181 (D.D.C. 2018) ........................................................................ 10

*Bechtel v. Admin. Review Bd.*,
  710 F.3d 443 (2d Cir. 2013) ........................................................................ 14

*Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015) ........................................................................ 40

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ........................................................................ 40

*Camp v. Pitts*,
  411 U.S. 138 (1973) ........................................................................ 16

*Central & SW Servs., Inc. v. EPA*,
  220 F.3d 683 (5th Cir. 2000) ........................................................................ 41

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ........................................................................ 15

*City & Cty. of S.F. v. United States Citizenship & Immigration Servs.*,
  944 F.3d 773 (9th Cir. 2019) ........................................................................ 19, 20

*Cooling Water Intake Structure Coal. v. United States EPA*,
  905 F.3d 49 (2d Cir. 2018) ........................................................................ 34

*Ctr. for Law & Educ. v. United States Dep't of Educ.*,
  315 F. Supp. 2d 15 (D.D.C. 2004) ........................................................................ 39

*Cty. of Westchester v. HUD*,
  802 F.3d 413 (2d Cir. 2015) ........................................................................ 14

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
　140 S. Ct. 1891 (2020) ................................................................................. 14, 15

*Envtl. Def. Fund, Inc. v. Costle*,
　657 F.2d 275 (D.C. Cir. 1981) ............................................................................ 14

*FCC* v. *Fox Television Stations, Inc.*,
556 U. S. 502 (2009) ............................................................................................ 14, 19

*Friends of DeReef Park v. Nat'l Park Service*,
　No. 2:13–cv–03453–DCN, 2014 WL 6969680 (D.S.C. Dec. 9, 2014) .................... 40

*Fund for Animals v. Kempthorne*,
　538 F.3d 124 (2d Cir. 2008) ......................................................................... 14, 30

*Hill Dermaceuticals, Inc. v. FDA*,
　709 F.3d 44 (D.C. Cir. 2013) .............................................................................. 16

*Just Bagels Mfg., Inc. v. Mayorkas*,
　900 F. Supp. 2d 363 (S.D.N.Y. 2012) .................................................................. 16

*Md. Native Plant Society v. U.S. Army Corps of Engineers*,
　332 F. Supp. 2d 845 (D. Md. 2004) ..................................................................... 40

*Motor Vehicle Mfrs. Ass'n*,
　463 U.S. 42 .......................................................................................................... 17

*Nat'l Assoc. of Home Builders v. Defenders of Wildlife*,
　551 U.S. 644, 127 S. Ct. 2518, 168 L. Ed. 2d 467 (2007) ...................................... 14

*Nat'l Black Media Coal. v. FCC*,
　791 F.2d 1016 (2d Cir. 1986) .............................................................................. 35

*Nat. Res. Def. Council v. U.S. Dep't of Agric.*,
　613 F.3d 76, 83-84 (2d Cir. 2010) ....................................................................... 15

*Nat. Res. Def. Council v. EPA*,
　808 F.3d 556, 584 (2d Cir. 2015) .................................................................... 15, 40

*New York v. FERC*,
　783 F.3d 946 (2d Cir. 2015) .......................................................................... 18, 19

*Pacific Bell v. Pac-West Telecomm, Inc.*,
　325 F.3d 1114 (9th Cir. 2003) ............................................................................ 40

*Safari Club Int'l v. Salazar*,
　709 F.3d 1 (2013) ................................................................................................ 15

*United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
  920 F.2d 960 (D.C. Cir. 1990) ................................................................ 40

*USA Grp. Loan Servs. v. Riley*,
  82 F.3d 708 (7th Cir. 1996) ............................................................... 17, 39

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) ............................................................................ 15

## Statutes and Regulations

5 U.S.C. § 553 ............................................................................... *passim*

5 U.S.C. § 705 ..................................................................................... 7

20 U.S.C. § 1070 ................................................................................. 1

20 U.S.C. § 1087a ........................................................................... 1, 4

20 USCS § 1098a(b)(2) ...................................................................... 16

34 C.F.R. 685.206 ......................................................................... *passim*

34 C.F.R. § 685.213 ...................................................................... *passim*

59 Fed. Reg. 61664 ............................................................................. 5

81 Fed. Reg. 39330 ............................................................................. 6

81 Fed. Reg. 75926 ............................................................................. 6

82 Fed. Reg. 27640 ............................................................................. 8

82 Fed. Reg. 41194 ............................................................................. 9

83 Fed. Reg. 37242 ....................................................................... passim

84 Fed. Reg. 49788 ....................................................................... passim

Defendants Elisabeth DeVos, in her official capacity as Secretary of Education, and the United States Department of Education ("ED"), by their attorney Audrey Strauss, Acting United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in opposition to Plaintiff's motion for summary judgment, and in support of the Defendants' cross-motion for summary judgment.[1]

## PRELIMINARY STATEMENT

In this action brought pursuant to the Administrative Procedure Act ("APA"), Plaintiff challenges regulations promulgated by ED concerning defenses student borrowers may raise against the repayment of certain federal loans taken by the students for the purpose of attending institutions of higher education. The challenged regulations were promulgated in 2019 and replaced, in part, certain earlier regulations governing the same subject matter.

Briefly, under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.*, ED is required to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part." *Id.* § 1087e(h). The relevant program here is the William D. Ford Federal Direct Loan Program (the "Direct Loan Program"). Under the Direct Loan Program, the Government provides federal loans directly to eligible students who attend participating institutions of higher education. 20 U.S.C. § 1087a. In the event of a borrower's default in repaying the loan, ED pursues collection from the debtor.

Since the HEA was enacted, ED has undertaken to promulgate borrower defense regulations on three occasions: the regulations were first put in place in 1994, substantially

---

[1] Pursuant to the Court's June 24, 2020 Order (Dkt. No. 36), the parties submitted a preliminary joint statement of facts on June 29, 2020 (Dkt. No. 43), and hereby submit a final joint statement of facts dated July 29, 2020. However, as set forth therein, Defendants do not join the portion that contains Plaintiff's supplemental statement of facts.

revised in 2016, and substantially revised again in 2019.  Plaintiff challenges the most recent iteration of these borrower defense regulations, and related regulations governing closed school loan discharges, on the grounds that the regulations are arbitrary and capricious and do not comply with the procedural requirements of the APA.

Plaintiff's allegations do not support a claim under the APA.  Rather, the Complaint and arguments raised in Plaintiff's motion for summary judgment simply reflect competing views about policy choices that are soundly within the discretion of the agency.  More specifically, Plaintiff plainly favors the policies reflected in the 2016 regulations which – enacted in the immediate wake of the failure of a large, nationwide school operator, affecting thousands of students – imposed heightened protections for student borrowers who sought loan forgiveness. The 2016 regulations, however, were indisputably expensive for taxpayers, imposed significant burdens on educational institutions, and favored the collective resolution of such claims as a group, rather than individualized determinations.

Like the 2016 regulations, the 2019 Regulations reflect the agency's goal to "provide students with a balanced, meaningful borrower defense to repayment claims process that relies on a single, Federal standard," to grant students loan discharges based on applicable borrower defenses that "are adjudicated equitably, swiftly, carefully, and fairly," and to "[d]iscourage schools from committing fraud or other acts or omissions that constitute misrepresentation."  ED, Final Rule, Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49,788, at 49789-90 (Sept. 23, 2019) (the "2019 Regulations").

The 2019 Regulations, however, also reflect the agency's efforts to balance its other stated policy objectives.  Among other things, the agency sought to reduce the burden on

taxpayers, who the agency concluded would otherwise bear the burden of billions of dollars in losses from approvals of loan discharges, and ensure both that institutions are afforded an adequate opportunity to respond to borrower defense to repayment claims, and that the agency has a complete record for the review of such claims. *Id.* at 49789-90.  In addition, the 2019 Regulations reflect the agency's intention to encourage students to seek remedies from the schools themselves rather than from the Government.  That Plaintiff disagrees with some or all of these competing policy objectives does not make ED's action arbitrary and capricious. Moreover, Plaintiff's arguments that the agency did not comply with the procedural requirements of the APA or the HEA are without merit.  Rather, the records demonstrates that the agency appropriately conducted negotiated rulemaking and met all the requirements of notice and comment rulemaking under the APA.

Plaintiff also focuses heavily on the agency's earlier efforts to delay the effective date of the 2016 regulations while the agency was undertaking to draft and promulgate the 2019 Regulations.  But Plaintiff's objections to these delays cannot now form the basis of a challenge to the 2019 Regulations.  Plaintiff correctly points out that the 2016 regulations were initially scheduled to go into effect on July 1, 2017.  84 Fed. Reg. 49788.  And, as detailed below, in response to a lawsuit filed in the District of Columbia on May 24, 2017, ED delayed the effective date of the relevant 2016 borrower defense regulations.  When these delay rules were also challenged by plaintiffs in the District of Columbia, the court concluded that the delay was invalid and, on October 12, 2018, vacated the relevant notices. As a consequence, the 2016 regulations went into effect.

As a result of this procedural history, during the negotiated rulemaking and the notice and comment period for the 2019 Regulations, the 1994 borrower defense regulations were

technically in effect, but – by the time the agency actually published the 2019 Regulations, the

2016 regulations had gone into effect.  Plaintiff takes the position that the 2019 Regulations are

accordingly invalid unless and until the agency commences an entirely new rulemaking process.

But, this argument has no merit, and – particularly as the agency considered all of the substantive

provisions of the 2016 regulations in preparing the 2019 Regulations – Plaintiff's argument

elevates form over substance in a manner not supported by the APA or the relevant case law.

BACKGROUND

**A.      The HEA and the Direct Loan Program**

As noted above, the HEA authorizes ED to operate the Direct Loan Program.  *See* 20

U.S.C. § 1087a, *et seq.*  Under the Direct Loan Program, the Government provides direct loans to

eligible students who attend "participating institutions of higher education selected by the

Secretary."  20 U.S.C. § 1087a.  The loans "shall be made by participating institutions . . . that

have agreements with the Secretary to originate loans, or by alternative originators designated by

the Secretary."  *Id.*  In general, ED provides the funds for the loans directly to the institution of

higher education or to the students themselves.  *Id.*  In the event of a borrower's default in

repaying the loan, the agency pursues collection from the debtor.  ED is required to "specify in

regulations which acts or omissions of an institution of higher education a borrower may assert

as a defense to repayment of a loan made under this part."  *Id.* § 1087e(h).  Section 1087(c)

specifically provides that "if a borrower . . . is unable to complete the program in which such

student is enrolled due to the closure of the institution . . . then the Secretary shall discharge the

borrower's liability on the loan."  *Id.*  The Secretary also has broad authority to "make,

promulgate, issue, rescind, and amend rules and regulations governing the manner of operation

of, and governing the applicable programs administered by, the Department."  *Id.* § 1221e-3.

4

**B.      Development of Borrower Defense Regulations**

**1.      1994 Regulations**

In accordance with its authority under the HEA, ED first put regulations governing

defenses to repayment in place in 1994.  *See* ED, Final Regulations, William D. Ford Federal

Direct Loan Program, 59 Fed. Reg. 61664 (Dec. 1, 1994).  The 1994 regulations specified that

"[i] any proceeding to collect on a Direct Loan, the borrower may assert as a defense against

repayment, any act or omission of the school attended by the student that would give rise to a

cause of action against the school under applicable State law."  *Id.* at 61696; 34 C.F.R.

685.206(c) (1994).  The 1994 regulations specifically indicated that the relevant proceedings

included, but were not limited to, tax refund offset proceedings, wage garnishment proceedings,

salary offset proceedings for federal employees, and credit bureau reporting proceedings.  *Id.*  In

the event a student successfully asserted a borrower defense and received a discharge of the

student loan, the 1994 regulations provided that the agency "may initiate an appropriate

proceeding to require the school whose act or omission resulted in the borrower's successful

defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to

which the defense applies."  *Id.*  The regulations did not expressly provide for affirmative claims

by students; rather, the regulations provided only that the student would only be able to assert a

borrower defense as a defense to a proceeding initiated against him or her.  *Id.*

With respect to student loan discharges relating to institutions that closed, the 1994

regulations provided that "[t]he Secretary discharges the borrower's . . . obligation to repay a

Direct Loan in accordance with the provisions of this section if the borrower . . . did not

complete the program of study for which the loan was made because the school at which the

borrower . . . was enrolled closed[.]"  34 C.F.R. § 685.213(a)(1) (1994).  As is relevant here, the

1994 regulations did not provide for automatic closed school discharges.  *Id. §* 685.213(c)

(1994).  Instead, to qualify for such a discharge, a student was required to submit a written

statement to the agency attesting to the fact that the borrower received the loan to attend a

school, that the borrower did not complete the program of study at that school because the school

closed, and did not complete the program of study through a teach-out at another school or by

transferring academic credits or hours earned at the closed school to another school.  *Id.*  At the

request of ED, the borrower could also be required to produce additional documentation to

demonstrate that the borrower met the qualifications for a closed school discharge.  *Id.*

§ 685.213(c)(3).

### 2.      The 2016 Regulations

Although the regulations governing closed school discharges were amended in the

interim, the 1994 regulations governing borrower defenses remained in place for over two

decades.  In May 2015, a large nationwide school operator, Corinthian Colleges, filed for

bankruptcy.  *See* ED, Notice of Proposed Rulemaking, Student Assistance General Provisions,

Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford

Federal Direct Loan Program, and Teacher Education Assistance for College and Higher

Education Grant Program, 81 Fed. Reg. 39330, 39335 (June 16, 2016).  Citing the resulting

borrower defense claims, which highlighted "difficulties in application and interpretation of the

current State law standard, as well as the lack of clarity surrounding the procedures that apply for

borrower defense," and "the growth of the proprietary higher education sector" more generally,

ED began rulemaking on the topic of borrower defenses to repayment, and, on November 1,

2016, published final regulations on the topic of borrower defenses to repayment.  *See* 81 Fed.

Reg. 75926 (Nov. 1, 2016).

In accordance with the HEA, the 2016 final regulations were scheduled to go into effect

on July 1, 2017.  *Id.* at 75927.  On May 24, 2017, however, the California Association of Private

Postsecondary Schools ("CAPPS") filed a Complaint and Prayer for Declaratory and Injunctive Relief in the United States District Court for the District of Columbia (Court), challenging the 2016 Rule. *See* Complaint and Prayer for Declaratory and Injunctive Relief, *California Association of Private Postsecondary Schools* v. *DeVos,* No. 17 Civ. 00999 (D.D.C. May 24, 2017). On June 16, 2017, ED accordingly published a notification of the delay of the effective date of certain provisions of the 2016 regulations, pursuant to Section 705 of the APA, pending resolution of the judicial challenges to the regulations, explaining that "[i]n light of the pending litigation, and for the following reasons, [ED] has concluded that justice requires it to postpone the effectiveness of certain provisions of the final regulations until the judicial challenges to the final regulations are resolved." *See* 82 Fed. Reg. 27621 (June 16, 2017) (the "705 Notice") (citing 5 U.S.C. § 705). The 705 Notice announced ED's plan to review and revise the regulations through the negotiated rulemaking process required under the HEA. *Id.*

On October 24, 2017, ED issued an interim final rule delaying the effective date of the same provisions of the 2016 Rule until July 1, 2018, and issued a notice of proposed rulemaking ("NRPM") to further delay the effective date to July 1, 2019. *See* 82 Fed. Reg. 49114 (Oct. 24, 2017) (the "Interim Final Rule"); 82 Fed. Reg. 49155 (Oct. 24, 2017). On February 14, 2018, ED published a final rule delaying the regulations' effective date until July 1, 2019. *See* 83 Fed. Reg. 6458 (Feb. 14, 2018) (the "Final Delay Rule").

Following issuance of the 705 Notice, two plaintiffs filed suit challenging the validity of the 705 Notice. *See* Complaint for Declaratory and Injunctive Relief, *Bauer* v. *DeVos*, No. 17 Civ. 1330 (D.D.C. Jul. 6, 2017). The attorneys general of eighteen States and the District of Columbia also filed a complaint challenging the validity of the 705 Notice. *See* *Massachusetts* v. *U.S. Dep't of Educ.,* No. 17 Civ. 01331 (D.D.C. Jul. 6, 2017). Plaintiffs in both

cases subsequently amended their complaints to include a challenge to the Interim Final Rule and

the Final Delay Rule, and the cases were consolidated by the Court.

### 3.   2019 Regulations

#### a. Negotiated Rulemaking Committee and NRPM

In the meantime, as planned and set forth in the 705 Notice, ED commenced the process

of negotiated rulemaking in June 2017.  Specifically, in accordance with the HEA, the agency

published a notice in the Federal Register on June 17, 2017, announcing its intent to establish a

negotiated rulemaking committee to revise the regulations on borrower defenses to the

repayment of federal student loans.  *See* 82 Fed. Reg. 27640.  In a subsequent notice, ED set a

schedule for the committee meetings and indicated that ED anticipated that the committee would

discuss regulations governing the following: borrower defenses, the definition of

misrepresentation as it pertains to borrow defenses, closed school discharges, arbitration, and

class action lawsuits.  *See* 82 Fed. Reg. 41194, 41195; 83 Fed. Reg. 37242, 37248.  The

negotiators included representatives from legal assistance organizations, as well student

representatives.  83 Fed. Reg. 37242, 37249.  The negotiating sessions took place over several

days in late 2017 and early 2018.

During the negotiated rulemaking sessions, the negotiators debated the appropriate

definition of misrepresentation, *see* 83 Fed. Reg. 37242, 37256, the evidentiary standard that

should be applied to borrower defense to repayment claims, *id.* at 37258, the financial harm

requirement, *id.* at 37259, whether to impose time limits on a borrower's ability to assert a

borrower defense to repayment and possible time periods for such limits, *id.* at 37260, the

requirements related to pre-dispute arbitration agreements and class action waivers, *id.* at 37265,

and automatic closed school discharges, *id.* at 37267-8.  The negotiators, however, did not reach

a consensus on these or other issues.

On July 31, 2018, ED published the notice of proposed rulemaking.  *See* 83 Fed. Reg. 37242 (July 31, 2018) (the "2018 NPRM").  The agency also solicited comments on every substantive aspect of the proposed rule and set a 30-day window of time, until August 30, 2018, for the submission of such comments.  In response, more than 38,450 parties submitted comments.  After the comment period had closed, however, on September 12, 2018, the Court in *Bauer* issued a Memorandum Opinion and Order in the consolidated matter, granting the plaintiffs' motion for summary judgment.  *See Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018).  In particular, on September 17, 2018 the Court issued a Memorandum Opinion and Order vacating the Final Delay Rule and the 705 Notice, though temporarily staying vacatur of the 705 Notice.  *Bauer v. DeVos*, 332 F. Supp. 3d 181, 183 (D.D.C. 2018).  The stay expired on October 16, 2018, at which time the 2016 Rule went into effect.  *Bauer v. DeVos*, No. 17 Civ. 1330, Minute Order (D.D.C. Oct. 12, 2018).

### b.  The Final 2019 Regulations

In light of the court's September 2018 decision in *Bauer*, the agency considered publishing a second NRPM that expressly used the 2016 regulations as a baseline.  84 Fed. Reg. 49788, 49789.  Ultimately, however, the agency concluded that the policies proposed in the 2018 NRPM were not affected by which regulation technically formed the baseline.  *Id.*  Moreover, although the 2018 NRPM proposed amendments of the pre-2016 regulations, whereas the final 2019 Regulations amended the 2016 regulations, the agency concluded that there was a meaningful opportunity for the public to comment on each of the regulatory proposals in the NPRM.  *Id.*  An additional NPRM would therefore only further delay the finality of the rulemaking process for borrowers and schools "without adding meaningfully to the public's

participation in the process." *Id.*  Accordingly, on September 23, 2019, the agency published

final regulations amending Parts 668, 682, and 685, of Title 34 of the C.F.R., including the

borrower defense regulations.  *See* 84 Fed. Reg. 49,788.

      In publishing 2019 Regulations, the agency expressly delineated the regulatory objectives

it sought to pursue.  Specifically, the agency stated that these most recent borrower defense

regulations are intended to:

> Provide students with a balanced, meaningful borrower defense to repayment claims process that relies on a single, Federal standard;

> Grant borrower defense to repayment loan discharges that are adjudicated equitably, swiftly, carefully, and fairly;

> Encourage students to directly seek remedies from schools when acts or omissions by the school, including those that do not support a borrower defense to repayment claim, fail to provide a student access to the educational or job placement opportunities promised, or otherwise cause harm to students;

> Ensure that schools, rather than taxpayers, bear the burden of billions of dollars in losses from approvals of borrower defense to repayment loan discharges;

> Establish that the Department has a complete record to review in adjudicating claims by allowing schools to respond to borrower defense to repayment claims and provide evidence to support their responses;

> Discourage schools from committing fraud or other acts or omissions that constitute misrepresentation;

> Encourage closing institutions to engage in orderly teach-outs rather than closing precipitously;

> Enable the Department to properly evaluate institutional financial risk in order to protect students and taxpayers;

> Eliminate the inclusion of lawsuits as a trigger for letter of credit requirements until those lawsuits are settled or adjudicated and a monetary value can be accurately assigned to them;

> Provide students with additional time to qualify for a closed school loan discharge and protect students who elect this option at the start of a teach-out, even if the teach-out exceeds the length of the regular lookback period;

> Adjust triggers for Letters of Credit to reflect actual, rather than potential, liabilities; and
>
> Reduce the strain on the government, and the delay to borrowers in adjudicated valid claims, due to large numbers of borrower defense to repayment applications.

84 Fed. Reg. 49788, 49789-49790.

In pursuit of these policy objectives, the 2019 Regulations revised the federal standard for borrower defenses to repayment, as well as the process for the assertion and resolution of claims. 84 Fed. Reg. 49788, 49790. Among other things, the rule sets a new definition of misrepresentation, requiring "a statement, act, or omission by an eligible school to a borrower that is false, misleading, or deceptive; that was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth; and that directly and clearly relates to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made." 34 C.F.R. § 685.206(e)(3) (2019). Unlike the 2016 regulations, the 2019 Regulations do not contemplate that an inadvertent error by the school, as opposed to a misrepresentation made with knowledge of its falsity, will give rise to a borrower defense to repayment. 84 Fed. Reg. 49788, 49804. The 2019 Regulations also provide greater opportunities for schools and borrowers to provide evidence and arguments when a defense to repayment application has been filed, including providing for an opportunity for each side to respond to the other's submissions. 84 Fed. Reg. 49788, 49790. In addition, the regulations require the borrower to provide evidence to the agency regarding the financial harm he or she incurred as a result of the misrepresentation. *See* 34 C.F.R. § 685.206(e)(4) (2019); 84 Fed. Reg. 49788, 49790.

The 2019 Regulations also expanded the responsibility and financial liability of schools for losses incurred by the agency through the discharge of loans based on a borrower defense to

repayment under these regulations.  84 Fed. Reg. 49788, 49790.  The 2019 Regulations require institutions to take responsibility for the repayment of amounts discharged by the Secretary pursuant to the borrower defense to repayment, closed school discharge, false certification discharge, and unpaid refund discharge regulations. 4 Fed. Reg. 49788, 49791.   Unlike the 2016 regulations, the 2019 Regulations do not prohibit the use of class action waivers or mandatory arbitration agreements by institutions, but instead require that such schools make a plain language disclosure of those requirements prior to enrollment to students and include information about those requirements in a borrower's entrance counseling.  84 Fed. Reg. 49788, 49790.

With respect to close school discharges, the 2019 Regulations forgo the automatic discharge provisions in favor of requiring an application by the individual borrower and extend the time period for a borrower to qualify for a closed school discharge.  The regulations also establish that – in the event a student accepts a teach-out plan (*i.e.* a plan that gives the student an opportunity to complete the degree in some alternative manner in response to the closure of an institution, rather than simply terminating the educational opportunity and obtaining a discharge of the loan) – the student will only qualify for a closed school discharge if the school fails to meet the material terms of the teach-out plan.  *Id*.

C.    **Plaintiff's Claims**

In this action, Plaintiff argues that the 2019 Regulations are arbitrary and capricious in violation of the APA.  Plaintiff challenges the 2019 Regulations as a whole, and also objects to the following specific provisions: (1) the definition of misrepresentation, (2) the use of the financial harm standard; (3) the elimination of the group claims process; (4) the amount of relief afforded to borrowers; (5) the elimination of the prohibition on the use of class action waivers or mandatory arbitration agreements by institutions in favor of disclosure requirements; (6) the

elimination of certain disclosure requirements by institutions; (7) the elimination of automatic closed school discharges in favor of application process. *See* Pl. Br. at 17-34. Plaintiff also challenges the imposition of the three-year statute of limitations on defensive claims on the grounds that it is not a logical outgrowth of the 2018 NPRM. Finally, Plaintiff raises procedural challenges to the manner in which the agency conducted its rulemaking.

ARGUMENT

A.   **Standard of Review**

    **1.   APA**

Under the APA, "a reviewing court must uphold agency action unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Cty. of Westchester v. HUD*, 802 F.3d 413, 430-31 (2d Cir. 2015) (quoting 5 U.S.C. § 706(2)(A)). "Under this narrow standard of review, a court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (internal citations and quotations omitted); *see also FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 513 (2009).

The APA's "arbitrary and capricious" standard is thus "highly deferential" and "presumes the agency's action to be valid." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citations omitted). An agency decision will only be set aside if it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 446 (2d Cir. 2013) (quoting *Nat'l Assoc. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658, 127 S. Ct.

13

2518, 168 L. Ed. 2d 467 (2007)).  Moreover, "the possibility of drawing two conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Fund for Animals v. Kempthorne*, 538 F.3d 124, 132 (2d Cir. 2008) (citation and internal quotation marks and alterations omitted).

As is relevant here, "competing views about policy" between the agency and plaintiffs challenging a regulation do not give rise to a claim under the APA.  *Safari Club Int'l v. Salazar*, 709 F.3d 1, 3 (2013); *see also Regents*, 140 S. Ct. 1891 (observing that the agency "may determine, in the particular context before it, that other interests and policy concerns outweigh any reliance interests.").

The APA requires agencies that intend to promulgate substantive rules to provide "[g]eneral notice" of the proposed rulemaking through publication in the Federal Register, with "reference to the legal authority under which the rule is proposed," and "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b); *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 & n.44 (1979).  Agencies must also "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c). While the courts "are charged with . . . ensuring that agencies comply with the 'outline of minimum essential rights and procedures' set out in the APA," they may not require procedures "beyond those specified in the APA."  *Chrysler Corp.*, 441 U.S. at 312-13 (quoting H.R. Rep. No. 1980, 79th Cong., 2d Sess., 16 (1946), and citing *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 549 n.21 (1978)).

Under the APA, review of the challenged agency action is based on the administrative record rather than extra-record material. *See, e.g.*, *Nat. Res. Def. Council v. U.S. Dep't of Agric.*,

613 F.3d 76, 83-84 (2d Cir. 2010).  This is because "when a party seeks review of agency action

under the APA, the district judge sits as an appellate tribunal.  The entire case on review is a

question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

There are no factual disputes for the court to resolve, and "the focal point for judicial review

should be the administrative record already in existence, not some new record made initially in

the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  Accordingly, Plaintiff's claims

should be evaluated based on the administrative record as set forth at Dkt. No. 28.  *See Just*

*Bagels Mfg., Inc. v. Mayorkas*, 900 F. Supp. 2d 363, 372 n.2 (S.D.N.Y. 2012) (cases based on the

review of an administrative record "present[] only a question of law").  To the extent Plaintiff

relies on information outside the administrative record, that information is not before the Court

and the Court should decline to consider or rely upon it for purposes of resolving Plaintiff's

claims.[2]

### 2.    Negotiated Rulemaking Requirement Under the HEA

Pursuant to the HEA, ED must utilize negotiated rulemaking, unless the agency

determines that applying such a requirement "is impracticable, unnecessary, or contrary to the

public interest."  20 U.S.C. § 1098a(b)(2).  "Participants in the negotiations process shall be

chosen by the Secretary" and must include "individuals and representatives of the groups

involved in student financial assistance programs under this title, such as students, legal

assistance organizations that represent students, institutions of higher education, State student

---

[2] In particular, Defendants oppose Plaintiff's reliance on a purported transcript of the negotiating session
that took place on November 13, 2017.  *See* Dkt. No. 41-2.  The negotiating session that took place on
that date was not recorded or transcribed by the agency, nor was the transcript before the agency during
drafting of the final rule.   The transcript accordingly is not part of the Administrative Record, and the
Court should decline to consider or rely upon it for purposes of resolving Plaintiff's claims.  Plaintiff's
assertion that the Court may nonetheless consider the transcript because "the administrative record itself
is so deficient as to preclude effective review," Pl. Br. at 7 n. 5 (quoting *Hill Dermaceuticals, Inc. v. FDA*,
709 F.3d 44, 47 (D.C. Cir. 2013), is wholly without merit.

grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies." *Id.* § 1098a.  The Secretary is further required to "select individuals with demonstrated expertise or experience in the relevant subjects under negotiation, reflecting the diversity in the industry, representing both large and small participants, as well as individuals serving local areas and national markets." *Id.* § 1098a(b)(2).

The HEA "does not envisage that the negotiations will end in a binding contract." *USA Grp. Loan Servs. v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996).  Rather, the statute "simply creates a consultative process in advance of the more formal arms' length procedure of notice and comment rulemaking." *Id.*

B.     **ED's Promulgation of the 2019 Regulations Was Neither Arbitrary Nor Capricious**

The 2019 Regulations at issue here are rational, based upon consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute, and accordingly should be upheld.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 at 42 (1983).  *See also Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402 at 415 (1971).  As detailed above, the 2018 NPRM transparently laid out the agency's regulatory objectives, set forth the proposed regulations, and solicited comments on the same.  In promulgating the final rule, the agency articulated the basis for its decisions, and specifically explained its reasons for rejecting alternatives, including those reflected in the 2016 regulations.  Plaintiff's argument that the regulations are arbitrary and capricious is accordingly without merit.

The 2019 Regulations reflect ED's efforts to balance various, and, at times, competing, goals.  Specifically, the regulatory objectives behind the promulgation of the 2019 Regulations included the interests of students who may be defrauded by their institutions, but also included the interests of taxpayers who otherwise would bear the cost of approvals of borrower defense to

repayment discharges,[3] the interests of institutions in being able to respond to claims, the concerns related to the strain on the government caused by large numbers of borrower defense claims, and the interests of students more broadly in obtaining accurate information to inform their enrollment decisions and ensure that unwarranted school closures do not limit educational options.  83 Fed. Reg. 37242, 37330-37243.  As ED noted, the 2019 Regulations reflect the agency's efforts to "very carefully . . . balance relief for borrowers who have been harmed by acts of institutional wrongdoing, with its obligation to the taxpayer to provide reliable stewardship of Federal dollars."  83 Fed. Reg. 37242, 37244.[4]

For instance, in determining the appropriate evidentiary standard that would apply, the agency observed that "[b]orrowers should be protected against misrepresentations made by institutions that result in financial harm to them, but at the same time, the [agency] must uphold a sufficiently rigorous evidentiary standard to ensure that the defense to repayment process does not impose unnecessary or unjustified financial risk to institutions, taxpayers, or future students." 84 Fed. Reg. 49788, 49817.  The agency accordingly aimed to "establish[] an evidentiary standard in these final regulations that carefully balances the need to protect borrowers in instances where they suffered harm as a result of misrepresentations with the need to maintain

---

[3] By the Department's estimation, the borrower defense activity under the 2016 Rule "would have an estimated $ 14.9 billion net budget impact for the 2017 to 2026 loan cohorts."  83 Fed. Reg. 37242 (citing 71 Fed. Reg. 76055).

[4] On this point, plaintiff argues that ED's decisionmaking was arbitrary and capricious in part because it did not specifically "address the 'spillover economic benefits' it had previously acknowledged" in the 2016 regulations.  Pl. Br. at 20.  Plaintiff is referring to a sentence in the notice of the 2016 regulations which, in addressing concerns regarding the admittedly high cost to taxpayers, speculated that there may be broader economic benefits associated with the discharge of student loans.  Stated in full, the sentence reads: "While difficult to quantify because of the multitude of different potential borrowing profiles and nature of the claims of those who will seek relief through borrower defense and the possibility of partial relief, the discharge of loans for which borrowers have valid borrower defenses could have significant positive consequences for affected borrowers and associated spillover economic benefits."  81 Fed. Reg. 75926, 76051.  In connection with the 2019 regulations, however, ED stated its intention to reduce quantifiable costs to taxpayers in the first instance, making this secondary, speculative analysis irrelevant.

the integrity of the student loan program." *Id.*

The 2019 Regulations also reflect a policy regarding the degree to which students are expected to obtain information and evaluate institutions before selecting a school.  In particular, "[t]he Department seeks to establish a policy that encourages students to fulfill responsibilities they have in seeking information and evaluating the accuracy and validity of that information when making a decision as important as selecting an institution of higher education."  84 Fed. Reg. 49788, 49816.

While Plaintiff may disagree with the priority afforded to these regulatory objectives, such disagreement does not make the agency's consideration of these factors arbitrary or capricious.  *See New York v. FERC,* 783 F.3d 946, 959 (2d Cir. 2015) ("[W]e may not displace an agency' 'choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo*.'") (citing *Universal Camera Corp. v. NLRB*, 340 U.S. at 488); *see also City & Cty. of S.F. v. United States Citizenship & Immigration Servs.*, 944 F.3d 773, 799 (9th Cir. 2019) ("And whether the change in policy results from changing circumstances or a change in administrations, the wisdom of the policy is not a question we can review.")  (citing *Brand X*, 545 U.S. at 981).

Moreover, Plaintiff's assertion that it was arbitrary and capricious for the agency to proceed with the publication of the final 2019 Regulations after the court's decision in *Bauer* that put the 2016 regulations into effect is without merit.  Throughout the rulemaking process, the agency carefully evaluated the substance of the 2016 regulations and provided reasoned explanations when it sought to modify or rescind those provisions.  That the agency was ultimately line editing the 2016 regulations instead of the 1994 regulations when it published the 2019 Regulations does not render the agency's decisionmaking arbitrary and capricious.  Nor,

contrary to Plaintiff's assertions, was this "new evidence or changed facts" that required a *de novo* rulemaking.

The decision by the agency to depart, in some instances, from the policies reflected in the 2016 regulations, does not change this analysis.  On the contrary, as the Supreme Court held, there is "no basis in the [APA] . . . for a requirement that all agency change be subjected to more searching review."  *Fox TV Stations, Inc.*, 556 U.S. at 514.  While the agency must provide a "reasoned explanation" and this would "ordinarily demand that it display awareness that it is changing position," the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* at 515 (emphasis in original).

In the event that the "new policy rests upon factual findings that contradict those which underlay its prior policy[,] or when its prior policy has engendered serious reliance interests that must be taken into account," then an agency may again be expected to provide a reasoned explanation "for disregarding [those] facts and circumstances."  *Id.* at 515-516.  However, this burden is no different than the ordinary requirements of the APA.  Simply put, "[t]he statute makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action."  *Id.* at 515.  *See also New York v. FERC*, 783 F.3d 946, 958 (2d Cir. 2015) ("The mere fact that an agency rescinds one rule and adopts another is not arbitrary or capricious where the new rule is supported by reasoned decisionmaking and there are no circumstances requiring further explanation, such as contradictory findings of fact or substantial reliance interests on the old rule."); *City & Cty. of S.F. v. United States Citizenship & Immigration Servs.,*

944 F.3d 773, 804-05 (9th Cir. 2019); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038, 401 U.S. App. D.C. 227 (D.C. Cir. 2012) (stating that "a reevaluation of which policy would be better in light of the facts" is the "kind of reevaluation [that] is well within an agency's discretion" even when the agency "offered no new evidence to support its decision").  Here, the agency provided such a reasoned explanation regarding why, in some instances, it departed from the 2016 regulations.

C.   **Plaintiff's Challenges to Specific Provisions of the 2019 Regulations Are Also Without Merit**

As to the specific provisions of the 2019 Regulations with which Plaintiff finds fault, Plaintiff similarly fail to demonstrate that any aspect of the rule was arbitrary and capricious.

### 1.   **Definition of Misrepresentation**

First, the agency's decision to narrow the scope of the definition of misrepresentation was also not arbitrary or capricious.  The standard for a misrepresentation contemplated by the 2019 Regulations reflects the agency's intention that "an inadvertent or innocent mistake should not, and will not, be treated as an act or omission that is false, misleading, or deceptive by an institution."  84 Fed. Reg. 49788, 49804.  In setting this standard for a misrepresentation, ED recognized that this policy choice departed from the policy reflected in the 2016 Regulations.  Specifically, ED acknowledged that in the preamble to the 2016 regulations, the agency "took the position that institutions should be responsible for the harm to borrowers as the result of even inadvertent or innocent mistakes."  *Id.*  By contrast, the 2019 Regulations reflects the view that "[t]reating innocent mistakes in the same manner as acts or omissions made with knowledge of their false, misleading, or deceptive nature, places well-performing schools at risk unnecessarily, potentially limiting postsecondary opportunities for students or increasing costs."  *Id.*

Not only did the 2018 NPRM provide a detailed explanation of the agency's proposal and

highlight the differences from the 2016 standard so as to afford adequate notice to interested

parties, *see* 83 Fed. Reg. at 37256-37257, the agency also evaluated numerous comments on this

proposal and provided a detailed and reasonable explanation of the agency's rationale for this

change in its notice of the final rule.  84 Fed. Reg. at 49804.  In particular, pointing to "its

responsibility to the Federal taxpayer," ED explained that the new standard for a

misrepresentation reflects its efforts to "strike[] a balance between protecting borrowers by

establishing a standard of evidence that is reasonable for a borrower to meet and protecting the

Federal taxpayer by requiring a level of evidence that ensures misrepresentation actually took

place and the student relied upon that misrepresentation and suffered harm."  83 Fed Reg. at

37257.  The agency also explained that the final rule reflects ED's view that "a Federal standard

with a different, more stringent definition of misrepresentation better guards the interests of all

students, including an institution's future tuition-paying students, an institution acting in good

faith, and the Federal taxpayer who, in some cases, inevitably must pay for any negligent or

innocent mistakes."  84 Fed. Reg. at 49805.  ED also noted the potential "chilling effect" on

communications between students and institutions that would result if the schools were held

liable for inadvertent errors, and expressed the simple view that "it would be improper to subject

an institution, and its current, past, and future students, to liability and reputational harm for

innocent or inadvertent misstatements."  84 Fed. Reg. at 49805.

　　　In its brief, Plaintiff appears to conflate the agency's discussion of the appropriate

*evidentiary standard* (*i.e.* preponderance of the evidence, as opposed to clear and convincing

evidence) with the agency's discussion of the revised definition of misrepresentation.  Plaintiff

asserts, for instance that the agency "stated a higher standard was needed to address a concern

that 'students either alone, or with the help of unscrupulous third parties, attempt to induce

statements that could then be misconstrued or used out of context to relieve borrowers who otherwise received an education from their repayment obligations.'"  Pl. Br. at 23.  But this is incorrect. The language Plaintiff quotes was not offered by the agency in support of the revised definition of a misrepresentation, and is not relevant here.[5]

### 2.  **Financial Harm**

Plaintiff is also incorrect that the inclusion of a financial harm requirement in the borrower defense regulations was arbitrary or capricious.  Under the 2019 Regulations, "defense to repayment relief is limited to instances where a school's misrepresentation resulted in quantifiable financial harm to the borrower."  84 Fed. Reg. at 49819.  In other words, "[i]f a misrepresentation associated with the making of a loan did not result in any such harm, it would not qualify as a basis for a defense to repayment under these final regulations."  *Id.*  This requirement again reflects the agency's "interest in balancing the need to protect both borrowers and Federal taxpayers."  83 Fed. Reg. at 37259.

Once again, the 2018 NPRM clearly delineated the agency's proposal to include a financial harm requirement and provided adequate opportunity for public comment.  *See id.* ("Consistent with its proposal during the negotiated rulemaking sessions, the Department proposes that a misrepresentation may serve as a basis for a borrower defense to repayment only if the misrepresentation resulted in financial harm to the borrower.")

Plaintiff cites the statement by ED that "[s]tudents may experience disappointments

---

[5] Similarly, Plaintiff's argument that the agency's "assertion that the increased evidentiary burden would not be problematic because students could insist that, during enrollment, institutions provide them with 'written representations and documentation,' 2019 Rule, . . . is untethered to the reality of interactions between students and predatory institutions," Pl. Br. at 24, again references the agency's discussion of the evidentiary standard.  Plaintiff does not challenge that portion of the 2019 Regulations, nor does this language provide any support for Plaintiff's assertion that the definition of misrepresentation included in the 2019 Regulations is arbitrary and capricious.

throughout their college experience and career, such as believing that they would have been better served by a different institution or major," 84 Fed. Reg. at 49819, and argues that this is an unreasonable basis to impose a financial harm requirement. Specifically, Plaintiff argues that "the record does not support the proposition that (1) students file borrower defense claims simply because they are 'disappointed' by their 'college experience' or (2) a 'financial harm' requirement would be the appropriate means for dealing with such a problem." Pl. Br. at 25. But Plaintiff simply misconstrues ED's position. It requires only common sense to conclude that a requirement that the student suffer financial harm to obtain relief under these regulations will discourage, and thereby reduce, the number of claims by students who did *not* suffer financial harm. Even in the event such students seek to assert a borrower defense claim, they would presumably be unable to recover absent actual financial harm. Thus, not only is the explanation offered by the agency thus a reasonable one, the question of whether or not to require financial harm is a matter of public policy. ED, in reaching the conclusion that "borrower defense relief should relate to financial harm," 84 Fed. Reg. at 49818, emphasized the goal of reducing the potential burden on taxpayers. *See id.* (observing that "such disappointments [as to a student's college experience or career] are not the institution or the taxpayer's responsibility"). Plaintiff's apparent disagreement with this regulatory objective does not render the rule arbitrary and capricious.

During the rulemaking process, ED also expressly considered the argument raised by Plaintiff that a financial harm requirement would impose an additional burden on students during the rulemaking process. *See* 84 Fed. Reg. at 49819. ED acknowledged that "the process should be as simple as possible for borrowers," but concluded that "we need to balance that concern with the need to protect the interests of taxpayers." *Id.* In particular, ED concluded that

23

"examples of financial harm evidence should be within the ability of most applicants to show and should not substantially complicate the process of submitting a defense to repayment application." *Id.*

    3. **Group Claims**

The exclusion of the group claim process from the 2019 Regulations was also neither arbitrary nor capricious.  As explained in the 2018 NPRM, the 2016 regulations "enable[d] the Department to initiate affirmative claims on behalf of entire groups of borrowers, if the Secretary determines that there are common facts and claims that apply to the group."  83 Fed. Reg. at 37244.  During the rulemaking process for the 2019 Regulations, however, the agency expressly proposed to remove this provision and solicited comments on the same.  *Id.*  In doing so, the agency clearly and reasonably explained its reasoning.  First, the agency explained that the group claims process was no longer appropriate in light of the new definition of misrepresentation which no longer permitted the assertion of a defense to repayment based on an inadvertent error by the institution.  83 Fed. Reg. 37242, 37244.  As the agency explained, "this proposed standard is dependent upon a fact-specific inquiry, [and] the Department does not believe that the group process is appropriate to include in these proposed regulations."  *Id.*  Even in the event that a group of borrowers "assert [a] misrepresentation on the part of the same school based on the same facts and circumstances, such as when the student borrowers were enrolled in a program that the school advertised to the public as being fully accredited by a specific programmatic accrediting agency when, in fact, it was not so accredited, . . . [the agency] would still need to determine that the borrower made a decision based on the misrepresentation, that the borrower was harmed by the misrepresentation, and to what, if any, amount of or type of relief the borrower is entitled."  *Id.* at 37262-37263 .

Second, ED highlighted that "a group discharge process could place an extraordinary burden on both [ED] and the taxpayer." *Id.* at 37244.   More specifically, the agency observed that "[i]f group claims . . . include borrowers who were not subjected to the misrepresentation, did not rely on a misrepresentation to make an enrollment decision, or were not harmed by the misrepresentation then those borrowers' loans should not be forgiven with taxpayer funds." *Id.* at 37285.[6]  Third, the agency was concerned that "[b]ecause an institution can refuse to provide an official transcript for a borrower whose loan has been forgiven, group discharges could render some borrowers unable to verify their credentials or work in the field for which they trained and have enjoyed employment."  *Id.* at 37244; *see also* 84 Fed. Reg. at 49879 (The group claim process "has the potential of providing loan forgiveness to borrowers who were not subject to a misrepresentation, did not make a decision based on the misrepresentation, or did not suffer financial harm as a result of their decision.")

In response to the NPRM, the agency received and considered comments on a wide variety of issues by groups and individuals who favored the inclusion of a group claim provision in the 2019 Regulations.  Among other things, commenters expressed views that the availability of a group claims process would allow students to expect that their claims would be adjudicated more expeditiously, would conserve ED's administrative resources, would not place an undue burden on the taxpayer so long as ED held institutions financially accountable, would strengthen the deterrent effect on institutions, would increase the ability of students without financial resources to obtain legal counsel to benefit from borrower defenses, and would decrease the

---

[6] On a related point, the agency noted that it had "conducted further analyses of the tens of thousands of defense to repayment applications for Corinthian students that the Department has received to date" and observed that "students enrolled at Corinthian who submitted defense to repayment applications may not all have been harmed to the same extent."  *Id.* at 37244.  By requiring individualized evaluation of each claim, the agency indicated its expectation that the process would thereby provide "fair and equal access to defense to repayment relief."  *Id.* at 37244.

burden on individual students.  *See* 84 Fed. Reg. at 49798-49799.  However, after careful

consideration of the comments, the agency ultimately concluded that it was unnecessary to

include a group claims process.

   With respect to the assertion that the group claims process would conserve Department

resources and that ED had concluded this in connection with its 2016 regulations, ED explained

that such a conclusion was incorrect as to the 2019 Regulations because the standard for a

borrower defense claim and the process adopted by the 2019 Regulations was substantially

different than the 2016 regulations.  *See* 84 Fed. Reg. at 49799 ("Determinations under these

final rules will be highly reliant upon evidence specific to individual borrowers, which requires

the Department to reconsider its previous burden calculation.")  Unlike the standard set forth in

the 2016 regulations, "a school engaging in misrepresentation alone will not be sufficient for a

successful claim."  *Id.*  Rather, "relief will be granted based upon a borrower's ability to

demonstrate that institutions made misrepresentations with knowledge of its false, misleading, or

deceptive nature or with reckless disregard and to provide evidence of financial harm."  *Id.*  ED

accordingly concluded that "[t]his evidentiary determination and harm analysis require that the

Department consider each borrower claim independently and on a case-by-case basis."  *Id.*

   Nor did ED ignore the observations that group claims reduce the burden on individual

students and permit a quicker resolution of claims.  However, after consideration of this

comment, ED disagreed and concluded that "it is prudent to balance the need for speedy

recovery for students against the need to properly resolve each claim on the merits and provide

relief in relation to the claimant's harm."  84 Fed. Reg. at 49799  ED also expressly rejected the

assertion that it was too burdensome for an individual student, one who had presumably signed a

promissory note and otherwise applied for financial aid, to provide documentation or to complete

an application for the assertion of a borrower defense.  *Id.*

Pointing to the agency's response to a specific commenter, Plaintiff asserts that the agency relied on "unspecified 'evidence of outside actors attempting to personally gain from the bad acts of institutions,'" and argues that the agency failed to "identify these actors or explain how the group resolution of administrative claims . . . allowed them to 'personally gain' in ways that individual claims would not."  Pl. Br. at 25.  According to Plaintiff, "[n]o evidence in the record shows that anyone manipulated the group claims process created by the 2016 Rule, or even that ED employed the process at all."  *Id.* However, as detailed above, and contrary to Plaintiff's characterization, the agency did *not* base its decision regarding group claims on the sole conclusion that there were outside actors attempting to financially benefit from the bad acts of institutions.  Rather, in response to a comment that observed that outside actors could attempt to monetize borrower defense claims to their own benefits, ED merely observed that it had "already become aware of evidence of outside actors attempting to personally gain from the bad acts of institutions as well as unfounded allegations." 84 Fed. Reg. at 49798.

Ultimately, the decision by ED to remove the provisions permitting group claims reflects a reasonable policy objective, *i.e.* that the adjudication of borrower defense claims should be a fact-specific inquiry taking the harm suffered by a particular borrower, as well as evidence that the particular borrower relied upon the misrepresentation, among other things, into account.  *Id*.

4.  **Amount of Relief Afforded to Borrowers**

Next, Plaintiff objects to the manner in which the 2019 Regulations address the valuation of the relief to be afforded to borrowers who assert a defense to repayment.  By way of background, in the 2018 NPRM, the agency proposed "to allow for partial relief, based on the degree of harm suffered by the borrower."  83 Fed. Reg. at 37263.  The agency recognized the

complex nature of calculating partial relief, and invited comments on the proposal and on any methodology for that calculation.  *Id.*  During the notice and comment period, the agency received numerous comments regarding this proposal.  *See* 84 Fed. Reg. at 49832-33.

Ultimately the agency did not include a specific methodology in the 2019 Regulations for determining the amount of financial harm, but the regulations nonetheless reflect the agency's determination "that partial student loan discharge is a possible outcome of a defense to repayment claim."  84 Fed. Reg. at 49820.  In accordance with this approach, the 2019 Regulations define financial harm as "the amount of monetary loss that a borrower incurs as a consequence of a misrepresentation" and then provide a non-exclusive list of the types of evidence that may indicate financial harm.  § 685.206(e)(4).[7]  As explained in the notice, "[p]ursuant to the definition of financial harm in § 685.206(e)(4), ED will determine how much relief to award by considering the amount of monetary loss that a borrower incurs as a consequence of a misrepresentation and the factors outlined in 34 CFR 685.206(e)(4)(i) through (iv)."  84 Fed. Reg. at 49835.

The preamble discussion also details the agency's reasoning behind this approach.  While acknowledging that "an approach that allows the Department to make determinations of partial relief may be more administratively burdensome and time-consuming," the agency nonetheless determined that "given the taxpayer and borrower interests at issue, as well as those of current

---

[7] In particular, under the 2019 Regulations, evidence of financial harm may include: (i) "Periods of unemployment upon graduating from the school's programs that are unrelated to national or local economic recessions;" (ii) "A significant difference between the amount or nature of the tuition and fees that the institution represented to the borrower that the institution would charge . . . and the actual amount or nature of the tuition and fees;" (iii) "The borrower's inability to secure employment in the field of study for which the institution expressly guaranteed employment;" and (iv) "The borrower's inability to complete the program because the institution no longer offers a requirement necessary for completion of the program in which the borrower enrolled and the institution did not provide for an acceptable alternative requirement to enable completion of the program."  *Id.*

and future students who will bear the cost of an institution's repayment of the claim to the Department, we continue to believe that an approach that provides the Department with the flexibility to provide partial relief, if warranted, strikes an appropriate balance between these interests."  84 Fed. Reg. at 49833.  It was reasonable for the agency to conclude that "not every borrower who experiences a misrepresentation suffers the same amount or types of harm," and that "[i]t is impossible to know whether all borrowers who attended the same institution experienced the same misrepresentation, relied on that information to make the same decision(s), or were harmed by the misrepresentation in the same way or to the same degree."  84 Fed. Reg. at 49833-49834

Thus, contrary to Plaintiff's assertions, the agency clearly and reasonably explained the rationale behind these provisions in the 2019 Regulations and was therefore neither arbitrary nor capricious in the promulgation of this rule.  Although Plaintiff disagrees with the policy choices behind the agency's decision to restrict the relief afforded to a borrower in this manner, such an objection does not support a claim under the APA.

### 5.  Arbitration and Class Action Waivers

Next, the agency's decision to permit the use of class action waivers and mandatory arbitration agreements by institutions, as long as appropriate disclosures are made to potential student borrowers, is also not arbitrary or capricious.  Again, the agency provided a reasonable explanation of the regulatory objectives behind this change, stating that "[a]rbitration is often a more efficient and less adversarial means of dispute resolution than time-consuming and expensive litigation that may result in borrowers waiting years to obtain a fair hearing and any relief, [and] may also allow borrowers to obtain greater relief than they would in a consumer class action case where attorneys often benefit most."  83 Fed. Reg. at 37245; *see also* 84 Fed.

Reg. at 49845 ("We are concerned that the adjudication of class action lawsuits benefit the wrong individuals, that is lawyers and not wronged students.").  In addition, the agency concluded that "arbitration may reduce the expense of litigation that a university would otherwise pass on to students in the form of higher tuition and fees."  83 Fed Reg. at 37245. Relying on information from the American Bar Association ("ABA"), ED concluded that arbitration provided benefits to the parties and "may provide a method for borrowers and schools to address a student's concerns without the significant expense and time commitment that are common to court litigation."  84 Fed. Reg. at 49840; *see also* 84 Fed. Reg. at 49841 (concluding that "arbitration provides significant advantages over a court proceeding, including: Party control over the process; typically lower cost and shorter resolution time; flexible process; confidentiality and privacy controls; awards that are fair, final, and enforceable; qualified arbitrators with specialized knowledge and experience; and broad user satisfaction.").[8]

The approach taken in the 2019 Regulations, accompanied by the disclosure requirement, also reflects the agency's objective to rely on "the ability of students to make informed, freely chosen decisions regarding how they spend their education dollars, time, and efforts," and the conclusion that "[a]s with any major life or financial decision the students will make, it is best for students to approach the choice with as much information as possible and conduct a unique-to-them, cost-benefit analysis on their own terms, weighing what is important to them and what

---

[8] Plaintiff objects to ED's reliance, in part, on information contained in this publication from the American Bar Association on the grounds that the authors are "a group of alternative dispute resolution professionals" who, Plaintiff asserts, must therefore "have a financial incentive . . . to say good things about arbitration."  Pl. Br. at 28.  However, not only was it entirely reasonable for the agency to seek information from experts in the field, Plaintiff does not challenge the substance of the information ED relied upon, such as the conclusion that arbitration is ordinarily faster and less expensive than litigation. Moreover, contrary to Plaintiff's argument, the agency's use of information from situations it deemed analogous, such as information about arbitration in commercial disputes or information about class actions in the mass tort context, was a reasoned approach to the issues.

they are willing to accept." *Id*.

While Plaintiff criticizes the agency for its differing conclusions as compared to those reflected in the 2016 regulations, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Kempthorne*, 538 F.3d 124 at 132.  It was reasonable, for example, for the agency to "reject[] the suggestion in the 2016 NPRM that class actions against certain institutions would have motivated other institutions to change their practices," and hypothesize that "it is possible that many institutions changed their approach in light of allegations made against those certain institutions, including those made by attorneys general, regardless of whether students had been able to bring class actions."  84 Fed. Reg. at 49842.  In the absence of actual data on the reason the institutions changed their practices, both conclusions are reasonable and deference to the agency's assessment should be afforded.

### 6.  **Elimination of Disclosure Requirements**

The agency's decision to eliminate certain disclosure requirements was also not arbitrary or capricious.  On the contrary, the decision again reflects the agency's efforts to take into account not only the interests of students seeking to have their loans discharged, but other actors as well, including the institution and future students.  The agency provided adequate notice of its intention to implement this rule, considered comments, provided a reasonable explanation of its actions, and accordingly fully complied with the requirements of the APA.

However, the agency concluded that "any benefit that a student may derive from knowing the loan repayment rate for a proprietary institution is negated by not knowing the comparable loan repayment rate at a non-profit or public institution, because the student may rely on the limited repayment rate information available and end up enrolling at an institution whose

31

repayment rate is the same or even worse than the proprietary institution."  84 Fed. Reg. 49876.

With respect to the financial protection disclosures, the agency expressly acknowledged that

"some prospective students may find this information helpful."  *Id.*  However, the agency

ultimately concluded that "the disclosures, if viewed without proper context, could tarnish the

reputation of an institution that otherwise satisfies title IV provisions, and thus jeopardize or

diminish the credential, or employment or career opportunities, of enrolled students and prior

graduates."  *Id.*

      Plaintiff's arguments regarding these provisions of the 2019 Regulations boil down to an

argument that, because the disclosures could potentially help students, they should be mandated.

Plaintiff does not, however, refute the agency's observation that disclosures such as these are

potentially misleading and could have an adverse effect on institutions and future students.  The

agency, expressly acknowledging the helpful nature of the disclosures in some respects, was

entitled to rely on its discretion to weigh these competing goals and select the route that reflects

the reasonable regulatory objectives the agency sought to achieve.

      7.  **Closed School Discharges**

      As noted above, the 2016 regulations included provisions that mandated automatic closed

school discharges for borrowers who did not re-enroll in an eligible institution within three years

of their schools' closures.  *See*, 81 Fed. Reg. at 76038.  The 2019 Regulations ended this practice

in favor of requiring individual student applications in most instances.  This approach again

reflects reasonable policy decisions by the agency and is neither arbitrary nor capricious.

      First, once again the agency clearly and reasonably explained the rationale behind this

rule, acknowledged the departure in practice from the 2016 regulations, and solicited comments

on its proposal in the 2018 NPRM.  83 Fed. Reg. at 37267.  The agency also articulated a

reasonable basis for the approach reflected in the 2019 Regulations, namely "encouraging students at closed or closing schools to complete their educational programs, either through an approved teach-out plan, or through the transfer of credits separate from a teach-out." 84 Fed. Reg. at 49847. The agency reasonably concluded that the provision of *automatic* closed school discharges to borrowers runs counter to that goal. *Id.* The 2019 Regulations instead give students "the option to pursue a closed school loan discharge by submitting an application, transfer to another institution, or accept the teach-out plan offered by their institution, which may include a teach-out plan offered by the closing institution or a plan from a teach-out partner." 84 Fed. Reg. at 49846. If a student accepts a teach-out plan offered by the institution, the student is not eligible for a closed school discharge (unless the school fails to materially adhere to the terms of the teach-out plan). *Id*. In pursuing this approach, the agency specifically noted that there "are large costs to institutions and taxpayers when students retain the right to transfer their credits and also receive a closed school loan discharge." *Id.* at 49848.

Contrary to Plaintiff's assertions, the agency also specifically considered the potential burden on student borrowers required to submit an application. However, after evaluating this concern, the agency concluded the burden was not significant and did not mandate automatic closed school discharges. Specifically, the agency concluded that "[i]n most cases, to apply for a closed school discharge, an eligible borrower is only required to complete the closed school discharge application form and submit it to the Department." *Id*. The agency also pointed out that the information needed by the agency to make a determination on such an application is limited. *See id.* at 49854.

Ultimately, while ED recognized that "there may be disagreement about whether automatic closed school loan discharge is better for borrowers than closed school loan discharges

provided to students who apply for such a benefit," ED sought to implement a policy whereby "it

is in incumbent upon the borrower to make the decision as to whether it is in his or her best

interest to retain the credits earned at the closed school or receive a closed school loan

discharge."  84 Fed. Reg. at 49848.  As the agency explained in detail:

> In our view, obtaining the education credential that the borrower wanted to pursue is generally preferable to foregoing credential completion or being required to start a program over at another institution. Disruptions in a student's time in school can have devastating consequences and, too often, lead to the student abandoning their educational pursuit. It is better to create a path for students to finish their degree, certificate, or program, rather than create perverse incentives to stop their schooling, with only a plan for an indeterminate, future starting date.

> Our goal is not to reduce the number of closed school discharges awarded through these regulations or reduce the liability for closing institutions, as one commenter suggested. Rather, it is to provide students enrolled at a closing or closed school as many options as possible for completing their program. The Department seeks to encourage institutions to provide approved teach-out offerings rather than closing precipitously."

84 Fed. Reg. at 49853.[9]  Although Plaintiff disagrees with this approach, one that places the

burden on the agency as opposed to the institutions for the dissemination of certain information

related to closed school discharges, the agency's approach reflects a reasonable policy choice

that was adequately articulated both in the 2018 NPRM and the final rule.

D.     **The Statute of Limitations on Defensive Claims Is a Logical Outgrowth of the Proposals Contained in the 2018 NPRM and Is Not Arbitrary or Capricious**

Contrary to Plaintiff's assertions, the agency's decision to implement a three-year statute

of limitations on defensive claims was not arbitrary or capricious, and it was a logical outgrowth

of the proposals contained in the 2018 NPRM.

---

[9] With respect to disclosure requirements, the agency also addressed these concerns, noting that:
"The Department has also determined that it is the appropriate party to provide affected students with a closed school discharge application and a written disclosure describing the benefits and consequences of a closed school discharge. When institutions were expected to fill this role, the estimated burden was approximately $70,000. As the Department already is in contact with affected students and has the relevant materials, we do not expect a significant increase in administrative burden after some initial set up costs."  84 FR at 49893.

The APA requires that the agency "include in its notice of proposed rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Cooling Water Intake Structure Coal. v. United States EPA*, 905 F.3d 49, 61 (2d Cir. 2018) (quoting 5 U.S.C. § 553(b)(3)). However, "[a] final rule need not be an exact replica of the rule proposed in the notice, only a 'logical outgrowth.'" *Id*. (internal quotations and citations omitted). This inquiry turns on "whether the agency's notice would fairly apprise interested persons of the subjects and issues of the rulemaking." *Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1022 (2d Cir. 1986) (quotation marks omitted).

Here, although the NPRM did not specifically contemplate a three-year statute of limitations for defensive claims, it did "fairly apprise interested persons" that the agency was considering imposing time limitations on defensive claims. Moreover, the agency expressly proposed a three-year statute of limitations for affirmative claims, and the agency's reasoning and the comments received on that proposal do not substantively differ from the analysis behind the limitation for defensive claims. *Id.* The NPRM also proposed other time limitations on defensive claims and solicited comment on the same. Specifically, the agency proposed to establish a requirement that a borrower comply with the filing deadlines established for the particular proceedings in which a borrower defense claim may be raised. 83 Fed. Reg. 37242, 37260. The agency noted that, for example, "when the Department intends to garnish a borrower's wages, the borrower is sent a notice of the Department's intention to initiate wage garnishment and is provided 30 days to request a hearing to dispute that action." *Id.* Under this approach, a borrower could raise a defense to repayment claim during that 30-day timeframe, but

would not be able to raise a claim after that period has elapsed.  *Id.*[10]

Specifically, after evaluating numerous comments on ED's proposal, ultimately ED "was persuaded by the commenter who proposed that a three-year limitations period be put in place for both affirmative and defensive borrower defense claims."  84 Fed. Reg. at 49823.  The agency provided a clear and reasonable explanation of its decision on this issue.  Among other things, ED concluded that, without a statute of limitations for defensive claims "a borrower who went into default nearly twenty years after graduation could, potentially, assert a defensive claim at that time."  *Id.*  And, ED observed, not only would it be "very unlikely that an institution would still possess the records needed to defend against such a claim at that time," but it would in fact "be ill-advised and very difficult for institutions to maintain records for that entire period, especially when considering privacy, as well as physical and digital storage considerations."  *Id.*  In addition, "[i]t is equally unlikely that faculty or staff would still be employed at the same school or be able to recall the incident(s) subject to the claim."  *Id.*  ED further emphasized that, unlike a civil proceeding in a court of law, the agency "does not possess the court's ability to compel parties to produce documents, call witnesses to produce testimony, or hold formal cross-examination."  *Id.*  ED also pointed out that "[n]otwithstanding anything in these final regulations, borrowers may continue to maintain other legal rights that they may have in collection proceedings. No provision in these final regulations burdens a student's ability to seek relief outside the Department's borrower defense claim process.  Subject to applicable law, borrowers are not deprived of a defense to, nor precluded from defending against, a collection

---

[10] As described in the 2018 NPRM, the relevant filing deadlines using this mechanism would have been: 65 days for tax refund offset proceedings; 65 days for salary offset proceedings for federal employees; 30 days for wage garnishment proceedings, and 30 days for consumer reporting proceedings.  *Id.*

action for as long as the debt can be collected." *Id.*[11]

ED also adequately considered other alternatives, including the suggestion that the limitation period should begin to run when the borrower discovers the harm. Concluding that such a rule would be impracticable under these circumstances, ED pointed out that "[d]etermining whether and when a borrower discovered or should have discovered the misrepresentation is a difficult task that is administratively burdensome." *Id.*

For these reasons, ED reasonably concluded that a three-year statute of limitations "is fair to both the borrower and the institution and strikes the right balance between providing obtainable relief for borrowers and allowing institutions to predict and control their financial conditions." *Id.*[12] The agency emphasized that "waiving the time limit could potentially generate massive liabilities for schools, which could create undesirable incentives for schools and negatively impact their long-term financial stability." *Id.*

Accordingly, the agency's decision to impose a three-year statute of limitations on defensive claims was not arbitrary and capricious.

*** 

---

[11] As to the selection of three years as the appropriate limitation, ED explained the reasonableness of this time frame in light of comparable statutes of limitations for civil fraud. 84 Fed. Reg. 49788, 49823. If, as ED observed is likely the case, the misrepresentation was made before the borrower enrolled in the school, then a three-year statute of limitations that runs from when the student is no longer enrolled in the school likely amounts to a 5 to 7 year window of time in which to raise a defense to repayment, given a program of study is typically at least two, three, or four years. *Id.* This is comparable to most civil fraud statutes of limitations. Using New York as an example, ED observed that state law requires that a fraud-based action must be commenced within six years of the fraud or within two years from the time the plaintiff discovered the fraud or could have discovered it with reasonable diligence. *Id.*

[12] To the extent Plaintiff argues that the CARES Act affects the application of the three-year statute of limitations, this is highly improbable. It is correct that certain current borrowers are in administrative forbearance due to the CARES Act until October 1, 2020. However, the three-year statute of limitations for defensive claims only applies to loans first disbursed on or after July 1, 2020, 34 CFR 685.206(e), and does not apply to borrowers currently in administrative forbearance under the CARES Act and whose loans would have been disbursed prior to July 1, 2020.

In sum, Plaintiff fails to meets its burden of showing that the 2019 Regulations were arbitrary and capricious or otherwise in violation of the APA.  Simply put, the 2019 Regulations reflect the agency's reasonable efforts to balance permissible policy objectives.  Plaintiff's conclusory assertion that the 2019 Regulations are "infected" by two "false premises" that render the entire rule arbitrary and capricious – that "(1) that the availability of borrower defense discharges impacts student behavior at and before enrollment, and (2) that, at the claims stage, borrowers and unidentified third-party actors somehow game the system and act in bad-faith," Pl. Br. at 18 – is thus belied by the actual reasons articulated by the agency in the notice of the 2019 Regulations.  As detailed above, these included the intent to reduce the burdens on taxpayers, to grant relief only to the extent a borrower suffered financial harm, and to require a fact-specific inquiry that takes the harm suffered by a particular borrower, as well as evidence that the particular borrower relied upon the misrepresentation, into account.  Plaintiff's disagreement with these policy objectives notwithstanding, the 2019 Regulations accordingly comply with the APA.

E.    **ED Complied with the Relevant Procedural Requirements**

Furthermore, ED complied with all procedural requirements related to its rulemaking.  As set forth above, the agency also undertook negotiated rulemaking in compliance with HEA.  This included the publication of a notice announcing its intent to establish a negotiated rulemaking committee, setting of a schedule for the committee meetings, and providing detailed notice on the topics that the committee would address.  The negotiators included representatives from legal assistance organizations, as well as students.  The negotiated rulemaking sessions took place over a number of days and provided a meaningful opportunity to discuss the regulations being proposed by ED.

In particular, and contrary to Plaintiff's assertions, during these negotiated rulemaking

sessions, the committee addressed all of the subject matters raised by Plaintiff in this action.  For

instance, negotiators debated the appropriate definition of misrepresentation, *see* 83 Fed. Reg. at

37256, the evidentiary standard that should be applied to borrower defense to repayment claims,

*id.* at 37258, the financial harm requirement, *id.* at 37259, whether to impose time limits on a

borrower's ability to assert a borrower defense to repayment and possible time periods for such

limits, *id.* at 37260, the requirements related to pre-dispute arbitration agreements and class

action waivers, *id.* at 37265, and automatic closed school discharges, *id.* at 37267.

Moreover, the simple fact that the agency took the position during the rulemaking process

that the 2016 regulations were not in effect does not support Plaintiff's argument that the agency

somehow negotiated in bad faith.  The agency plainly stated its view on this subject and engaged

in discussions on all substantive changes proposed by the agency, including proposed changes to

the 2016 regulations.

Even had the agency negotiated in bad faith, which it did not, the limited case law on the

subject suggests that there is no cause of action under the APA on this basis.  Although Plaintiff

quotes on *USA Grp. Loan Servs. v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996), in support of its

argument, Plaintiff neglects to include the unequivocal *doubt* the court expressed about the

existence of such a remedy.  In *Riley*, the Seventh Circuit first notes that the HEA did not specify

a remedy in the event the agency negotiated in bad faith, *see id.* at 714, and then states –

counterfactually – that "[i]f *as we doubt* the Negotiated Rulemaking Act creates a remedy as well

as a right, we suppose that a refusal to negotiate that really was in bad faith, because the agency

was determined to stonewall, might invalidate the rule eventually adopted by the agency."  *Id.* at

715 (emphasis added); *see also Ctr. for Law & Educ. v. United States Dep't of Educ.*, 315 F.

Supp. 2d 15, 30 n.14 (D.D.C. 2004) ("In dicta from *Riley*, Judge Posner suggested that Section

570 would prevent a challenge to an agency regulation based on the agency's alleged failure to negotiate in good faith during the negotiated rulemaking process."), *aff'd on other grounds*, 396 F.3d 1152 (2005).

As the court in *Riley* observes, the "purpose [of negotiated rulemaking] – to reduce judicial challenges to regulations by encouraging the parties to narrow their differences in advance of the formal rulemaking proceeding – would be poorly served if the negotiations became a source and focus of litigation." *Riley*, 82 F.3d at 715.

F.     **Even Were the Court to Determine That Some Aspect of the Agency's Rulemaking Failed to Comply with the APA, the Court Should Not Vacate the 2019 Regulations**

Were the Court to determine that some aspect of the 2019 Regulations fails to comply with the APA, vacatur is not the appropriate remedy. Judicial policies favor permitting agencies to try and remedy their errors, and here the equities weigh against vacating the 2019 Regulations. The appropriate remedy would be a remand to ED to address any issues the Court deemed necessary, without vacatur.

Courts may allow agency actions to remain in place pending completion of additional regulatory process on remand, even where those actions were found to be arbitrary and capricious. *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015); *Pacific Bell v. Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1122-23 (9th Cir. 2003); *United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966-67 (D.C. Cir. 1990); *Md. Native Plant Society v. U.S. Army Corps of Engineers*, 332 F. Supp. 2d 845, 863 (D. Md. 2004). Thus, "where it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process, the remedy of remand *without vacatur* is surely appropriate." *Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (emphasis added).

The Second Circuit has not articulated a test for deciding when a court may decline to vacate agency action, *see, e.g.*, *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015), but numerous courts follow the D.C. Circuit's approach, which entails balancing the seriousness of the action's deficiencies against the disruptive consequences of a vacatur. *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm.*, 988 F.2d 146, 150 (D.C. Cir. 1993); *see, e.g.*, *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (per curiam); *Friends of DeReef Park v. Nat'l Park Servic*e, No. 2:13–cv–03453–DCN, 2014 WL 6969680, *3 (D.S.C. Dec. 9, 2014). Remanding a rule without vacatur is "generally appropriate when 'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so, and when vacating would be 'disruptive.'" *Central & SW Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (quoting *Allied-Signal*, 988 F.2d at 151).

Here, the disruptive effect of vacating the 2019 Regulations would be significant.  The borrower defense regulations govern vast numbers of students seeking federal loans and a vacatur of these regulations invites serious confusion and inefficiency.  It is instead appropriate to permit ED to address any concerns the Court may have regarding the 2019 Regulations in the first instance.  At a minimum, the agency respectfully requests that the Court order supplemental briefing on remedy so that the issue of remedy might be more fully addressed.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiff's motion for summary judgment, and grant ED's cross-motions for summary judgment.

Dated:  New York, New York
        July 29, 2020

                              Respectfully submitted,

                              AUDREY STRAUSS
                              Acting United States Attorney of the
                              Southern District of New York

        By:   _____
                              JENNIFER C. SIMON
                              Assistant United States Attorney
                              86 Chambers Street, Third Floor
                              New York, New York 10007
                              Tel.: (212) 637-2746
                              E-mail: Jennifer.Simon@usdoj.gov