UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEW YORK LEGAL ASSISTANCE
GROUP,

                Plaintiff,

      v.

ELISABETH DeVOS, in her official capacity
as Secretary of Education, and UNITED
STATES DEPARTMENT OF EDUCATION,

           Defendants.

No. 20 Civ. 1414 (LGS)

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Eileen M. Connor
Toby R. Merrill
Michael N. Turi
PROJECT ON PREDATORY STUDENT LENDING,
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003
tomerrill@law.harvard.edu

Adam R. Pulver
Adina H. Rosenbaum
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-7790
apulver@citizen.org

*Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................1

ARGUMENT ...............................................................................................2

I.   ED failed to comply with procedural requirements in adopting the 2019 Rule. ......................2

   A.   ED failed to conduct a meaningful negotiated rulemaking. ................................2

   B.   Vacatur of ED's delays of the 2016 Rule required a reopening of the rulemaking.............4

   C.   ED fails to demonstrate that the defensive statute of limitations was a logical
        outgrowth of the NPRM..........................................................................5

II.  The 2019 Rule is arbitrary and capricious. ................................................5

   A.   ED's reliance on false premises undercuts the entire 2019 Rule.........................6

   B.   The changes to the claims process and standards were arbitrary and capricious.. ..............7

      1.   Three-year limitations period on "defensive" claims ...................................8

      2.   Substantive and evidentiary standards for relief............................................9

      3.   Elimination of the group claims process...................................................11

      4.   Amount of relief..............................................................................11

   C.   The rescission of conditions on the use of pre-dispute arbitration agreements and
        class action waivers was arbitrary and capricious.. .........................................12

   D.   ED's elimination of disclosure requirements was arbitrary and capricious.. ...................13

   E.   ED's elimination of automatic closed school discharges and related disclosures was
        arbitrary and capricious....................................................................14

III. Vacatur of the 2019 Rule is the appropriate remedy. ...........................................15

CONCLUSION...............................................................................................16

# TABLE OF AUTHORITIES[*]

**CASES**                                                                    **PAGE(S)**

*Abington Memorial Hospital v. Burwell*,
    216 F. Supp. 3d 110 (D.D.C. 2016) ...................................................................3

*Allina Health Services v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014) ...................................................................16

*Ashland Oil, Inc. v. FTC*,
    548 F.2d 977 (D.C. Cir. 1976) .....................................................................7

*Bauer v. DeVos*,
    325 F. Supp. 3d 74 (D.D.C. 2018) ...............................................................3

*California Wilderness Coalition v. U.S. Department of Energy*,
    631 F.3d 1072 (9th Cir. 2011) .....................................................................4

*Center for Auto Safety v. Federal Highway Administration*,
    956 F.2d 309 (D.C. Cir. 1992) .....................................................................6

*City Club of New York. v. U.S. Army Corps of Engineers*,
    246 F. Supp. 3d 860 (S.D.N.Y. 2017) .......................................................16

*In re Crude Oil Commodity Litigation*,
    No. 06 Civ. 6677, 2007 WL 2589482 (S.D.N.Y. Sept. 7, 2007) ................2

*Department of Homeland Security v. Regents of the University of California*,
    140 S. Ct. 1891 (2020) ...............................................................................16

*Detsel v. Sullivan*,
    895 F.2d 58 (2d Cir. 1990) .........................................................................13

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ...............................................................................13

*Environmental Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005) .....................................................................5

*Esch v. Yeutter*,
    876 F.2d 976 (D.C. Cir. 1989) .....................................................................3

---

[*] Comments cited are not included herein, but will be provided to the Court in a Joint Appendix, along with an index, per the Court's June 23, 2020 Order (ECF 33).

*Federal Housing Finance Agency v. Merrill Lynch & Co.*,
   903 F. Supp. 2d 274 (S.D.N.Y. 2012) ...................................................................................3

*Financial Guaranty Insurance Co. v. Putnam Advisory Co., LLC*,
   No. 12 Civ. 7372 (AT), 2020 WL 264146 (S.D.N.Y. Jan. 17, 2020) ...................................2

*Global Reinsurance Corp. of Am. v. Century Indemnity Co.*,
   No. 13 Civ. 06577 (LGS), 2015 WL 1782206 (S.D.N.Y. Apr. 15, 2015) .............................2

*Guertin v. United States*,
   743 F.3d 382 (2d Cir. 2014) ...............................................................................................15

*Hill Dermaceuticals, Inc. v. FDA*,
   709 F.3d 44 (D.C. Cir. 2013) ................................................................................................3

*Horsehead Resource Development Co., Inc. v. Browner*,
   16 F.3d 1246 (D.C. Cir. 1994) ...........................................................................................13

*Long Island Head Start Child Development Services v. NLRB*,
   460 F.3d 254 (2d Cir. 2006) .................................................................................................8

*Motor Vehicle Manufacturers Association of the U.S. v. State Farm Mutual Automobile Insurance Co.*,
   463 U.S. 29 (1983) ...............................................................................................................9

*NRDC v. EPA*,
   902 F.2d 962 (D.C. Cir. 1990) ...........................................................................................12

*NRDC v. U.S. EPA*,
   No. 19 Civ. 5174 (DLC), 2020 WL 2769491 (S.D.N.Y. Apr. 15, 2020) .............................15

*National Black Media Coalition v. FCC*,
   791 F.2d 1016 (2d Cir. 1986) ...............................................................................................4

*National Education Association v. DeVos*,
   379 F. Supp. 3d 1001 (N.D. Cal. 2019) ................................................................................3

*New York v. U.S. Department of Homeland Security*,
   No. 19-3591, 2020 WL 4457951 (2d Cir. Aug. 4, 2020) .......................................................2

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ..........................................................................................................8, 10

*Tolbert v. Queens College*,
   242 F.3d 58 (2d Cir. 2001) ...................................................................................................3

*USA Group Loan Services v. Riley*,
    82 F.3d 708 (7th Cir. 1996) ...................................................................3, 4

*Yale New Haven Hospital v. Azar*,
    No. 3:18-cv-1230(JCH), 2020 WL 2204197 (D. Conn. May 26, 2020).................................3


**STATUTES**

5 U.S.C. § 553 ..............................................................................................1

5 U.S.C. § 706(2)(D).....................................................................................3

20 U.S.C. § 1098a ......................................................................................1, 2


**REGULATIONS**

34 C.F.R. § 668.14(b)(32) ...........................................................................14

34 C.F.R. § 668.41(h) ..................................................................................14

34 C.F.R. § 668.41(i) ...................................................................................14

34 C.F.R. § 685.206(e)...........................................................................5, 9, 12

34 C.F.R. § 685.214(c)(2)(ii) ......................................................................14

34 C.F.R. § 685.222(f)–(h) ..........................................................................11

34 C.F.R. § 685.222(i)(2)(i) .........................................................................11

34 C.F.R. § 685.300(e)–(f)...........................................................................12


**OTHER AGENCY MATERIALS**

ED, Final regulations; Student Assistance General Provisions, Federal Perkins Loan Program,
    Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and
    Teacher Education Assistance for College and Higher Education Grant Program, 81 Fed.
    Reg. 75,926, AR-K-1 (Nov. 1, 2016) .........................................................8, 12, 13

ED, Final rule, Student Assistance General Provisions, Federal Perkins Loan Program, Federal
    Family Education Loan Program, William D. Ford Federal Direct Loan Program, 84 Fed.
    Reg. 49,788, AR-A-1 (Sept. 23, 2019) ......................................................... *passim*

ED, Notice of proposed rulemaking; Student Assistance General Provisions, Federal Per-
kins Loan Program, Federal Family Education Loan Program, and William D. Ford
Federal Direct Loan Program, 83 Fed. Reg. 37,242, AR-B-1 (July 31, 2018)..........................5

## INTRODUCTION

In opposing plaintiff New York Legal Assistance Group's (NYLAG) motion for summary judgment and supporting its own motion for summary judgment, Defendants U.S. Department of Education and Elisabeth DeVos (collectively, ED) repeatedly attempt to justify the challenged provisions of ED's 2019 Borrower Defense Rule (the 2019 Rule) by talismanically describing them as reflections of the agency's "policy choices." Agencies, however, do not have carte blanche with respect to policy; policy choices are constrained by both statutory procedural requirements and the reasoned decisionmaking requirements of the Administrative Procedure Act (APA).

As explained in NYLAG's opening memorandum, ED violated these constraints when it issued the 2019 Rule. ED fails to address many of the Rule's flaws raised by NYLAG. ED's cursory responses to NYLAG's procedural arguments do not demonstrate that ED complied with the public participation requirements of the Higher Education Act (HEA), 20 U.S.C. § 1098a, and the APA, 5 U.S.C. § 553. And ED's attempts to explain away the arbitrary and capricious reasoning identified by NYLAG are likewise inadequate, as they reflect impermissible *post hoc* rationalizations, fail to justify why ED ignored important factors and evidence, and ask the Court to grant deference to the agency's speculation despite a lack of, or in some cases contrary, evidence in the record. Because the reasons that ED contemporaneously gave for adopting the 2019 Rule are not supported by the record, reflect unexplained departures from the agency's prior conclusions, and do not show the agency considered all relevant factors, the 2019 Rule is arbitrary and capricious.

The procedural flaws and lack of reasoned decisionmaking pervade the entire Rule and are serious, and the harms of allowing the Rule to continue to operate unlawfully far outweigh the hypothetical disruptive effects of vacatur. The Court should set aside the 2019 Rule in its entirety.

## ARGUMENT[1]

### I.   ED failed to comply with procedural requirements in adopting the 2019 Rule.

In its opening memorandum, NYLAG identified three separate procedural violations: (1) ED failed to provide a meaningful opportunity to discuss the need for, and content of, a new rule during the negotiated rulemaking proceedings;  (2) ED relied on a negotiated rulemaking and notice-and-comment process based on the erroneous premise that the 2016 Rule never went into effect; and (3) ED included in the 2019 Rule a provision that was not a logical outgrowth of the 2018 NPRM. *See* Pl.'s Mem. (ECF 39) at 12–17. ED's response does not demonstrate otherwise.

#### A.   ED failed to conduct a meaningful negotiated rulemaking.

Although ED nominally conducted negotiated rulemaking sessions as required by the HEA, 20 U.S.C. § 1098a, it treated these sessions as an empty formality. Throughout the sessions, ED repeatedly refused to allow discussion of several relevant topics—including whether to repeal the 2016 Rule, and ED's position on the arbitration and class action provisions in that rule. *See, e.g.*, Connor Decl., Ex. B at 16; AR-F-663:4–8; AR-D-475:4–8.[2] ED does not dispute that its negotiator made the cited comments and shut down discussion of these topics, and it does not address

---

[1] ED's memorandum does not contest NYLAG's standing. NYLAG therefore rests on the argument set out in its opening brief, as well as the facts proffered in its supplemental statement of facts. ECF 68 at ¶¶ 53–65. NYLAG also brings to the Court's attention the Second Circuit's decision in *New York v. U.S. Department of Homeland Security*, No. 19-3591, 2020 WL 4457951, at *10–*11 (2d Cir. Aug. 4, 2020), which held that providers of legal and social services had standing based on similar injuries.

[2] In a footnote, ED "opposes Plaintiff's reliance" on the transcript of the November 13, 2017 proceedings. Defs.' Mem. (ECF 67) at 15 n.2. But "arguments which appear in footnotes are generally deemed to have been waived," *Global Reinsurance Corp. of Am. v. Century Indem. Co.*, No. 13 Civ. 06577 (LGS), 2015 WL 1782206, at *2 (S.D.N.Y. Apr. 15, 2015) (quoting *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 7, 2007)); *see also Fin. Guaranty Ins. Co. v. Putnam Advisory Co., LLC*, No. 12 Civ. 7372 (AT), 2020 WL 264146, at *2 (S.D.N.Y. Jan. 17, 2020) (collecting cases). Moreover, ED does not respond to NYLAG's argument as to the propriety of consideration of the November 13 transcript, stating only that it "is

these comments at all; it simply cites to ED's own description of the rulemaking proceedings in the NPRM, deeming the proceedings sufficient. Defs.' Mem. at 45. But the transcripts belie ED's self-serving description of those proceedings. And as with other procedural requirements, ED's compliance with the negotiated rulemaking requirements is a legal question, analyzed *de novo* and with no deference to the agency. *Cf. Yale New Haven Hosp. v. Azar*, No. 3:18-cv-1230(JCH), 2020 WL 2204197, at *4 (D. Conn. May 26, 2020) (citing *Abington Mem. Hosp. v. Burwell*, 216 F. Supp. 3d 110, 130 (D.D.C. 2016)) (compliance with notice-and-comment requirements is a question of law and court owes no deference to agency).

ED states that out-of-circuit dicta "suggests that there is no cause of action under the APA on this basis." Defs.' Mem. at 39 (citing *USA Grp. Loan Servs. v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996)). However, there is certainly a "cause of action under the APA" for failure to comply with a procedural requirement, 5 U.S.C. § 706(2)(D), and indeed courts have found ED's failure to comply with the negotiated rulemaking requirement justiciable and vacated ED action on that ground. *See, e.g.*, *Nat'l Educ. Ass'n v. DeVos*, 379 F. Supp. 3d 1001, 1032–33 (N.D. Cal. 2019) (vacating rule for failure to engage in negotiated rulemaking); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 97–101 (D.D.C. 2018) (finding rule invalid due to failure to undertake negotiated rulemaking). The fact that the Seventh Circuit expressed "doubt" before stating it "suppose[d] that a refusal to negotiate that really was in bad faith … might invalidate the rule eventually adopted by the agency," 82 F.3d at 715, does not show otherwise. And as this court and others have held, to

---

wholly without merit." Defs.' Mem. at 15 n. 2. "[I]t is well established that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Fed. Hous. Fin. Agency v. Merrill Lynch & Co.*, 903 F. Supp. 2d 274, 277 n.3 (S.D.N.Y. 2012) (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001)). The transcript falls into the category of "extra-record evidence" that may be considered "when the procedural validity of the agency's action remains in serious question." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)) (cleaned up).

comply with statutory public participation requirements, agencies must do more than pay lip ser-vice, but actually provide meaningful opportunities for such participation. *See, e.g.*, *Nat'l Black Media Coalition v. FCC*, 791 F.2d 1016, 1018 (2d Cir. 1986) (opportunity to comment under the APA must be meaningful); *Cal. Wilderness Coalition v. U.S. Dep't of Energy*, 631 F.3d 1072, 1086–87 (9th Cir. 2011) (agency failure to engage in "meaningful exchange of information" was inconsistent with statutory consultation requirement).

ED does not explain why the negotiated rulemaking requirement should be treated any differently. Thus, ED's failure to comply with its obligations to conduct a meaningful negotiated rulemaking by barring discussion of the decision whether to rescind the 2016 Rule, among other topics, is a basis for invalidating the 2019 Rule.

**B.  Vacatur of ED's delays of the 2016 Rule required a reopening of the rulemaking.**

ED misrepresents NYLAG's position as to the relevance of the agency's unlawful delays of the 2016 Rule. Those delays were vacated by court order in 2017. NYLAG does not argue that its "objections to these delays … form the basis of a challenge to the 2019 Regulations," as ED suggests. Defs.' Mem. at 9. Rather, NYLAG maintains that the changed circumstances resulting from the vacatur required additional opportunity for negotiated rulemaking and public comment. *See* Pl.'s Mem. at 14–16. ED does not dispute that both its negotiated rulemaking and its proposed rule relied on the assumption that the 2016 Rule would never go into effect, that the 2016 Rule in fact did go into effect, and that ED did not reopen the rulemaking. Nonetheless, ED purported to rely on its "experience" implementing the 2016 Rule in issuing the Final Rule. *See* AR-A-5, 62, 78, 109 (84 Fed. Reg. at 49,792, 49,849, 49,865, 49,896). ED erred in failing to allow members of the public to likewise weigh in on that experience. ED makes no attempt in its brief to address NYLAG's argument, supported by case law, that where an agency finds changed circumstances

relevant to a rulemaking, the public may not be deprived of the opportunity to comment on those changed circumstances.

### C. ED fails to demonstrate that the defensive statute of limitations was a logical outgrowth of the NPRM.

The 2019 Rule imposed a three-year statute of limitations for "defensive" borrower defense claims. 34 C.F.R. § 685.206(e)(6). As ED concedes, however, "the NPRM did not specifically contemplate a three-year statute of limitations for defensive claims." Defs.' Mem. at 35. To the contrary, the NPRM *explicitly* disclaimed consideration of *any* statute of limitations for defensive claims. *See* NPRM, AR-B-16, 19 (83 Fed. Reg. at 37,257, 37,260). ED asserts that the NPRM "'fairly apprise[d] interested persons' that the agency was considering imposing time limitations on defensive claims," Defs.' Mem. at 35, but it does not point to any language in the NPRM that did so. Instead, it cites language relating to the thirty days a borrower has to request a hearing in response to a wage garnishment notice. *Id.* (citing 83 Fed. Reg. at 37,242). This very specific deadline to responding to a notice in one kind of proceeding is not remotely related to a three-year limitation on a defense to repayment in *any* proceeding, measured from the borrower's departure from the institution that defrauded them. Because the three-year statute of limitations "finds no roots in the agency's proposal" and "interested parties would have had to divine the agency's unspoken thoughts," ED failed to provide proper notice. *Environmental Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (cleaned up).

## II. The 2019 Rule is arbitrary and capricious.

As explained in NYLAG's opening memorandum and the memoranda of *amici curiae*, the 2019 Rule takes a sledgehammer to both the ability of borrowers to obtain relief when they have been defrauded and to incentives for responsible behavior by predatory institutions. Because these changes were based on unsupported speculation, misrepresentations of the record, and illogical

reasoning or no reasoning at all, the Rule is arbitrary and capricious. ED's errors infect both the Rule as a whole and specific provisions.

### A. ED's reliance on false premises undercuts the entire 2019 Rule.

"An agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence." *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992). As NYLAG has explained, the entire 2019 Rule is based on two unsupported factual premises: "(1) that the availability of borrower defense discharges impacts student behavior at and before enrollment, and (2) that, at the claims stage, borrowers and unidentified third-party actors somehow game the system and act in bad-faith." Pl.'s Mem. at 18. ED's sole response is that these premises were not the "actual reasons" articulated by the agency. Defs.' Mem. at 38. But the Rule itself shows otherwise.

ED explicitly and repeatedly justified its changes to the borrower defense regime by citing their anticipated impact on borrower behavior. *See, e.g.*, 2019 Rule, AR-A-13 (84 Fed. Reg. at 49,800) (noting goal of regulations was to "encourage[e] fiscal responsibility for students"); 29 (84 Fed. Reg. at 49,816) ("The Department seeks to establish a policy that encourages students to fulfill responsibilities they have in seeking information and evaluating the accuracy and validity of that information when making a decision as important as selecting an institution of higher education"); 30 (84 Fed. Reg. at 49,817) ("this change is appropriate so that borrowers shop wisely, take personal responsibility for seeking the best information available and make informed choices, and accept the benefits of student loans with the full understanding that they, generally, are legally obligated to repay those loans in full"); 35 (84 Fed. Reg. at 49,822) ("urg[ing] students to make informed consumer decisions"). And ED explicitly justified portions of the Rule as necessary to prevent bad faith conduct by borrowers and third parties. *See, e.g.*, Final Rule, AR-A-29–30 (84

Fed Reg. at 49,816–17) ("The Department does not wish to create a standard so low that students either alone, or with the help of unscrupulous third parties, attempt to induce statements that could then be misconstrued or used out of context to relieve borrowers who otherwise received an education from their repayment obligations."). ED cannot now claim the reasons provided in the Rule were not its "actual reasons." *See, e.g.*, *Ashland Oil, Inc. v. FTC*, 548 F.2d 977, 981 (D.C. Cir. 1976) (agency's litigation position cannot "bind the court to ignore the rationale on which the [agency]'s decision was actually based").

### B.  The changes to the claims process and standards were arbitrary and capricious.

ED's changes to the claims process and the standard to be applied in adjudicating applications for borrower defense relief also reflect arbitrary and capricious decisionmaking—beyond mere policy disagreement as ED suggests. The illogic of ED's approach is highlighted by its inconsistent and unsupported discussion of taxpayer harms. While minimizing the harm to taxpayers as a result of fraudulent and deceptive conduct by predatory institutions is a valid objective, ED still must show a rational connection between that objective and the policies it adopted. Here, ED claimed the supposed problem of "frivolous" claims necessitated tougher standards than those in the 2016 Rule in order to "protect taxpayers." 2019 Rule, AR-A-13–14 (84 Fed. Reg. at 49,800–01). As ED explained in the 2019 Rule, however, it was using "frivolous" and "unsubstantiated" interchangeably as a term of art "to describe claims provided by borrowers that allege misrepresentations that actually did not occur, that seek discharge from private rather than Federal loans, or that seek relief from a school not associated with any of the borrower's current underlying loans." 2019 Rule, AR-A-13 (84 Fed. Reg. at 49,800). In its opening memorandum, NYLAG pointed out that, while ED referenced 9,000 frivolous claims that it had *denied* under existing standards, the administrative record contained no evidence concerning these claims. Moreover,

even if it had, claims denied under *existing* standards "would not support *toughening* the standards for borrower defense claims; rather, it would suggest that the standard was adequately screening out claims that should be denied."  Pl.'s Mem. at 19. ED did not respond to this argument.

In addition, ED completely ignored both comments and the agency's own prior factual conclusions about how the process and standard contained in the 2016 Rule itself provided benefits to taxpayers, in the form of "spillover economic benefits." *See, e.g.*, Pl.'s Mem. at 20 (collecting comments); 2016 Rule, AR-K-126 (81 Fed. Reg. at 76,051). In a footnote in its memorandum, ED concedes that it did not address this point, claiming that the agency's "intention to reduce quanti-fiable costs to taxpayers in the first instance" made this factor "irrelevant." Defs.' Mem. at 17 n.4. But the fact that ED wanted to adopt a new rule did not allow it to ignore the benefits of the existing rule as "irrelevant." Moreover, ED cannot rely on this *post hoc* rationalization of why it did not address significant comments and the agency's own prior position in adopting the 2019 Rule. *See Long Island Head Start Child Dev. Servs. v. NLRB*, 460 F.3d 254, 259 (2d Cir. 2006) ("Even if this new rationale were more compelling than it seems to be, the NLRB may not advance this theory for the first time on judicial review." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)). ED's selective and unsubstantiated consideration of taxpayer interests infects all of its changes to the claims process.

### 1. Three-year limitations period on "defensive" claims

ED does not dispute that, in adopting a three-year limitations period for defensive claims, it did not address the agency's own prior explanation why defensive claims are treated differently from affirmative ones for limitations purposes, which had relied on the FTC's "Holder Rule," 16 C.F.R. part 433, "general State law principles," and "general principles relating to the defense of recoupment." *See* Pl.'s Mem. at 21 (quoting 2016 Rule, AR-K-31–32, 34 (81 Fed. Reg. at 75,956–

57, 59)). Nor does ED rebut NYLAG's point that a three-year statute of limitations for defensive claims effectively eliminates the ability of students to raise defensive claims *at all*. *See* Pl.'s Mem. at 21–22. ED's response that it considered another factor—the "fairness" to schools that may have defrauded students in order to obtain taxpayer money, Defs.' Mem. at 36–37—does not excuse its failure to consider *all* relevant factors and important aspects of the problem. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### 2.   Substantive and evidentiary standards for relief

NYLAG's opening brief identified "three components" of the 2019 Rule that "together make it nearly impossible to obtain borrower defense relief," by imposing insurmountable substantive *and* evidentiary standards: (1) a "more stringent definition of misrepresentation," 34 C.F.R. § 685.206(e)(3) (2019); (2) a "documentation" requirement, § 685.206(e)(8)(ii) (2019); and (3) a new independent "financial harm" requirement, § 685.206(e)(4),(8)(v). Pl.'s Mem. at 22–23. These components resulted from arbitrary and capricious decisionmaking.

ED suggests that NYLAG improperly "conflate[d]" the substantive and evidentiary standards. Defs.' Mem. at 21, 22 n.5. The two provisions, however, as well as the financial harm provision, work together, and the combination of narrowing the kinds of misconduct to qualify as "misrepresentation" *and* requiring written proof of such misconduct devastates borrowers' abilities to obtain relief. The documentation requirement demands that borrowers submit written proof that an institution made a statement with "knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth," 2019 Rule, AR-A-31 (84 Fed. Reg. at 49,818), something borrowers are particularly unlikely to be able to obtain. ED's rebuttal in the Rule—that students should be "smart consumers" and "obtain written representations" prior to enrolling in schools deemed eligible for federal loan participation by the federal government—ignores mountains of

evidence in comments and in the 2016 Rule which explain that doing so is not a realistic possibility. *See* Pl.'s Mem. at 23–25. ED does not respond to this argument.

ED dismisses all of NYLAG's references to the documentation requirement by claiming that NYLAG "does not challenge" the evidentiary standard contained in the 2019 Rule. Defs.' Mem. at at 21, 22 n.5. ED is incorrect. NYLAG's opening brief explicitly challenges the documentation requirement, Pl.'s Mem. at 24–25, as does the Complaint. *See, e.g.*, Compl. (ECF 1) at ¶ 12. ED's choice not to address the unsupported absurdities NYLAG identified in ED's rationale supporting that requirement, and the unacknowledged and unexplained inconsistencies with ED's prior statements, *see* Pl.'s Mem. at 24–25, speaks for itself.

Finally, ED seeks to evade its statement that the financial harm requirement was a "necessary deterrent to unsubstantiated claims" including borrowers' claims predicated upon "disappointments through their college experience and career, such as believing that they would have been better served by a different institution or major." 2019 Rule, AR-A-32. Unable to point to any evidence in the record supporting this justification, ED cites "common sense" for the proposition that the specific financial harm requirement it imposed will deter claims by "students who did *not* suffer financial harms." Defs.' Mem. at 23. But this theory was *not* ED's justification in the Rule and thus is not a basis to uphold the provision. *See Chenery*, 318 U.S. at 94.

As noted above, in the Final Rule, ED used the term "unsubstantiated claims" as a term of art, not to refer to claims by students who did not suffer financial harm, but to specific kinds of "frivolous" claims—those " provided by borrowers that allege misrepresentations that actually did not occur, that seek discharge from private rather than Federal loans, or that seek relief from a school not associated with any of the borrower's current underlying loans." 2019 Rule, AR-A-13 (84 Fed. Reg. at 49,800). ED has made no showing—in the record or as "common sense"—that

requiring students show that they experienced harm beyond that associated with student loan debt would deter students from filing these "frivolous" claims, and thus the financial harm requirement was arbitrary and capricious.

### 3.  Elimination of the group claims process

In defending its elimination of a process for group resolution of borrower defense claims, 34 C.F.R. § 685.222(f)–(h) (2016), ED again ignores the arguments raised in NYLAG's opening brief. Although ED notes that the agency "expressly rejected the assertion that it was too burden-some for an individual student" to complete a borrower defense application, Defs.' Br. at 26, that is beside the point. NYLAG's argument is that the reasoning ED gave in support of this "express rejection" was illogical and contrary to the record. Pl.'s Mem. at 25–27 (citing comments). ED does not even respond to this argument.

Furthermore, ED does not dispute that, in eliminating a group claims process, it purportedly relied on "evidence of outside actors attempting to personally gain from the bad acts of institu-tions," 2019 Rule, AR-A-11 (84 Fed. Reg. at 49,798), even though there is no such evidence in the record. *See* Pl.'s Mem. at 25. It simply claims that the agency's decision was not based "on the *sole conclusion*" that such actors existed and that the group resolution of administrative claims allowed them to "personally gain." Defs.' Mem. at 27 (emphasis added). But even if this were only one of several reasons for ED's actions, the Court may not presume the agency would have acted the same absent this unsupported basis, particularly in light of the agency's irrational explanation of the burdens that eliminating a group claims process would impose on students.

### 4.  Amount of relief

ED replaced a provision specifying how the agency would calculate relief, 34 C.F.R. § 685.222(i)(2)(i) (2016), with one that only identifies types of evidence that will be considered in

determining how much relief to award borrowers, 34 C.F.R. § 685.206(e)(12)(2019), without explaining how that evidence would be used in making such calculations or why it chose that evidence. *See* Pl.'s Mem. at 27. ED mistakenly asserts that NYLAG is challenging its "policy choice" to provide different borrowers different amounts of relief. Defs.' Mem. at 29. NYLAG's challenge, however, is to ED's arbitrary and capricious refusal to explain how it will determine how much relief should be granted to a particular borrower, or why it would no longer consider the cost of and the value of the education received—a consideration that it previously deemed critical. *See* 2016 Rule, 81 Fed. Reg. at 75,974–75, AR-K-49–50.

### C.  The rescission of conditions on the use of pre-dispute arbitration agreements and class action waivers was arbitrary and capricious.

In defending its rescission of conditions on the use of pre-dispute arbitration agreements and class action waivers, 34 C.F.R. § 685.300(e)–(f) (2016), ED continues to rely on a promotional pamphlet from the ABA's affinity group for arbitrators discussing the benefits of commercial arbitration and an article criticizing class action lawyers in mass tort disputes. Defs.' Mem. at 30. ED does not address NYLAG's argument that it was inconsistent to rely on these publications while refusing to consider other evidence on the ground that other forms of consumer loans were insufficiently analogous to student loans. *See* Pl.'s Mem. at 28 (citing 2019 Rule, AR-A-55 (84 Fed. Reg. at 49,842) (finding conclusions of report that examined "payday loans, car title loans, tax refund anticipations loans, and unsecured loans" insufficiently relevant)). While agencies may base their decisions on "reasonable extrapolations from some reliable evidence," *NRDC v. EPA*, 902 F.2d 962, 968 (D.C. Cir. 1990), ED's extrapolations met neither of those criteria here. ED does not explain, either in the 2019 Rule or in its memorandum, why extrapolating from these obviously disparate scenarios was appropriate, or how the pamphlet and article constitute "reliable

evidence." Nor did ED explain why it chose to rely on these sources, and not the extensive evidence submitted by student and consumer advocates, among others. *See, e.g.*, Pl.'s Mem. at 27 (collecting comments).

ED also does not meaningfully respond to NYLAG's argument that its 2016 and 2019 positions about these provisions are irreconcilable. First, ED does not address NYLAG's point that ED failed to acknowledge that its position that class actions benefit "lawyers and not wronged students" explicitly contradicts the position in the 2016 Rule. *See* Pl.'s Mem. at 28–29 (citing 2016 Rule, AR-K-101 (81 Fed. Reg. at 76,026)). The requirements of reasoned decisionmaking required ED to acknowledge and explain this reversal. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016). Second, responding to NYLAG's point that ED's reversal of position as to deterrent effects of class actions was based on unsupported speculation, ED simply states, without citing to any evidence in the record, that "it was reasonable" to "hypothesize" that factors other than class actions deterred bad behavior. Defs.' Mem. at 31. Even if ED's expertise may allow it to rely on "hypotheses" in limited contexts, ED does not have any such expertise as to the deterrent effect of class actions that would allow it to ground a reversal of policy on such speculation. *Cf. Horsehead Resource Development Co., Inc. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994) (collecting cases and finding an agency may not "rely[] on pure speculation"); *Detsel v. Sullivan*, 895 F.2d 58, 64 (2d Cir. 1990) ("we can hardly accept an agency's reliance on 'evidence' that is itself mere speculation").

### D.  ED's elimination of disclosure requirements was arbitrary and capricious.

In the 2019 Rule, ED eliminated two separate disclosure requirements: a "loan repayment" disclosure required when an institution's median borrower failed to make progress on paying off

their loans, 34 C.F.R. § 668.41(h) (2016), and a "financial protection" disclosure required when the school was in a financially vulnerable position, *id*. § 668.41(i) (2016).

ED does not respond to NYLAG's discussion of the agency's deficient reasoning as to the loan repayment requirement. *See* Pl.'s Br. at 31. As to the financial protection disclosures, ED misstates NYLAG's position as "an argument that, because the disclosures could potentially help students, they should be mandated." Defs.' Mem. at 32. In fact, NYLAG argues that, in attributing a minimal value to the disclosures, ED failed to address the contrary conclusion in the 2016 Rule, or extensive contrary comments in the record, as the agency was required to do prior to adopting its "policy choice," and that the reasoning ED did provide was internally inconsistent with the agency's own repeated emphasis on the need for students to be "informed consumers." *See* Pl.'s Mem. at 32. NYLAG also explained why ED's purported concern that disclosures were misleading was illogical and refuted by the agency's own prior statements. *Id.* at 31–32. ED's invocation of "discretion" and "regulatory objectives," Defs.' Mem. at 32, do not justify its illogical and unsupported treatment of both the benefits and harms of the disclosure requirements.

### E. ED's elimination of automatic closed school discharges and related disclosures was arbitrary and capricious.

Finally, ED has failed to demonstrate that its elimination of automatic closed school discharges, 34 C.F.R. § 685.214(c)(2)(ii) (2016), and the related disclosure requirement, *id*. § 668.14(b)(32) (2016), reflected reasoned decisionmaking. ED justified eliminating automatic discharges on the ground that the availability of automatic closed school discharges—three years after a school's closure—deters students from completing their education. 2019 Rule, AR-A-60 (84 Fed. Reg. at 49,847). There is *no* evidence to support this supposition. To the contrary, evidence in the record shows that *other* factors influence those decisions. *See* Pl.'s Mem. at 39 (citing comments). ED does not argue otherwise in its memorandum, and instead asserts without citation

that its unsubstantiated speculation as to such a deterrent effect was "reasonable." But ED's asser-tion of the reasonableness of its hypothesis does not convert illogical speculation into an adequate basis for a policy change.

The record not only fails to support ED's claimed "benefits" of eliminating automatic closed school discharges, it also does not support ED's cursory discussion of the harms of elimi-nating such discharges. NYLAG does not argue, as ED suggests, that ED failed to address the burden on student borrowers, Defs.' Mem. at 33, but rather that the agency's conclusion that the burden was not significant because students need only "complete the closed school discharge ap-plication form," 2019 Rule, AR-A-61 (84 Fed. Reg. at 49,848), was irrational, given the unacknowledged evidence in the record showing how burdensome such applications are. *See* Pl.'s Mem. at 33 (citing Legal Aid Cmty. Comments (29073) at 80). ED does not address its failure to consider this evidence.

Although eliminating the automatic discharge requirement *increased* the importance of in-forming students of the availability of the closed school discharge requirements, ED eliminated the requirement that closing schools provide students this information without acknowledging this obvious fact. ED did not respond to NYLAG's arguments as to the agency's inadequate justifica-tion for eliminating this requirement or the agency's failure to address the cumulative impacts of the two provisions. *See* Pl.'s Mem. at 33-34. As explained in NYLAG's opening memorandum, the elimination of the disclosure requirement was arbitrary and capricious.

### III.   Vacatur of the 2019 Rule is the appropriate remedy.

ED asks the Court, should it find "some aspect" of the 2019 Rule unlawful, to remand the rule to the agency without vacatur so that the agency could "address any concerns the Court may have." Defs.' Mem. at 41. As this Court has previously explained, only in "'rare' circumstances"

should a court "deviate from the general rule that vacatur is the appropriate remedy when 'an agency violates its obligations under the APA." *City Club of N.Y. v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860 (S.D.N.Y. 2017) (quoting *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014)). ED has not shown such rare circumstances exist here.

"To determine whether remand without vacatur is superior to vacatur, courts consider the 'seriousness of the action's deficiencies and the likely disruptive consequences of vacatur.'" *NRDC v. U.S. EPA*, No. 19 Civ. 5174 (DLC), 2020 WL 2769491, at *1 (S.D.N.Y. Apr. 15, 2020) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)). As to the first factor, the wide-ranging procedural and substantive flaws in the 2019 Rule are serious, and unlikely to be remedied on remand. Procedural violations like those identified by NYLAG are "fundamental flaw[s] that almost always require[] vacatur." *Allina Health*, 746 F.3d at 1110 (quotation omitted). And to the extent ED seeks to provide new reasons on remand to buttress the arbitrary and capricious reasons contained in the Rule, it cannot do so. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908–09 (2020). As to the second factor, there is no support for ED's assertion that vacatur of the 2019 Rule would cause massive disruption. Vacatur of the 2019 Rule would simply restore the 2016 Rule, a rule that was in place for nearly three years and continues to be in place as to loans disbursed prior to July 2020. Indeed, the outcome would be the same as when the *Bauer* court vacated ED's unlawful delays of the 2016 Rule.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment should be granted and the 2019 Rule should be vacated.

16

Dated: August 21, 2020                      Respectfully submitted,

                                            /s/ Adam R. Pulver
Eileen M. Connor                             Adam R. Pulver
Toby R. Merrill                              Adina H. Rosenbaum (*pro hac vice*)
Michael N. Turi                              PUBLIC CITIZEN LITIGATION GROUP
PROJECT ON PREDATORY STUDENT LENDING,        1600 20th Street NW
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL  Washington, DC 20009
122 Boylston Street                          (202) 588-7790
Jamaica Plain, MA 02130                      apulver@citizen.org
(617) 522-3003
tomerrill@law.harvard.edu

                    *Counsel for Plaintiff*